## TITLE SERVICES AGREEMENT

This Title Services Agreement ("Agreement") is entered into as of August 1ˢᵗ, 2006 by and among Genuine Title LLC, a Maryland corporation, located at 11155 Dolfield Blvd, Ste 100, Owings Mills MD 21117, ("Affiliate") and R&R Marketing, LLC , located at 807 Dominion Lane , Reisterstown MD, 21136 ("Service Provider").

### RECITALS

A. Service Provider is engaged in the business of providing real estate title insurance and related services (the "Business");

B. Affiliate is in the business of providing title and settlement services to customers throughout the United States in the states where it is duly qualified to do business and, if required, licensed by the applicable regulators to provide such services;

C. Affiliate desires to contract with Service Provider for the provision of title insurance, including search and examination functions in order to perform title insurance services; and

D. Service Provider is willing to perform such services

NOW, THEREFORE, in consideration of the foregoing and of the covenants contained herein the parties agree as follows:

### ARTICLES I- RESPONSIBILITIES OF SERVICE PROVIDER

1.01   *Duties of Service Provider.*   Subject to the applicable laws and regulations of the jurisdiction in which such services are performed, together with the service descriptions and standards that are or shall in the future be established by Affiliate, Service Provider shall:

(a)   Perform electronic data entry into Affiliate's operating system, including the keying of all information contained in written or verbal orders received from Service Provider's customers, and the scanning of any additional written documentation provided, including, but not limited to copies of existing title insurance policies or other evidence of prior title insurance, deeds and other instruments of conveyance, legal descriptions, agreements and reports that may be necessary to Affiliate in its provision of title insurance and settlement services

(b)   Provide review services for matters that Affiliate has searched, then examine and not as exceptions for voluntary or involuntary liens to title on all Preliminary Reports of Title and Commitments to Insure Title (collectively, "Preliminary Product"). Where and when requested by Affiliate, Service Provider shall contact lienholders and /or identify and locate their successors, further researching such liens for additional information in order to provide Affiliate data necessary for it modify or remove such matters form final policies of title insurance . Notwithstanding the service described in this Subsection 1.01(b), Service Provider understands and agrees that its

provision of this service in no way is intended to be or shall be authority for it to either examine or clear title matters that shall appear in Affiliate's Preliminary Product

(c) When necessary, obtain written evidence of payment in full, including all interest, penalties and additional charges, which will be required by a lienholder identified in the Preliminary Product or other creditor, in order to insure title and/or to comply with the instructions of the lender in a real estate transaction. Service Provider shall request and obtain current statements from lienholders and creditors, and shall be responsible to comply and scan all such information and electronically transfer such information to Affiliate's operating systems.

(d) Obtain, when appropriate and necessary, all letters of estoppel, certificates and other documentation, as required by management of the HOA, Condominium, or PUD, if the property that is the subject of the Preliminary Product identifies the property as a Condominium, PUD or otherwise subject to HOA fees and assessments.

(e) Assist Affiliate, as Affiliate may reasonable request or otherwise require to perform its duties hereunder.

(g) Promptly notify Affiliate of any judicial action or administrative proceedings pertaining to the services provided hereunder.

## ARTICLE II – RESPONSIBILITIES OF AFFILIATE

2.01    *Duties of Affiliate.*   Affiliate shall:

(a) Provide an initial search of the public record to Service Provider.

(b) Use only a properly licensed and qualified title insurer to underwrite title insurance pursuant to this Agreement.

(c) Perform title clearance work at the closing of the transaction

(d) Prepare closing documents, including HUD-1 documents, for each transaction that proceeds to closing.

(e) Promptly notify Service Provider of any judicial action or administrative proceeding pertaining to the services provided hereunder.

## ARTICLE III- COMPENSATION

3.01    *Compensation.*   Service Provider shall be compensated by Affiliate for its services under this Agreement as mutually agreed by the parties for transactions in connection with which Affiliate will issue its Preliminary Product and final policy of title insurance policy and shall be initially in accordance with the attached schedule.

