Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FRANK A. and SHELLY PALOMBARO, JR., *
et al.,
　　　　　　　　　　　　　　　　　　　　*
　　　Plaintiffs　　　　　　　　　　　　　Case No.
　　　　　　　　　　　　　　　　　　　*　1:15-CV-00792-SJD

　　　vs.　　　　　　　　　　　　　　　　*

EMERY FEDERAL CREDIT UNION,　　　　　*

　　　Defendant　　　　　　　　　　　　*

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

EDWARD J. FANGMAN, et al.,　　　　　　*

　　　Plaintiffs　　　　　　　　　　　　* Civil Action No.
　　　　　　　　　　　　　　　　　　　　　1:14-CV-0081-RDB
vs.　　　　　　　　　　　　　　　　　　*

GENUINE TITLE, LLC, et al.,　　　　　　*

　　　Defendants
*　　*　　*　　*　　*　　*　　*　　*　　*　　*
VIDEO DEPOSITION OF BRANDON GLICKSTEIN
Thursday, September 15, 2016
Towson, Maryland

Reported By: Laurie Baker
*　　*　　*　　*　　*
EVANS REPORTING SERVICE
The Munsey Building, Suite 705
Seven North Calvert Street
Baltimore, Maryland 21202

Page 59

1  **managers at Eagle?**

2  A   To my recollection, it would have been

3  marketing services.

4  **Q   Do you recall the amount of credit that**

5  **you were providing to them per deal?**

6  A   I can't recall specifically, but, as I

7  said before, the average was -- it was one to three,

8  and two would probably be the average.

9  **Q   And when you say one to three, you're**

10 **talking $300, one to $300, with $200 being the most**

11 **predominant?**

12 A   Correct.  Yes.

13 **Q   Using your nomenclature, they would have**

14 **been on the CAM model?**

15 A   Yes.

16 **Q   Did you also pay those people -- did Eagle**

17 **predate the CAM model?  Was there a time when you**

18 **were paying them money?**

19 A   So two questions.  I think that Eagle did

20 predate the CAM model.  There may have been some

21 Eagle people that received checks because I do

Page 60

1  believe that Eagle did predate the CAM model, but
2  I'm not positive.
3      Q    But are you able to say that the
4  relationships that you had at Eagle, for each
5  referral, there was either a marketing credit or
6  money paid to those individuals for their branch
7  sending people to Genuine Title?
8      A    Yes.
9      Q    I'll go through some of the branch
10 managers that I identified in the records and ask
11 you whether they were your person, or their branch
12 was your branch or not.
13          MR. KIEVAL:  Objection to form.
14     Q    Jim Kniest, was he a branch manager that
15 you dealt with at Eagle?
16     A    Yes.
17     Q    Is John Hauck a branch manager you dealt
18 with at Eagle?
19     A    Yes.
20     Q    Was Bret Springer a branch manager that
21 you dealt with at Eagle?

Page 61

```
 1      A    Yes.
 2      Q    Was John Klimcha a branch manager that you
 3   dealt with at Eagle?
 4      A    Yes.
 5      Q    Was Gary Klopp a branch manager that you
 6   dealt with at Eagle?
 7      A    No.
 8      Q    Was Adam Ellis a branch manager you dealt
 9   with at Eagle?
10      A    No.
11      Q    Was Angela Poblitz a branch manager you
12   dealt with at Eagle?
13      A    No.
14      Q    With respect to the referrals that were
15   received from Jim Kniest's branch of Eagle, was --
16   for each deal was a marketing credit -- or strike
17   that.
18           With respect to the deals that were
19   referred by Jim Kniest's branch, was there an
20   agreement in place whereby there would be either
21   money or marketing credits paid for each of those
```

Page 62

1   referrals?

2       A    Yes.  Can I clarify that?  That there was
3   an understanding, there was not a formal --

4       Q    Written agreement?

5       A    Right.

6       Q    But for those deals, they agreed to refer
7   it, and you did pay them either money or marketing
8   credits, correct?

9       A    Correct.

10      Q    John Klimcha, with respect to his branch,
11  was there an understanding in place whereby they
12  would send borrowers, Eagle borrowers to you or to
13  Genuine Title in exchange for either money or
14  marketing credits?

15      A    Yes.

16      Q    With respect to Bret Springer's branch,
17  was there an understanding that -- was there an
18  understanding in place that for every deal sent from
19  Bret Springer's office or branch that a referral fee
20  or marketing credits were paid?

21           MR. KIEVAL:  Objection to form.

Page 63

1     A    With Bret Springer's branch, now I cannot
2  clearly recall the individuals that we were working
3  with, that Genuine Title was working with while Bret
4  Springer was at Eagle, but I do recall that with
5  regard to Bret Springer's branch, the agreement
6  would be on an individual basis, individual loan
7  officer basis.  So --
8     **Q    Go ahead.**
9     A    Go ahead.
10    **Q    Did those individual loan officers receive**
11 **either marketing credits or money for each referral?**
12         MR. KIEVAL:  Objection to form.
13    A    They likely would have.  And I say likely
14 because I cannot recall.  It's easy for me to recall
15 a manager.  I cannot recall who within the branch we
16 would have been working with at that time.
17    **Q    Do you recall any people at Bret**
18 **Springer's branch when he was at Eagle who you can**
19 **identify as not receiving either money or marketing**
20 **credits for the referrals to Genuine Title?**
21    A    No.