**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **MARY EDMONDSON**, *et al.*, | * |
| | * |
|     **Plaintiffs**, | * |
| | * |
| v. | *   **Civil Case No. SAG-16-3938** |
| | * |
| **EAGLE NATIONAL BANK**, *et al.*, | * |
| | * |
|     **Defendants.** | * |
| | * |

**\*\*\*\*\*\*\*\*\*\*\*\***

## MEMORANDUM OPINION

THIS MATTER concerns a Motion to Certify a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. ECF 57. In the Amended Complaint, Mary Edmondson, Chemene Clark, and Janet Clark (collectively, "Plaintiffs"),[1] seek to represent a class of borrowers that "currently have or had a federally related mortgage loan" serviced by Eagle National Bank or Eagle Nationwide Mortgage Company (collectively, with Eagle National Bancorp, Inc., ESSA Bank & Trust, and ESSA Bancorp, Inc., "Defendants"). ECF 55. Defendants opposed the Motion to Certify the class, ECF 63, and Plaintiffs filed a Reply, ECF 70. Additionally, Defendants filed a sur-reply. ECF 73.[2] A telephonic hearing was held on May 14, 2020. For the reasons that follow, Plaintiffs' Motion, ECF 57, will be GRANTED.

**I.   FACTUAL BACKGROUND**

The three named Plaintiffs seek to represent a class of borrowers that (1) serviced a loan with one of the Defendants, and (2) received title and settlement services in connection with the

---

[1] Janet Clark has withdrawn as a putative class representative due to ongoing health issues. *See* ECF 63 at 1 n.1.

[2] Based on the new arguments raised in Plaintiffs' Reply, ECF 70, Defendants' Motion for leave to file a sur-reply, ECF 73, is GRANTED, and the corresponding attachments have been considered by the Court. *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605–06 (D. Md. 2003).

closing of the loan from Genuine Title, LLC. ECF 55 ¶ 74. Plaintiff Edmondson alleges that in 2010, she obtained a residential mortgage loan from Eagle Nationwide Mortgage Company ("Eagle Nationwide"), in order to refinance her home. *Id.* ¶ 61. Based on a referral from Eagle Nationwide, Edmondson paid Genuine Title for title and settlement services, and her loan settled on August 19, 2010. *Id.* ¶ 62. Similarly, in or about January, 2009, Plaintiffs Chemene and Janet Clark obtained a residential mortgage loan from Eagle Nationwide for the purpose of refinancing their home. *Id.* ¶ 67. The Clarks were, likewise, referred to Genuine Title, and their loan settled on January 30, 2009. *Id.* ¶ 68. Edmondson and the Clarks allege that Eagle Nationwide referred them to Genuine Title because of an illegal kickback scheme perpetrated by these and other entities. *Id.* ¶ 2. Specifically, Plaintiffs assert that a portion of the respective payments they made to Genuine Title was split with the Defendants, in violation of the Real Estate Settlement Procedures Act ("RESPA"). *Id.*

Plaintiffs provide further details about the alleged kickback scheme in their Amended Complaint. For instance, they allege that Brandon Glickstein — who previously worked for Genuine Title — formed two "sham" companies in order to facilitate the scheme. *Id.* ¶ 24 (referring to "Brandon Glickstein, Inc." and "Competitive Advantage Media Group, LLC" as sham companies). According to Plaintiffs, Brandon Glickstein, Inc., and Competitive Advantage served as conduits by which Genuine Title would pay Defendants in exchange for referring borrowers to Genuine Title. *Id.* ¶ 27. In addition to providing cash payments, Genuine Title would compensate Defendants with either free or heavily discounted marketing materials and services, in exchange for their consistent referrals. *E.g.*, *id.* ¶ 29.

Prior to the instant Amended Complaint, United States District Judge Richard D. Bennett granted Defendants' Motion to Dismiss this action. ECF 26; 2018 WL 582514 (D. Md. Jan. 29,

2018). Judge Bennett found that Plaintiffs' RESPA claim was barred by that law's one-year statute of limitations, and further concluded that equitable tolling could not salvage the claim. *Id.* at 17–18; 2018 WL 582514, at *8. However, the United States Court of Appeals for the Fourth Circuit reversed on appeal. *Edmondson v. Eagle National Bank*, 922 F.3d 535, 558 (4th Cir. 2019). Primarily, the Fourth Circuit found that Plaintiffs had sufficiently alleged that Defendants engaged in affirmative acts of concealment, and thus, that the one-year statute of limitations might be tolled based on a theory of fraudulent concealment. *Id.* at 551–58. The panel remanded for further proceedings, and Plaintiffs filed the instant Amended Complaint.