3.02    *Payment.*   For each Preliminary Product that results in the issuance in a final policy of title insurance in connection with a real estate transaction directed to Service Provider by its

customer and for which Affiliate will be designated as the provider of title insurance for such transaction, affiliate shall make payment to Service Provider for the Administrative Services provided under the terms of this Agreement. Payment to Service Provider shall be made by the 20th day of the month following the closing and disbursement of the real estate transaction.

### ARTICLE IV-TERM AND TERMINATION

4.01   *Term.*   This Agreement shall be effective until terminated by either party of sixty (60) days written notice to the party.

4.02   *Termination of Cause.*   Either party shall have the right to terminate this Agreement immediately upon written notice in the event of the other party: (1) terminates or suspends its business; (2) becomes subject to any bankruptcy or insolvency proceeding under federal or state law; (3) becomes insolvent or subject to direct control of a trustee, receiver, or similar authority, or (40 materially breaches the terms of this Agreement. In addition, this Agreement may be terminated without prior notice to either party in the vent that the termination of the Agreement is required as a result of a judicial determination by a court of competent jurisdiction or an administrative finding, ruling or order of a government agency with the regulatory oversight over the affected party or parties.

4.03   *Continuing obligations upon termination.*   On Termination of this agreement for any reason payment of compensation due hereunder to Service Provider shall be terminated except for amounts already earned hereunder. If Affiliate is processing any orders for title insurance at the time of termination of this Agreement, Affiliate will complete any orders that were placed prior to the date of termination and in connection with each other so placed, Service Provider will not perform administrative services as set forth in Article I of this Agreement, but will be responsible for paying Affiliate for title insurance premiums and related title charges at the time of the closing of each other.

### ARTICLE V- MISCELLANEOUS

5.01   *Statutory and Regulatory Compliance.*   Servicer Provider acknowledges and agrees that Preliminary Product and final policies of title insurance may only be issued by Affiliate, and that Service Provider will not perform any function, undertake any duty, or make any representation to any third party which indicates or implies that Service Provider is a title insurance agency in states where it is not duly licensed by the applicable jurisdiction and appointed by a licensed title insurance underwriter. Specifically, and in accordance with the federal Real Estate Settlement Procedures Act of 1973 ("RESPA") (12 U.S.C. §§ 2601, et seq.), Service Provider acknowledges and agrees that Affiliate shall maintain sole responsibility for the performance of core title services in connection with all transactions under this Agreement in which Affiliate will issue Preliminary Product and final policies of title insurance, including title examination and evaluation for insurability, preparing Preliminary product and final policies of insurance and clearance of title objections. Accordingly, each settlement statement that is prepared for the purposes of closing a real estate transaction in which Service Provider has performed administrative services as set forth in Article I of this

Agreement, must indicate that Affiliate, and not Service Provider, is the party to be paid for all title insurance related charges, including tile insurance premiums, endorsement premiums, Commitment charges, and title searches and examination fees.

5.02    *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota applicable in the case of contracts made and to be performed in such state.

5.03    *Alternative Dispute Resolution.*  The parties elect to pursue non-binding mediation and, should non-binding mediation fail, binding arbitration to resolve any disputes or controversies under this Agreement including disputes or controversies related to or arising from this arbitration provision, its scope, enforceability, and any defenses to enforcement of this arbitration provision. Each party to such arbitration will bear its own expenses incurred during the arbitration of arbitrator's fee, attorney's fees, witness fees, and other expenses of presenting its case. Other arbitration costs, including fees for a record and transcript, will be borne equally by the parties. Any demand for arbitration shall be made to the American Arbitration Association, in accordance with its streamlined commercial rules, and shall be held in Minneapolis, Minnesota.