The parties have conducted class certification discovery. As part of this process, Plaintiffs deposed Gary Klopp, ECF 57-11, who managed one of Defendant Eagle Nationwide Mortgage Company's branches, and Jay Zuckerberg, ECF 57-3, Genuine Title's President.

## II.  LEGAL STANDARD

The "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Class actions are subject to Federal Rule of Civil Procedure 23(a), which requires that (1) the alleged class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representatives' claims are typical of the claims of the class; and (4) the representatives will fairly and adequately protect the interests of the class. The party seeking certification carries the burden of demonstrating that it has complied with Rule 23. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).

The four requirements of Rule 23(a) — numerosity, commonality, typicality, and adequate representation — limit the class claims to those fairly encompassed by the named plaintiff's

claims. *Dukes*, 564 U.S. at 349. Courts evaluating class certification "must rigorously apply the requirements of Rule 23." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998). Although the court's analysis must be "rigorous" and "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Ct. Retirement Plans and Trust Funds*, 568 U.S. 455, 465–66 (2013) (citations omitted). The merits may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Id.* at 466.

## III. ANALYSIS

### A. Standing

Before considering the Motion to Certify, the Court will first address the Article III standing of the lead Plaintiffs, which Defendants have challenged, ECF 63 at 11–16. "Standing" is a doctrine rooted in the traditional understanding of an Article III "case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing consists of three elements: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The burden is on the plaintiff to establish these elements. *Id.*

#### 1. Edmondson

Injury in fact, primarily at issue with respect to Edmondson, is the "first and foremost" of standing's three elements. *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Importantly, "[i]n a

4

class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiffs." *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017); *see also Baehr v. Creig Northrop Team, P.C.,* 953 F.3d 244, 252 (4th Cir. 2020) ("The strictures of Article III standing are no less important in the context of class actions.").

While Plaintiffs have undoubtedly alleged a particularized injury, Defendants contend that the alleged harm resulting from a violation of RESPA is insufficiently "concrete" to confer Article III standing. ECF 63 at 12. Indeed, after *Spokeo*, a plaintiff may not satisfy the strictures of Article III by alleging "a bare procedural violation, divorced from any concrete harm." 136 S. Ct. at 1549. Nevertheless, recent case law illustrates that Plaintiffs here have alleged more than a bare procedural violation.

Edmondson has not suffered concrete harm, according to Defendants, because she was not charged excessive fees for title and settlement services. ECF 63 at 11–14. Defendants' expert witness, William L. Yerman, opined that Genuine Title not only charged Edmondson an appropriate amount, but also that she paid fees "well below the market rate charged at that time by other title companies." ECF 63-37. Plaintiffs, for their part, vigorously contest the accuracy and reliability of Yerman's expert report. *See* ECF 70 at 4–8.

The Fourth Circuit addressed standing, in the context of RESPA, earlier this year in *Baehr v. Creig Northrop Team*, 953 F.3d 244 (4th Cir. 2020). The facts of *Baehr* are eerily similar to those confronted here. In that case, two homeowners alleged that Lakeview Title Company paid kickbacks to real estate agents at Creig Northrop, in exchange for the brokers referring borrowers to Lakeview for title and settlement services. *Id.* at 247. The homeowners alleged that the defendants had violated RESPA, and sought to represent a class of borrowers who were purportedly "victims" of the kickback scheme. *Id.* at 249–50. However, the defendants argued that

5

the plaintiffs lacked Article III standing, and the district court agreed. *Id.* at 251. Specifically, the district court concluded that the homeowners had not suffered "a concrete injury as necessary to establish injury-in-fact" because they were not *overcharged* for settlement services. *Id.*

The Fourth Circuit affirmed. Notably, in identifying the concrete harm that they allegedly had suffered, the *Baehr* plaintiffs did not argue that they had been overcharged for settlement services. *Id.* at 254. Rather, they relied on "the deprivation of impartial and fair competition between settlement services providers" as the basis of their injury. *Id.* at 253. The Fourth Circuit invoked the Supreme Court's recent decision in *Spokeo*, and explained that a statutory cause of action does not automatically satisfy Article III. *Id.* ("A statutory cause of action is not a replacement for concrete injury… a plaintiff suffers a concrete injury if she shows the harm stemming from the defendant's statutory violation is the type of harm Congress sought to prevent when it enacted the statute"). And, according to the panel, the harm that Congress aimed to alleviate with RESPA was not interference with the market for settlement services, but rather "the increased costs that 'tend' to result" from such interference. *Id.* at 254 (quoting 12 U.S.C. § 2601(b)(2)). Accordingly, "the deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA." *Id.*