5.04    *Confidentiality.*  Neither party will disclose to any third party or otherwise use, except in connection with performing their respective duties and obligations hereunder, any confidential information relating to the other party's processes, products, methods, customers or clients, plans, equipment or trade secrets as well as confidential information resulting from the provision of services under this Agreement. Any information no available to the public shall be considered confidential for the purpose of this Agreement, but should any of this information be published or otherwise made available to the public by the owning party or by third parties without breach of this Agreement, the other party shall be free to sue such publicly available information, except to the extent that use of such information would be the unlicensed use of intellectual property rights of the other party.  Although the parties are in the business of providing and will provide to third parties services similar to those provided hereunder, each party agrees not to use o disclose in the course of providing services for others any information or materials obtained from the other party pursuant to this Agreement, whether confidential or not. This Subsection 5.04 will survive the termination of this Agreement for any reason for a period of five (5) years from the date of termination. In the event of violation of this provision, either party may initiate an action for injunctive relief in the appropriate courts of equity jurisdiction without the necessity of posting bond. Notwithstanding anything to the contrary above, it shall not be a breach of this Subsection 5.04 for the receiving party to disclose the confidential information of the disclosing party when, and to the extent that, such disclosure is required by law or applicable legal process, provided that the receiving party making such disclosure shall (i) give the disclosing party as much prior notice thereof as is reasonably practicable so that the disclosing party may seek such protective orders or other confidentially protection as it, in its sole discretion and at its sole expense, may elect; and (ii) reasonably cooperate with the disclosing party in protecting such confidential or proprietary nature of the confidential information that must be disclosed. In no event shall either party be liable to the

other for any indirect, special or consequential damages arising out of or in connection with the furnishing use, or improper disclosure or confidentially information.

5.05   *Confidentially of Customer Information.*   Each party shall maintain the confidentiality of customer information supplied by the other party to the full extent required under the provisions of the Gramm-Leach-Bailey Act, 15 U.S.C. §6801, et seq., including the regulations promulgated thereunder, and to the extent required under state and local laws and regulations.

5.06   *Intellectual Property.*   Each party specifically acknowledges that this Agreement does not confer upon either party any interest in or right to use or make reference to the name of the other party or any of its affiliate companies or any trademark, service mark or other intellectual property rights of such party as affiliates.

5.07   *Exclusivity.*   This Agreement shall be non-exclusive for each of Affiliate and Service Provider.

5.08   *Waiver and Extensions.*   No term or provision hereof shall be deemed waived and no performance shall be excused hereunder unless prior waiver or consent shall be given in a writing signed by the party against whom it is sought to be enforced. Any waiver of any default by any of the parties shall not constitute a waiver of the same or different default on a separate occasion.

5.09   *Costs and Attorneys' fees.*   If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

5.10   *Assignment.*   Neither this Agreement nor the rights, duties or obligations of either party hereunder may be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld, except that either party may assign this Agreement to an affiliate or subsidiary upon written notice to the other party.

5.11   *Binding Effect.*   This Agreement shall inure to the benefit of and be binding on and enforceable against the parties and their heirs, legal representatives, successors and approved assigns.

5.12   *Notice.*   All notices under this Agreement shall be in writing and may be delivered by registered or certified mail, return receipt requested, or by any means reasonably calculated to produce a receipt proving delivery and shall be addressed to the party's last known address.

5.13   *Severability.*   If any portion of this Agreement is held to be in valued or unenforceable, the remaining portion shall remain in full force and effect as if it has been signed with the invalid portion omitted.

5.14    *Entire Agreement and Modifications.*   This Agreement contains the entire Agreement of the parties and supersedes all prior representations and agreements, whether oral or written, other than those contained in this Agreement. It may be modified only in a writing signed by the party against whom the modification is sought to be enforced.

5.15    *Interpretations.*   Each party has had the opportunity for legal counsel to assist in the review or preparation of this Agreement. No rule of strict construction shall be applied in the interpretation of the provisions of this Agreement.

5.16    *Captions.*   The paragraph headings throughout this Agreement are for convenience and reference only and the words contained therein shall not affect in any way the interpretation, construction or meaning of this Agreement.

5.17    *Relationships of Parties: No Third Party Beneficiaries.*   Neither party shall be deemed to be the legal representative of the other. It is expressly understood that this agreement and the relationship between Affiliate and Service Provider hereby established does not constitute a partnership, joint venture, agency or contract of employment between them. By entering into this Agreement, the parties do not intend to create or vest any rights in any third parties to this Agreement.

5.18    *Counterparts.*   This Agreement may be executed in one or more counterparts and by a facsimile or digital image containing the signature of an authorized person, each of which shall be deemed and accepted as an original, and all of which together shall constitute a single instrument. Each party represents and warrants that the person executing on behalf of such party has been duly authorized to execute this Agreement.