Unlike the homeowners in *Baehr*, here, Plaintiffs have not alleged "a statutory violation divorced from any real world effect," *id.* (quoting *Dreher v. Experian Info. Sols.*, 856 F.3d 337, 346 (4th Cir. 2017). Edmondson not only *alleges* that she was overcharged for title and settlement services, but has also provided evidence in an effort to corroborate her contention. For instance, per Edmondson's HUD-1 documents, a different company charged her $175 for title and settlement services related to a 2009 home refinancing, ECF 70-8, while Genuine Title charged

$440 for identical services the following year, *see* ECF 57-27. In addition, whereas the *Baehr* plaintiffs "were satisfied" with their homebuying experience, and with the settlement services they had received, 953 F.3d at 249, Edmondson asserts that Defendants' services were materially impaired by the kickback arrangement. *See, e.g.*, ECF 70-9 (alleging that Eagle Nationwide branch manager Adam Mandelberg "did not have [her] best interest" in mind).

The Court expresses no view at this time as to whether Edmondson or any of the putative class members were overcharged for services rendered. Indeed, Defendants' expert concluded that, based on a sample of HUD-1 statements, Genuine Title charged Edmondson a fee that was below the market rate for comparable title and settlement services. On the other hand, Plaintiffs offered data from the Department of Housing and Urban Development, indicating that Edmondson's $440 charge was significantly above the average fee for comparable services in the state of Maryland. ECF 70 at 7–8, ECF 70-4 (referring to the mean and median amounts for title services by state). At this stage of the proceedings, Edmondson has proffered enough evidence about being overcharged — in conjunction with a purportedly diminished quality of service — to meet the requirements of Article III standing.[3]

**2. Chemene Clark**

Defendants contend that Plaintiff Chemene Clark lacks standing to pursue her claims, because she filed for Chapter 7 bankruptcy in 2012. ECF 63 at 15 (citing *Richman v. Garza*, 1997 WL 360644, at *1 (4th Cir. July 1, 1997)). In response, Plaintiffs have proposed the substitution of an entirely new class representative. *See* ECF 70 at 2–4. However, as both sides acknowledged

---

[3] As more factual development occurs, it may become clear that Plaintiffs were not overcharged for title and settlement services. Accordingly, Defendants are welcome to continue challenging Plaintiffs' Article III standing as this litigation proceeds, particularly at the summary judgment stage. *See Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (explaining that the elements of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation.").

at the hearing, since the Court has concluded that Edmondson has Article III standing, substitution of a class member is not required at this time.[4]

### B. Class Certification[5]

Plaintiffs have moved to certify a class under Rule 23(b)(3), in which "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). As a result, Rule 23(b)(3) class actions "must meet predominance and superiority requirements not imposed on other kinds of class actions." *Gunnells v. Healthplan Servcs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003). Importantly, "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions.'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods.*, 521 U.S. at 609). Thus, the Court will analyze predominance and commonality together. *See, e.g.*, *Romeo v. Antero Resources Corp.*, 2020 WL 1430468, at *8 (N.D. W. Va. Mar. 23, 2020) ("[T]he Court will consider commonality in its discussion of predominance").

1. **Rule 23(b)(3)**

Predominance of Common Questions

Defendants contend that common issues do not predominate in this matter, primarily because Plaintiffs' reliance on equitable tolling will require the Court to conduct "fact-intensive, individualized inquir[ies]." *See* ECF 63 at 23. In the appeal of Judge Bennett's Order, the Fourth

---

[4] Certainly, the Court would entertain a Motion to substitute a new class member if it becomes necessary at a later date.

[5] Defendants do not challenge Rule 23(a)'s numerosity requirement. In any event, Plaintiffs' counsel have identified 3,472 loans that fall within the proposed class definition. ECF 57-1 at 22.