## ARTICLE VI

6.1    R&R Marketing LLC  agrees to indemnify and hold harmless Genuine Title LLC ("Genuine") from and against any and all losses, claims, actions, suites, proceedings, damages, liabilities or expenses of whatsoever nature or kind, including reasonable attorney fees and investigation expenses incurred by the Genuine, arising out of (1) the breach by R&R to perform its services in accordance with this Agreement; (2) the breach by R&R of any covenant, condition, warranty or representation contained in this Agreement; (3)  R&R's failure or the failure of their directors, officers, employees, or agents to discharge their duties and obligations under, or observe and comply with the limitations on its authority contained in this Agreement; or (4) the negligence, willful misconduct or wanton misbehavior of R&R, its directors, officers, employees or agents.

6.2    Genuine agrees to indemnity and hold harmless R&R from and against any and all losses, claims, actions, suites, proceedings, damage, liabilities or expenses of whatsoever nature or kind, including reasonable attorney fees and investigation expenses incurred by R&R to which R&R may become subject by reason of (1) the performance by Genuine of services, if performed in accordance with the instructions of Genuine (2) the breach by Genuine of any covenant, condition, warranty, or representation contained in this Agreement; (3) Genuine failure or the failure of their

directors, officers, employees, or agents to discharge their duties and obligations under, or observe and comply with the limitations on its authority contained in this Agreement; or (4) the negligence, willful misconduct or wanton misbehavior of Genuine, its directors, officers, employees or agents.

*IN WITNESS WHEREOF*, this Agreement is executed on the date first set forth above.

**AFFILIATE:**

Genuine Title, LLC

By: _____

Name: Jay Zukerberg

Its: Pres

**SERVICE PROVIDER:**

R&R Marketing, LLC

By: _____

Name: Adam Mandelberg

Its: Partner

RRMG000021

## EXHIBIT A

### Fee Schedule

| Administrative Service | Fee per file |
| --- | --- |
| Electronic Data Entry | $ 25.00 |
| Title Exception Research | $ 50.00 |
| Obtain Payoff Information | $ 75.00 |
| HOA, Condominium and PUD Documents, Certificates and Assessments | $ 50.00 |
| All services | $200.00 |

RRMG000022

## TITLE SERVICES AGREEMENT

This Title Services Agreement ("Agreement") is entered into as of August 1st, 2010 by and among Genuine Title LLC, a Maryland corporation, located at 11155 Dolfield Blvd, Ste 100, Owings Mills MD 21117, ("Affiliate") and MARC LLC, located at 1A Vale Rd, Bel Air MD, 21014 ("Service Provider").

## RECITALS

A. Service Provider is engaged in the business of providing real estate title insurance and related services (the "Business");

B. Affiliate is in the business of providing title and settlement services to customers throughout the United States in the states where it is duly qualified to do business and, if required, licensed by the applicable regulators to provide such services;

C. Affiliate desires to contract with Service Provider for the provision of title insurance, including search and examination functions in order to perform title insurance services; and

D. Service Provider is willing to perform such services

NOW, THEREFORE, in consideration of the foregoing and of the covenants contained herein the parties agree as follows:

### ARTICLES I- RESPONSIBILITIES OF SERVICE PROVIDER

1.01 *Duties of Service Provider.* Subject to the applicable laws and regulations of the jurisdiction in which such services are performed, together with the service descriptions and standards that are or shall in the future be established by Affiliate, Service Provider shall:

(a) Perform electronic data entry into Affiliate's operating system, including the keying of all information contained in written or verbal orders received from Service Provider's customers, and the scanning of any additional written documentation provided, including, but not limited to copies of existing title insurance policies or other evidence of prior title insurance, deeds and other instruments of conveyance, legal descriptions, agreements and reports that may be necessary to Affiliate in its provision of title insurance and settlement services

(b) Provide review services for matters that Affiliate has searched, then examine and not as exceptions for voluntary or involuntary liens to title on all Preliminary Reports of Title and Commitments to Insure Title (collectively, "Preliminary Product"). Where and when requested by Affiliate, Service Provider shall contact lienholders and /or identify and locate their successors, further researching such liens for additional information in order to provide Affiliate data necessary for it modify or remove such matters form final policies of title insurance. Notwithstanding the service described in this Subsection 1.01(b), Service Provider understands and agrees that its

provision of this service in no way is intended to be or shall be authority for it to either examine or clear title matters that shall appear in Affiliate's Preliminary Product

(c) When necessary, obtain written evidence of payment in full, including all interest, penalties and additional charges, which will be required by a lienholder identified in the Preliminary Product or other creditor, in order to insure title and/or to comply with the instructions of the lender in a real estate transaction. Service Provider shall request and obtain current statements from lienholders and creditors, and shall be responsible to comply and scan all such information and electronically transfer such information to Affiliate's operating systems.