Circuit articulated the proper standard that courts should employ when deciding whether to equitably toll a statute of limitations based on fraudulent concealment. *Edmondson*, 922 F.3d at 548. "A plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Id.* (quoting *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995)). On the merits, Defendants argue that equitable tolling should not apply here, because Plaintiffs would have, with reasonable diligence, uncovered the facts substantiating their claim long before they filed suit. Specifically, the underlying kickback scheme was the subject of two lawsuits and at least two joint enforcement actions by the Consumer Financial Protection Bureau ("CFPB") and by Maryland's Attorney General, all of which led to widely available media reports and other public information. ECF 63 at 20–21. Whether Plaintiffs have demonstrated their equitable tolling defense to statute of limitations is a question for another day. Pertinent here, however, the Court is not persuaded by Defendants' assertions that ultimate resolution of this question will require individualized inquiries, such that class certification is inappropriate.

Defendants rely considerably on *Thorn v. Jefferson-Pilot Ins. Co.*, 445 F.3d 311 (4th Cir. 2006), which, similarly, considered the extent to which common questions predominated in assessing the defense to a statute of limitations. In that case, Jefferson-Pilot Insurance Company had charged higher premiums to African-Americans in certain states, as compared with white policyholders receiving similar benefits. *Id.* at 315. A group of African-American policyholders filed a class action complaint, alleging that the company violated the civil rights statute, 42 U.S.C. § 1981. *Id.* When the plaintiffs moved to certify a class under Rule 23, Jefferson-Pilot argued that certification was inappropriate. Since individual members of the class could have had exposure to

information that would have given them actual or constructive notice of Jefferson-Pilot's "dual-rate practices," the argument goes, the district court would need to conduct countless hearings to evaluate whether each class member had such knowledge. *Id.* at 316. The district court denied class certification largely for this reason, and the Fourth Circuit affirmed on appeal.

The Fourth Circuit rejected each of the plaintiffs' arguments regarding questions that could be answered on a class-wide basis. For instance, the plaintiffs suggested that the "homogeneity of the class" would allow a court to answer whether members of the class were exposed to sufficient information so as to defeat their defense to the statute of limitations. *See id.* at 323. According to the panel, however, this contention was belied by the breadth of the purported class. *See id.* (stating the record revealed that the class included "1.4 million African-Americans of all ages and both sexes, who are spread out geographically over four states and temporally over 62 years"). As a result, there was no indication that these millions of individuals would have had exposure to the same sample of media reports and other information.

The *Thorn* Court contrasted that case with *In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004). In *Monumental*, a group of plaintiffs also alleged that insurance companies had maintained racially discriminatory dual-rate policies. *Id.* at 412 (accusing the defendants "of placing blacks in industrial policies offering the same benefits as do policies sold to whites, but at a higher premium"). Much like the defendants in *Thorn*, the insurance companies argued that individualized hearings would be necessary to determine whether each class member had exposure to media reporting, and thus, whether each person had constructive notice of facts giving rise to a civil rights claim. *Id.* at 421. The Court disagreed, and found that the issue was determinable on a class-wide basis, mainly because the defendants had not demonstrated that media coverage differed substantially throughout the country. *See id.* ("Had defendants provided evidence—or

even alleged—that media treatment of this issue was more prevalent in some regions of the country than in others, the district court's observation that individualized hearings are required… might be sustainable.").

The present case is much more akin to *Monumental* than it is to *Thorn*. Defendants argue that members of the putative class may have, or should have, encountered information in the public domain related to litigation and enforcement actions surrounding the underlying Genuine Title kickback scheme. Regardless of the answer to this question, the Court does not believe that individualized hearings will be necessary to reach a decision. Following the guidance supplied by the Fourth Circuit, this Court can assess, on a class-wide basis, whether the information and media reporting related to prior litigation and enforcement proceedings would have prompted a reasonable person to uncover the facts substantiating Plaintiffs' RESPA claims. *See Edmondson*, 922 F.3d at 555 (explaining that "the fraudulent concealment doctrine requires *reasonable* diligence"). This case does not involve nearly the same temporal or geographic reach that the Fourth Circuit addressed in *Thorn*. In contrast to a case spanning multiple states and 62 years of time, here, there is a comparatively modest ecosystem of media reporting about the Genuine Title litigation and enforcement actions. Assessing the fraudulent concealment defense to statute of limitations, and whether Plaintiffs were on notice about facts giving rise to a claim, can be answered on a class-wide basis.[6]

Defendants further argue that determining the applicability of RESPA in the first instance is also an individualized question, because of exceptions codified in the statute. ECF 63 at 31–32. By the terms of 12 U.S.C. § 2606(a), RESPA does not apply to federally related mortgage loans