(d) Obtain, when appropriate and necessary, all letters of estoppel, certificates and other documentation, as required by management of the HOA, Condominium, or PUD, if the property that is the subject of the Preliminary Product identifies the property as a Condominium, PUD or otherwise subject to HOA fees and assessments.

(e) Assist Affiliate, as Affiliate may reasonable request or otherwise require to perform its duties hereunder.

(g) Promptly notify Affiliate of any judicial action or administrative proceedings pertaining to the services provided hereunder.

## ARTICLE II – RESPONSIBILITIES OF AFFILIATE

2.01 *Duties of Affiliate.* Affiliate shall:

(a) Provide an initial search of the public record to Service Provider.

(b) Use only a properly licensed and qualified title insurer to underwrite title insurance pursuant to this Agreement.

(c) Perform title clearance work at the closing of the transaction

(d) Prepare closing documents, including HUD-1 documents, for each transaction that proceeds to closing.

(e) Promptly notify Service Provider of any judicial action or administrative proceeding pertaining to the services provided hereunder.

## ARTICLE III- COMPENSATION

3.01 *Compensation.* Service Provider shall be compensated by Affiliate for its services under this Agreement as mutually agreed by the parties for transactions in connection with which Affiliate will issue its Preliminary Product and final policy of title insurance policy and shall be initially in accordance with the attached schedule.

3.02 *Payment.* For each Preliminary Product that results in the issuance in a final policy of title insurance in connection with a real estate transaction directed to Service Provider by its

customer and for which Affiliate will be designated as the provider of title insurance for such transaction, affiliate shall make payment to Service Provider for the Administrative Services provided under the terms of this Agreement. Payment to Service Provider shall be made by the 20th day of the month following the closing and disbursement of the real estate transaction.

### ARTICLE IV-TERM AND TERMINATION

4.01 *Term.* This Agreement shall be effective until terminated by either party of sixty (60) days written notice to the party.

4.02 *Termination of Cause.* Either party shall have the right to terminate this Agreement immediately upon written notice in the event of the other party: (1) terminates or suspends its business; (2) becomes subject to any bankruptcy or insolvency proceeding under federal or state law; (3) becomes insolvent or subject to direct control of a trustee, receiver, or similar authority, or (40 materially breaches the terms of this Agreement. In addition, this Agreement may be terminated without prior notice to either party in the vent that the termination of the Agreement is required as a result of a judicial determination by a court of competent jurisdiction or an administrative finding, ruling or order of a government agency with the regulatory oversight over the affected party or parties.

4.03 *Continuing obligations upon termination.* On Termination of this agreement for any reason payment of compensation due hereunder to Service Provider shall be terminated except for amounts already earned hereunder. If Affiliate is processing any orders for title insurance at the time of termination of this Agreement, Affiliate will complete any orders that were placed prior to the date of termination and in connection with each other so placed, Service Provider will not perform administrative services as set forth in Article I of this Agreement, but will be responsible for paying Affiliate for title insurance premiums and related title charges at the time of the closing of each other.

### ARTICLE V- MISCELLANEOUS

5.01 *Statutory and Regulatory Compliance.* Servicer Provider acknowledges and agrees that Preliminary Product and final policies of title insurance may only be issued by Affiliate, and that Service Provider will not perform any function, undertake any duty, or make any representation to any third party which indicates or implies that Service Provider is a title insurance agency in states where it is not duly licensed by the applicable jurisdiction and appointed by a licensed title insurance underwriter. Specifically, and in accordance with the federal Real Estate Settlement Procedures Act of 1973 ("RESPA") (12 U.S.C. §§ 2601, et seq.), Service Provider acknowledges and agrees that Affiliate shall maintain sole responsibility for the performance of core title services in connection with all transactions under this Agreement in which Affiliate will issue Preliminary Product and final policies of title insurance, including title examination and evaluation for insurability, preparing Preliminary product and final policies of insurance and clearance of title objections. Accordingly, each settlement statement that is prepared for the purposes of closing a real estate transaction in which Service Provider has performed administrative services as set forth in Article I of this

Agreement, must indicate that Affiliate, and not Service Provider, is the party to be paid for all title insurance related charges, including title insurance premiums, endorsement premiums, Commitment charges, and title searches and examination fees.