---

[6] Certainly, the Court reserves the right to decertify the class action if later factual development reveals that individual questions predominate over common questions. *See Minter v. Wells Fargo Bank, N.A.*, 2013 WL 1795564, at *3 (D. Md. Apr. 26, 2013) ("When the Court certified the Tolling Class it noted it was possible that proving equitable tolling might become unmanageable and thus warrant the Court's exercise of discretion to decertify the class.").

involving the extension of credit "primarily for business, commercial, or agricultural purposes." While it is possible that some putative class members' loans will fall within a relevant exemption, the Court is not persuaded that this number will exceed a negligible percentage of loans encompassed by the class definition. For instance, based on Genuine Title's loan processing data, Plaintiffs have identified 3,472 loans that fall within their proposed class definition. *See* ECF 57-9. The vast majority of these loans are either VA refinance loans or FHA loans, both of which impose limitations that would render RESPA's exemptions inapplicable. *See, e.g.*, ECF 70-10 (describing restrictions for VA refinance loans).

Defendants suggest that a federal court denied class certification under "identical circumstances" in *Loughlin v. Amerisave Mortgage Corp.*, 2018 WL 1896409, at *24 (N.D. Ga. Feb. 7, 2018). ECF 63 at 33. While *Loughlin* does state that applying RESPA's statutory exemptions could require "loan-by-loan review," the Judge found that a number of other individualized questions defeated predominance under the circumstances of that case. For instance, the *Loughlin* plaintiffs did not dispute that damage calculation would involve personalized analysis about whether each class member had already received some form of reimbursement. *See id.* at *25 (explaining that some class members had received redress "via CFPB's distribution of redress funds paid by the Defendants.") Therefore, "Given the quantity and quality of individualized inquiries that [would] arise in this case," the Court found that the predominance requirement was not satisfied. *Id.*

Whereas it was undisputed in *Loughlin* that certain class members had received redress, which would necessarily *need* to be factored into any damage calculation in a personalized manner, here, by contrast, Defendants merely hypothesize, with no support, that some loans may fall within a RESPA exemption. Plaintiffs have proffered enough evidence at this stage to show that only a

miniscule amount of loans could fall outside of RESPA's statutory boundaries. Moreover, if it becomes necessary, the parties can discern which class members' loans fall within a RESPA exemption through the ordinary discovery process (with a survey, for example) without the need for court-sponsored individualized hearings. In any event, this issue regarding RESPA exemptions does not predominate over the numerous, imperative questions that are answerable on a class-wide basis.

As noted above, the question of whether Plaintiffs can establish their fraudulent concealment defense to the statute of limitations is a common question that predominates over individual questions. Nevertheless, Plaintiffs have identified several other common questions that are essential to resolving this litigation. Namely, Plaintiffs allege that the title and settlement services provided to all class members were tainted by an unlawful referral agreement between Defendants and Genuine Title. Indeed, Genuine Title's president, Jay Zuckerberg, conceded at deposition that Genuine Title had paid fees to mortgage originators for customer referrals. *See* ECF 57-3 at 26: 13–20 (answering "yes" to question about paying fees for referrals). Accordingly, determining whether an unlawful arrangement existed, and to what extent it caused harm to Defendants' customers, will resolve the central issue in the class's RESPA claims "in one stroke." *See Bond v. Marriott Int'l, Inc.*, 296 F.R.D. 403, 407 (D. Md. 2014).

Furthermore, answering this larger question about an unlawful kickback scheme, and potential violations of RESPA, is predicated on answering numerous factual questions that are common to the entire class's claims. For instance, according to Plaintiffs, the HUD-1 documents for all putative class members omit the amount of money that Genuine Title paid to the mortgage originators. Additionally, Plaintiffs allege that branch managers for Defendants signed and executed sham title service agreements, in furtherance of the scheme. These and other factual

questions are answerable on a class-wide basis, and will be relevant not only in assessing substantive RESPA liability, but also in determining the applicability of the fraudulent concealment defense to statute of limitations. Plaintiffs' claims rest on a theory of a common pattern or practice, *i.e.*, the same series of actions orchestrated by Defendants and Genuine Title over a period of several years, that violates RESPA and entitles the putative class to relief.

Superiority

Finally, the Court finds that the class action vehicle is "superior to other methods" of adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3). Based upon the common questions that predominate, as explained above, a class action is more efficient than allowing potentially thousands of individual claims arising from this purported kickback arrangement. Defendants' suggestion that statutory damages obviates the necessity of a class action is without merit. *See* ECF 63 at 26–27.