5.02    *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota applicable in the case of contracts made and to be performed in such state.

5.03    *Alternative Dispute Resolution.*  The parties elect to pursue non-binding mediation and, should non-binding mediation fail, binding arbitration to resolve any disputes or controversies under this Agreement including disputes or controversies related to or arising from this arbitration provision, its scope, enforceability, and any defenses to enforcement of this arbitration provision. Each party to such arbitration will bear its own expenses incurred during the arbitration of arbitrator's fee, attorney's fees, witness fees, and other expenses of presenting its case. Other arbitration costs, including fees for a record and transcript, will be borne equally by the parties. Any demand for arbitration shall be made to the American Arbitration Association, in accordance with its streamlined commercial rules, and shall be held in Minneapolis, Minnesota.

5.04    *Confidentiality.*  Neither party will disclose to any third party or otherwise use, except in connection with performing their respective duties and obligations hereunder, any confidential information relating to the other party's processes, products, methods, customers or clients, plans, equipment or trade secrets as well as confidential information resulting from the provision of services under this Agreement. Any information no available to the public shall be considered confidential for the purpose of this Agreement, but should any of this information be published or otherwise made available to the public by the owning party or by third parties without breach of this Agreement, the other party shall be free to sue such publicly available information, except to the extent that use of such information would be the unlicensed use of intellectual property rights of the other party. Although the parties are in the business of providing and will provide to third parties services similar to those provided hereunder, each party agrees not to use o disclose in the course of providing services for others any information or materials obtained from the other party pursuant to this Agreement, whether confidential or not. This Subsection 5.04 will survive the termination of this Agreement for any reason for a period of five (5) years from the date of termination. In the event of violation of this provision, either party may initiate an action for injunctive relief in the appropriate courts of equity jurisdiction without the necessity of posting bond. Notwithstanding anything to the contrary above, it shall not be a breach of this Subsection 5.04 for the receiving party to disclose the confidential information of the disclosing party when, and to the extent that, such disclosure is required by law or applicable legal process, provided that the receiving party making such disclosure shall (i) give the disclosing party as much prior notice thereof as is reasonably practicable so that the disclosing party may seek such protective orders or other confidentially protection as it, in its sole discretion and at its sole expense, may elect; and (ii) reasonably cooperate with the disclosing party in protecting such confidential or proprietary nature of the confidential information that must be disclosed. In no event shall either party be liable to the

other for any indirect, special or consequential damages arising out of or in connection with the furnishing use, or improper disclosure or confidentially information.

5.05    *Confidentially of Customer Information.*  Each party shall maintain the confidentiality of customer information supplied by the other party to the full extent required under the provisions of the Gramm-Leach-Bailey Act, 15 U.S.C. §6801, et seq., including the regulations promulgated thereunder, and to the extent required under state and local laws and regulations.

5.06    *Intellectual Property.*  Each party specifically acknowledges that this Agreement does not confer upon either party any interest in or right to use or make reference to the name of the other party or any of its affiliate companies or any trademark, service mark or other intellectual property rights of such party as affiliates.

5.07    *Exclusivity.*  This Agreement shall be non-exclusive for each of Affiliate and Service Provider.

5.08    *Waiver and Extensions.*  No term or provision hereof shall be deemed waived and no performance shall be excused hereunder unless prior waiver or consent shall be given in a writing signed by the party against whom it is sought to be enforced. Any waiver of any default by any of the parties shall not constitute a waiver of the same or different default on a separate occasion.