2. **Rule 23(a)**

Typicality

The "typicality" requirement in Rule 23 "goes to the heart of a representative parties' ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). For that reason, the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Id.* For example, the Fourth Circuit found that typicality was lacking in *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998). In that case, owners of Meineke Discount Muffler franchises sued the franchisor for breaching trademark agreements. *Id.* at 334. On appeal, the defendants argued that the class had been erroneously certified in district court. *Id.* The Fourth Circuit agreed, and found several deficiencies indicating a lack of "typicality." For instance,

according to the panel, the plaintiffs could not advance "a single collective breach of contract action" because class members had signed very different agreements with the franchisor. *Id.* at 340. The agreements not only varied "from year to year and from franchisee to franchisee," but also contained "materially different contract language." *See id.* The clauses in certain contracts, the Court explained, bolstered the plaintiffs' arguments, while clauses in other contracts undermined their claims entirely. *See id.* Here, by contrast, Defendants have not shown that the class representatives' mortgage agreements differ meaningfully from other class members' contracts. In any event, minor discrepancies in the arrangement between borrower and mortgagor will not significantly alter the Court's analysis regarding potential violations of RESPA. For example, Defendants refer to the fact that Edmondson's transaction consisted of refinancing, which may diverge from the transaction that other class members entered into with one of the Defendants. *See* ECF 63 at 31–32. However, for purposes of typicality, the kickback scheme described by Plaintiffs would be violative of RESPA (if proven), regardless of whether an individual class member had engaged in first-time financing or refinancing. The key element of Edmondson's claim — an arrangement to pay Defendants for customer referrals — is typical of the purported class members' claims.

<u>Adequate Representation</u>

Finally, Plaintiffs must illustrate that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Defendants invoke nonbinding case law in an attempt to show that Edmondson is an inadequate class representative. For example, Defendants argue that Edmondson has "displayed a fundamental lack of knowledge" about the case, because she did not know it was filed in federal court. ECF 63 at 30. A trivial mistake of this nature does not seriously cast doubt on Edmondson's interest in or competency to litigate this matter. *See Gunnells*, 348

F.3d at 430 (explaining that a plaintiff "need not have extensive knowledge of the facts of the case in order to be an adequate representative").

In *In re Goldchip Funding Co.*, 61 F.R.D. 592 (M.D. Pa. 1974), as cited by Defendants, a District Judge found that the plaintiffs were not adequate representatives. However, the Court primarily expressed concerns that neither plaintiff had attended any of the three hearings held throughout litigation. *Id.* at 595. By contrast, Defendants here merely claim that Edmondson and her attorneys have had "infrequent contact." ECF 63 at 30. However, the Court is not aware of any communication issues between Edmondson and counsel, let alone any issues that have undermined either Edmondson's or counsels' ability to litigate this case thus far. Indeed, the Court notes that Edmondson attended the telephonic hearing for this class certification Motion.

    **C.**    **Class Definition**

Finally, Defendants contend that if a class is certified, it should be for the time period of October 2009 to January 2011. ECF 63 at 34. However, several witnesses testified at deposition regarding an arrangement for kickbacks that started several years prior to 2009. For instance, Genuine Title's president, Jay Zuckerberg, testified that he had an agreement with Gary Klopp for referrals in as early as 2005. *See* ECF 76-1 at 32: 12–16. Gary Klopp, similarly, testified at deposition about receiving "$400 per loan" starting in 2006 and "from that point forward." *See* ECF 76-2 at 126:4 – 128:6.

On the other hand, Plaintiffs have not rebutted Defendants' contention that Eagle Nationwide terminated its employees, including Klopp, on January 31, 2011. Therefore, the Court amends the relevant dates in Plaintiffs' proposed class definition, and hereby certifies a class of the following individuals:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12

U.S.C. § 2602) from, brokered or originated by, Eagle National Bank or Eagle Nationwide Mortgage Company for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2007, and January 31, 2011. Exempted from this class is any person who, during the period of January 1, 2007 through January 31, 2011, was an employee, officer, member and/or agent of Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, ESSA Bank & Trust, Genuine Title LLC, Brandon Glickstein, Inc., and/or Competitive Advantage Media Group LLC.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Certify a class action, ECF 57, is GRANTED. Defendants' Motion for leave to file a sur-reply, ECF 73, is GRANTED. A separate Order follows.

Dated:  May 21, 2020

/s/
Stephanie A. Gallagher
United States District Judge