5.09    *Costs and Attorneys' fees.*  If any legal action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

5.10    *Assignment.*  Neither this Agreement nor the rights, duties or obligations of either party hereunder may be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld, except that either party may assign this Agreement to an affiliate or subsidiary upon written notice to the other party.

5.11    *Binding Effect.*  This Agreement shall inure to the benefit of and be binding on and enforceable against the parties and their heirs, legal representatives, successors and approved assigns.

5.12    *Notice.*  All notices under this Agreement shall be in writing and may be delivered by registered or certified mail, return receipt requested, or by any means reasonably calculated to produce a receipt proving delivery and shall be addressed to the party's last known address.

5.13    *Severability.*  If any portion of this Agreement is held to be in valued or unenforceable, the remaining portion shall remain in full force and effect as if it has been signed with the invalid portion omitted.

5.14    *Entire Agreement and Modifications.*  This Agreement contains the entire Agreement of the parties and supersedes all prior representations and agreements, whether oral or written, other than those contained in this Agreement. It may be modified only in a writing signed by the party against whom the modification is sought to be enforced.

5.15    *Interpretations.*  Each party has had the opportunity for legal counsel to assist in the review or preparation of this Agreement. No rule of strict construction shall be applied in the interpretation of the provisions of this Agreement.

5.16    *Captions.*  The paragraph headings throughout this Agreement are for convenience and reference only and the words contained therein shall not affect in any way the interpretation, construction or meaning of this Agreement.

5.17    *Relationships of Parties: No Third Party Beneficiaries.*  Neither party shall be deemed to be the legal representative of the other. It is expressly understood that this agreement and the relationship between Affiliate and Service Provider hereby established does not constitute a partnership, joint venture, agency or contract of employment between them. By entering into this Agreement, the parties do not intend to create or vest any rights in any third parties to this Agreement.

5.18    *Counterparts.*  This Agreement may be executed in one or more counterparts and by a facsimile or digital image containing the signature of an authorized person, each of which shall be deemed and accepted as an original, and all of which together shall constitute a single instrument. Each party represents and warrants that the person executing on behalf of such party has been duly authorized to execute this Agreement.

## ARTICLE VI

6.1     · MARC agrees to indemnify and hold harmless Genuine Title LLC ("Genuine") from and against any and all losses, claims, actions, suites, proceedings, damages, liabilities or expenses of whatsoever nature or kind, including reasonable attorney fees and investigation expenses incurred by the Genuine, arising out of (1) the breach by MARC to perform its services in accordance with this Agreement; (2) the breach by MARC of any covenant, condition, warranty or representation contained in this Agreement; (3) MARC's failure or the failure of their directors, officers, employees, or agents to discharge their duties and obligations under, or observe and comply with the limitations on its authority contained in this Agreement; or (4) the negligence, willful misconduct or wanton misbehavior of MARC, its directors, officers, employees or agents.

6.2     Genuine agrees to indemnity and hold harmless MARC from and against any and all losses, claims, actions, suites, proceedings, damage, liabilities or expenses of whatsoever nature or kind, including reasonable attorney fees and investigation expenses incurred by MARC to which MARC may become subject by reason of (1) the performance by Genuine of services, if performed in accordance with the instructions of Genuine (2) the breach by Genuine of any covenant, condition, warranty, or representation contained in this Agreement; (3) Genuine failure or the failure of their

directors, officers, employees, or agents to discharge their duties and obligations under, or observe and comply with the limitations on its authority contained in this Agreement; or (4) the negligence, willful misconduct or wanton misbehavior of Genuine, its directors, officers, employees or agents.

*IN WITNESS WHEREOF*, this Agreement is executed on the date first set forth above.

AFFILIATE:                                              SERVICE PROVIDER:

Genuine Title, LLC                                      MARC LLC.
By: _____                             By: _____
Name: Jay Zukerberg                                     Name: Angela Poblett
Its: Pres                                               Its: _____

MARC-000270

Pobletts 56

## EXHIBIT A

### Fee Schedule

| Administrative Service | Fee per file |
|---|---|
| Electronic Data Entry | $ 25.00 |
| Title Exception Research | $ 50.00 |
| Obtain Payoff Information | $ 75.00 |
| HOA, Condominium and PUD Documents, Certificates and Assessments | $ 50.00 |
| All services | $200.00 |