```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF MARYLAND
 2
        MARY E. EDMONDSON,      )
 3      et al.,                 )
                                )
 4                 Plaintiffs, )
                                )
 5          vs.                 )    CIVIL NO.:  1:16-0398-SAG
                                )
 6      EAGLE NATIONAL BANK,    )
        et al.,                 )
 7                              )
             Defendants.        )
 8      _____)

 9                         May 15, 2020
                      Transcript of Proceedings
10                         Teleconference

11

        BEFORE:   The Honorable STEPHANIE A. GALLAGHER, Judge
12

13      For the Plaintiffs:

14      MICHAEL P. SMITH, Esquire
        MELISSA L. ENGLISH, Esquire
15      Smith, Gildea & Schmidt, LLC

16      TIMOTHY F. MALONEY, Esquire
        Joseph Greenwald & Laake, PA
17      ----------------------------------
        For the Defendants:
18
        BRIAN L. MOFFET, Esquire
19      MICHAEL BROWN, Esquire
        Miles & Stockbridge, PC
20
        RYAN T. BECKER, Esquire
21      Fox Rothschild, LLP

22      _____
                          Reported By:
23
                      Nadine M. Gazic, CCR, RMR
24               Federal Official Court Reporter
                  101 W. Lombard Street, 4th Floor
25                   Baltimore, Maryland 21201
```

**P R O C E E D I N G S**

**THE COURT:**  Good morning, everyone.  This is Judge Gallagher and I understand we have everyone on the line.

We are here today in the case of Mary Edmondson versus Eagle National Bank, case number SAG-16-3938.  Let me ask at the outset if everyone could put their phones on mute if you're not actively participating.  I think that would limit the amount of feedback we're hearing.  Okay, thank you.

Now if I could have the lawyer for the parties introduce themselves, starting with the Plaintiffs and tell us who is on the line for your side.

**MR. SMITH:**  Your Honor, it's Michael Smith and Tim Maloney and Melissa English, on behalf of the Plaintiffs.

**THE COURT:**  All right, and who do we have for the Defendants?

**MR. BECKER:**  Good morning, Your Honor.  Ryan Becker, with Brian Moffet and Michael Brown for all of the Defendants.

**THE COURT:**  Thank you.  And I once again would ask that people put their phones on mute.  I am hearing a little bit of feedback from somebody's phone.

Okay, for the hearing today, we will proceed by having argument from the Plaintiffs, then from the Defendants, and then again from the Plaintiffs in rebuttal.  What I am going to do is to reserve my questions until Counsel has finished speaking to avoid people from interrupting one

1    another during a phone hearing.  So I will allow Counsel to

2    finish their presentation and will reserve my questions for

3    the end.  So why don't we start from hearing from Plaintiffs'

4    counsel.

5           **MR. SMITH:**  Yes, Your Honor.  Michael Smith.  I'll

6    start for the Plaintiffs and then Tim Maloney will add on his

7    topics.

8           By way of background, Genuine Title was owned by Jay

9    Zukerberg.  He started the company in approximately 2005 and

10   at the beginning he had come from another title company,

11   Heavyweight Title and he started Genuine Title and he started

12   paying kickbacks as part of his business plan in order to

13   generate business.

14          By 2008, Jay Zukerberg admits that more than

15   50 percent of Genuine Title's business is supported by

16   kickbacks.  He identifies two types of targets for business,

17   big banks and at big banks he targets loan officers

18   specifically and at regional and smaller banks he targets

19   branch managers, because they're the ones who control where

20   the title services went.

21          Eagle is a regional bank and mortgage company during

22   the time that's at issue.  From 2007 to 2012 Genuine Title

23   paid kickbacks to Eagle through its branch managers.

24          There are two main people at Genuine Title who

25   generate business.  It's Jay Zukerberg and Brandon Glickstein.

```
 1        Jay throughout his time at Genuine Title and he's the owner of
 2        Genuine Title, was a money guy.  And by "money guy" I mean he
 3        paid cash or checks to the branch managers and/or loan
 4        officers in order to get the business.  Brandon Glickstein
 5        starts out as a money guy at Genuine Title, but then switches
 6        approximately in 2009 or 2010 he switches to doing marketing.
 7        And what he would do is have Genuine Title pay the brokers'
 8        bills for marketing via what he calls credits.  But what he
 9        would do is instead of paying somebody $200 per referral, he
10        would get Genuine Title to pay $200 to Competitive Advantage
11        Marketing for marketing materials that he was supplying to the
12        referred.  So in those cases they would be characterized in
13        our complaint as marketing credits, but what it was was it was
14        cash that was paid by Genuine Title to CAM to pay the bills of
15        the branch managers or the loan officers as the case may be.
16             During the time period that is the subject of this
17        case, kickbacks Jay Zukerberg testifies both at the Maryland
18        Insurance Administration and in a related case, Emery, that
19        kickbacks is a problem within the Maryland market and Jay
20        Zukerberg says this is what he had to do to compete.  He would
21        have preferred to compete by lowering prices, but kickbacks
22        are what it took with companies he was dealing with.  He
23        testified explicitly what he means by that is he would have
24        been happy to pass on these kickbacks onto the borrowers as
25        savings, but the branch managers at Eagle and other places
```

1   wanted the money for themselves.

2          During the period of time identified in the Class,

3   we have identified 3,472 loans through the information we have

4   obtained from the Genuine Title settlement database.  We

5   exported that to an Excel spreadsheet and we have been able to

6   identify these loans because these loans have settlement dates

7   in the database which based on our past experience makes them

8   likely to have closed.

9          With respect to these loans, one thing that is

10  telling is that a whopping 68 percent of these loans come from

11  Gary Klopp's branch at Eagle.  We know this because the

12  referring branches appealed in the Genuine Title database.

13         Jay Zukerberg tells us via affidavit that he started

14  paying Gary Klopp in 2005 or 2006 between $300 and $400 per

15  loan.  We have identified and had Mr. Zukerberg authenticate

16  $340,000 in checks to Gary Klopp during the applicable period.

17  Since then we've identified an additional $119,000 in checks.

18         With respect to other branches, 8 percent of the

19  loans, 8 percent of those 3,472 loans comes from Adam

20  Mandelberg's branch.  Adam Mandelberg has testified -- he has

21  been deposed.  Mr. Mandelberg took the Fifth when being asked

22  about taking kickbacks while at Eagle.  We know from Jay,

23  however, that Genuine Title was paying kickbacks throughout

24  Adam's time at Eagle at a minimum of $300 per referral.  How

25  it would work would be -- Jay Zukerberg has described how it

1    works on a monthly basis.  He would run the totals at the end

2    of each month or since the last payment, but it was generally

3    monthly.  He would cut the check the following month to the

4    LLC that had been set up to run the kickbacks through.

5          Some of the players -- other players, Jim Kniest who

6    was a branch manager at Eagle, got money in the beginning and

7    then marketing credits through Brandon Glickstein.  And

8    Brandon has testified to that in that the fact that kickbacks

9    were paid throughout Jim Kniest's time at Eagle on all of Jim

10   Kniest loans referred.

11         Klimchak was another branch that Brandon managed and

12   he also has testified that his branch received kickbacks for

13   each referral throughout his time at Eagle.  Jay Zukerberg

14   testifies and tells us that the branch managers set up the

15   LLCs to receive the kickbacks because they, quote, "did not

16   want it to look fishy."  End quote.  In fact, the names of the

17   LLCs that were chosen were either related to, quote,

18   "consulting companies or something that sounded like a normal

19   vendor for a title company."  In Mr. Klopp's case, he had

20   three LLCs that he ran through kickbacks from Genuine Title.

21   They are Carroll Abstracts, All County Settlements and

22   Columbian Network Associates.  Mr. Klopp was getting so much

23   money that he needed three LLCs to funnel this money through

24   and then he used -- he didn't use marketing materials, he used

25   this money to purchase live leads to generate business for

 1    Eagle National and Eagle Nationwide.  It is on this factual

 2    backdrop that we move for Class certification.  All

 3    individuals in the U.S. with regards on federally-related

 4    mortgage as defined under RESPA from brokers who were

 5    originated by Eagle Bank or Eagle Nationwide Mortgage for

 6    which Genuine Title provided a settlement service as

 7    identified in Section 1100 on the HUD-1 between January 1,

 8    2007, and December 31, 2011.  Exempted from this class is any

 9    person who during the period of January 1, 2007, to

10    December 31, 2011, was an employee, officer, member and/or

11    agent of the Defendants, Eagle National Bank, Eagle Nationwide

12    Mortgage, ESSA Bank and Trust, Genuine Title LLC, Brandon

13    Glickstein, Inc., and/or Competitive Advantage Media Group,

14    LLC.

15         With respect to ascertainability, the Rule 23

16    factors ascertainability has been identified as an additional

17    consideration.  We have the Genuine Title database with the

18    addresses, telephone numbers, et cetera.  The database tells

19    us what loans had settlement dates.  Eagle also has loan files

20    including HUD-1s to identify this class.

21         With respect to numerosity, Your Honor, there are

22    3,472 loans with settlement dates.  This Circuit has approved

23    cases with as little as 40 members.  Numerosity is satisfied.

24         With respect to commonality, and commonality does

25    not require all or even most issues to be common, but here,

1    we're talking about Mary Edmondson or frankly, Barry or

2    Harriet homeowner, the questions and the evidence are going to

3    be the same.

4            Jay Zukerberg will testify, did you pay a kickback

5    for every loan referred or sent by these Eagle branches,

6    Klopp, Mandelberg, et cetera?  And the answer will be yes.

7    How much did you pay for each loan between X and Y?  And it

8    will vary based upon the branch that's being discussed.  How

9    often would you pay for loans?  And he will testify, I would

10   tally up the settlements since the last kickback, normally

11   monthly, and cut them a check for the agreed-upon amount.

12           With respect to fraudulent concealment, these issues

13   are common as well.  When the CFPB and the Maryland Insurance

14   Administration were closing in on you, Mr. Zukerberg, did you

15   create and backdate sham title services agreement to try and

16   conceal the kickbacks from regulators?  The answer will be a

17   candid yes.  Didn't Mr. Klopp and Mr. Mandelberg sign these

18   backdated title services agreement?  And this is 76 percent of

19   the loans that Eagle has.  The answer will be yes.  These

20   folks did.  Did these Eagle folks form LLCs to receive

21   kickbacks to conceal the kickbacks so that it would not look

22   fishy?  His answer will be yes.  Did you pay those LLCs for

23   the referrals?  Yes.  Did you and Eagle choose not to put the

24   referral fees on the HUD-1s?  Yes.  Is that every HUD-1?  Yes.

25   Were the kickbacks disclosed in the good faith estimate?  His

1  answer will be no.  And is that true for all of the loans

2  referred by Eagle?  Yes.  Were barters ever told of the

3  referral fees?  He will say that they were not, and so on and

4  so on.  All the things that we have alleged for concealment

5  will be testified to on a Class-wide basis.

6         The same basic questions will be asked of Brandon

7  Glickstein, Gary Klopp and if Mr. Mandelberg doesn't take the

8  Fifth, Mr. Mandelberg and others.  The evidence will come in

9  on a class-wide basis because, Judge, frankly that is how the

10  witnesses actually remember it.  Unlike other cases, Jay

11  Zukerberg does not remember Mary Edmondson or Chemene Clark's

12  settlement or Harry or Harriet Homeowner, a member of the

13  punitive class.  What he does remember was they did the same

14  thing time and time again and it happened throughout the time

15  that these folks were at Eagle.

16         When you're getting 3,500 to 4,000 loans from one

17  institution and 68 percent from one person's branch, you

18  remember what that deal was.  And you remember that it

19  occurred all the time.

20         As for damages, this is common as well.  It is the

21  same formula for each set of borrowers.  The only thing that

22  would change is the amount based on what they've paid.  This

23  has never been an issue -- calculating damages has never been

24  an issue in the tens of thousands of borrowers that have been

25  helped throughout these RESPA actions that we have had.

 1            With respect to typicality, claims arise or defense

 2     arise from the same conduct and whether the same legal theory

 3     underlies the claim or defenses.  Here, they're all RESPA

 4     claims.  They're all for kickbacks.  They're out of each

 5     settlement and they all involve fraudulent concealment and

 6     specifically the testimony will be in bulk.  It will not be

 7     specific as to a specific person because that's not how the

 8     witnesses remember it.  They remember it from they did the

 9     same thing every time, all the time and the facts are Class

10     wide.

11            We'll talk about it more later, but the defense all

12     involves the jury's consideration of the same evidence that is

13     applicable to all the claims on the issue of fraudulent

14     concealment.  Uniformity in the way that it was concealed is

15     what the testimony will be.  The defense's proof of what was

16     available out there in the universe.  The arguments that they

17     made before the Fourth Circuit.  They all apply -- those

18     arguments apply to the reasonable residential borrower test as

19     set out in *Edmondson*.  And this uniformity in the way that

20     they concealed, uniformity in what was available in the

21     universe can all be weighed by the jury to determine whether

22     diligence required the reasonable residential borrower to find

23     such evidence.  And what that evidence would mean, even if

24     they found it.

25            It is an objective standard for the jury to

1      determine, does due diligence require a reasonable residential

2      borrower to search info that the defense relies on at or about

3      the time that it is available to be found.  In this case, that

4      evidence will be that -- the evidence that they point to isn't

5      even available on the internet until between five and

6      eight years, depending upon when you settle in our class after

7      your settlement.

8              Your Honor, as Judge Bennett said in *Fangman*, when

9      approving the class action certification of the class as to

10     West Town, this is all subject to class-wide proof.  And he

11     cited in part, a HUD regulation 12 CFR 1024 regarding the use

12     of pattern and practice to prove the broader scheme.

13             Mrs. Edmondson -- on the issue of typicality, Ms.

14     Edmondson's falls into the pattern and practice that Jay

15     Zukerberg testified to.  She settles on August the 10th, 2010

16     and the kickback check is issued for the Mandelberg branch

17     referral on September 2, 2010.

18             With respect to adequacy, the representative

19     plaintiffs have provided documents, answered discovery, sat

20     for their depos.  Ms. Edmondson drove up from North Carolina

21     for her depo.  She was scheduled to be on the phone now.  I

22     did not hear her announce, but I don't know whether that was

23     part of the process.  Ms. Clark would be here, but she's a

24     nurse and has been working countless hours in the hospital

25     through this pandemic.

1          With respect to the adequacy of counsel, counsel has

2    been approved as class counsel in a number of these RESPA

3    class action cases, and no Court has ever failed to determine

4    that we were at the very least, adequate.

5          With respect to Rule 23(b), common questions

6    predominate.  When going through the common amount issues I

7    went through this analysis.  It is effectively the same issues

8    as commonality, but with the added requirement that these

9    common issues predominate the individual ones.  Was there a

10   (audio distortion) source of conduct?  Yes.  Is the testimony

11   going to be on a class-wide basis?  Yes.  How are we going to

12   prove it?  Through the principals who were involved and the

13   documents that were found on a class-wide basis.  Was RESPA

14   violated in the same manner?  Yes.  Are the common issues the

15   heart of this matter?  And I would say yes, that's what the

16   predominance is all about.  We are going to be able to put on

17   one witness, one time who is going to testify to the scheme,

18   the fraudulent concealment in one fell swoop.  And the

19   violations were concealed in the same manner.

20         Superiority.  With respect to superiority, discovery

21   is the same.  The testimony is the same.  The issues are the

22   same.  The measures are the same and doing this up to 3,400

23   times as opposed to one time is what predominance and

24   superiority are all about.

25         Now with respect to the Defendant's arguments on the

 1        issue of predominance, they cite diligence, the first prong

 2        for fraudulent concealment.  I contend that these are actually

 3        common issues.  How it was concealed in the first place is the

 4        same in each instance.  And Jay Zukerberg and Brandon

 5        Glickstein are going to testify to that.  It was never put on

 6        HUD-1s, it was never put in GFEs.  The payments were always

 7        made through Sham LLCs and/or CAM and Marketing Creditor.  The

 8        borrowers were never told.  There was backdated title services

 9        agreements involved both as to Gary Klopp and Adam Mandelberg

10        accounting for 76 percent of this class.  The jury will

11        evaluate this evidence and determine whether a reasonable, due

12        diligent residential borrower would investigate.

13               With respect to the information that is available on

14        the internet that Defendants cite to, the information is the

15        same for all Plaintiffs.  It is uniform.  They're a Government

16        press release and the importance of it certainly we disagree

17        on, but the fact that there were Government for absolute

18        leases, the fact that there was a court case that somebody

19        went through Pacer.  The media is the media that they have

20        identified and can be found where they say that it can be

21        found many years after the entire class had settled its loans

22        and the jury evaluates their argument whether diligence

23        requires a reasonable residential borrower per the Court of

24        Appeals in *Edmondson* with a settlement that involved common

25        concealments as described above to scour the internet many

1    years after their settlement for info as to whether the bank

2    that did your loan was doing something wrong at the time of

3    your loan some five to eight years prior.  This issue is

4    common for the entire class and can be evaluated as such.  I

5    can't imagine jurors buying the argument that diligence

6    requires a reasonable residential borrower every day or once a

7    month for up to eight years to do a LexisNexis search as the

8    Defendant's counsel did to see whether there was any

9    wrongdoing involved with their bank and apply the reasonable

10   residential borrower's test.  But if they get past the Motion

11   for Summary Judgment by Plaintiffs on that issue, that would

12   be common proof for the jury to evaluate.

13           What the Defendants may be really saying here is

14   just maybe, maybe a borrower just happened to be reading the

15   Baltimore Sun or the Washington Post on Friday, January the

16   23, 2015 and read the entire paper.  And found on page A-12

17   and A-14 respectfully and saw that Wells Fargo and Chase had

18   settled with the CFPB.  There's nothing in that article about

19   Eagle or any of its employees or the article on Friday,

20   February the 5th, 2016 in the Baltimore Sun on the Wells Fargo

21   settlement with its borrowers where there's no mention of

22   Eagle or any of its employees, or the article on Thursday,

23   April the 30th, 2015 with Genuine Title's employees and other

24   mortgage brokers including Klopp and Mandelberg reaching an

25   agreement with the CFPB.  All these articles are buried in the

1    paper and none of them include Eagle.  This is a lot to do

2    about nothing.  87 percent, Your Honor, of the loans out of

3    3,472, 87 percent of the loans are outside the state of

4    Maryland.  94 percent of those loans are outside the state of

5    Virginia.  So an article in the Baltimore Sun or the

6    Washington Post would mean nothing to those folks.  All these

7    articles appear on a weekday.  The subscribers to the

8    Baltimore Sun, Maryland subscribers to the Baltimore Sun only

9    represent 2 percent of all Marylanders.  What that means out

10   of the Maryland loans, on average, if 2 percent subscribe to

11   the Baltimore Sun, nine borrowers would even have the

12   subscription to the Sun.  This is not attempting to find the

13   needle in the haystack.  This is the defendants trying to find

14   a needle in the fields where the hate is grown.  And guess

15   what?  There's likely no needle there.  None of these

16   borrowers were combing the papers for five to eight years to

17   find an article on page A-12 that does not mention their bank

18   and then figure out that their bank took a kickback five to

19   eight years prior.  87 percent of the loans are outside of

20   Maryland.  As the Court pointed out in -- the Court of Appeals

21   pointed out in *Edmondson*, notice of one wrong by Defendant

22   does not necessarily trigger a duty for potential Plaintiffs

23   to investigate other potential wrongs the Defendant might be

24   committing.  To say the proverbial needle predominates all the

25   common issues that I've gone over in this case is contrary to

 1     the idea of what predominance means, to be the strongest or

 2     main element.

 3            The Defendants' citations of *Thorn* is nothing like

 4     what is found in this case.  *Thorn* involved somebody trying to

 5     certify a class over I think it was 67 years from 1911 to

 6     1974, that a white-owned insurance company had been

 7     discriminating against African Americans or blacks.  And the

 8     evidence in that case was that there were churches that were

 9     preaching about this problem.  There were black-owned

10     insurance companies formed and part of their marketing was to

11     tell the African American community that they were being taken

12     advantage and it was a class of I think 1.4 million people

13     with respect to that.  That case was not on point with this

14     case.

15            The other argument that Defendants make is the

16     exemptions on RESPA loans create individualized issues and

17     those individualized issues predominate.  They are the

18     strongest or main element of this case.  Of the 3,472 Eagle

19     class loans, 1,385 are identified as VA refinanced loans,

20     commonly known as VAIRRL.  These loans may only refinance an

21     existing VA loan and a VA loan cannot be made for an

22     investment purpose.  It may only be made for primary

23     residential purposes and we cite the VA guidelines with

24     respect to that.

25            Cash out is available in very limited circumstances

1    and only to clear a lien against the property secured by VA

2    loans.  Because VA loans are limited to primarily residential

3    properties, any possibility of cash out for investment or

4    business purpose is excluded.  536 of those loans are FHA

5    loans and they have similar restrictions and we cite those to

6    more than 55 percent of the loans by definition and by

7    guidelines done by the VA and the FHA are precluded from

8    having the exempted purposes.  Applying those statistics that

9    we cite in our brief to the remaining loans, there's only

10   about 178 Eagle class loans that would be expected to have

11   cash out refinances.  The loan documents that the defendants

12   have would show which ones were cash out refinances and an

13   inquiry of that nature does not predominate the common issues

14   found in here.

15           Boils down further, Your Honor, the Defendant's

16   Uniform Residential loan application would provide additional

17   guidance as to the purposes of any cashout as we see in Ms.

18   Clark's HUD-1 -- or in her both HUD-1 and her application that

19   was paid off, consumer debt.

20           With respect to their argument with respect to the

21   time frame of the class, Jay Zukerberg testified in his

22   deposition that he had kickback agreements and paid Eagle

23   branch managers or employees such as Gary Klopp beginning in

24   2007 or as early as 2007.  The data from the Genuine Title's

25   processing software confirms this showing the 117 loans

```
 1    assigned and referred to Genuine Title by Eagle in 2007.
 2    There's no basis to amend the class definition at this point.
 3          Today is not about the merits.  The affidavits that
 4    they referred to is before we found more evidence and before
 5    Mr. Zukerberg testified in his deposition in 2016.  The
 6    Plaintiffs anticipate that Zukerberg will again confirm that
 7    there were kickbacks in exchange for referrals the entire time
 8    that these folks were at Eagle.
 9          Your Honor, frankly this is a textbook case for
10    class certification.  The common evidence is remarkable in
11    this case as I don't know if you read the opinion by Judge
12    Dlott or Judge Bennett, but they remarked on how much common
13    evidence they were able to uncover.  And the common facts here
14    make it clear that one case is obviously preferable to
15    managing up to 3,000 cases.
16          Mr. Maloney will talk about standing, but if you
17    have any questions for my portion of it, I'm happy to --
18          THE COURT:  Okay, and it probably does make sense
19    for me to ask you my questions now and then we'll hear from
20    Mr. Maloney on standing.  Let me start kind of where you left
21    off on the date issue.  You refer to Mr. Zukerberg admitting
22    to this scheme beginning as early as 2007.  In his deposition
23    at page 17, line 10 he says it was 2009.  Can you pinpoint for
24    me where this 2007 admission is located?
25          MR. SMITH:  I'll see if I can find that, Your Honor.
```

1    I don't have his deposition.  It's a little bit harder, I

2    don't have a trial notebook like I normally would.

3              THE COURT:  Can you provide it maybe by a brief

4    letter filing after the hearing if no one finds it for you as

5    we go on?

6              MR. SMITH:  Yes, absolutely.

7              THE COURT:  All right.  And then in Mr. Klopp's

8    deposition, are you arguing that he's saying kickbacks were

9    paid as early as 2006?  Some of that context seems to be

10   missing, which makes it a bit difficult to decipher.

11             MR. SMITH:  Your Honor, my recollection, I took Mr.

12   Klopp's deposition and my recollection is that the testimony

13   of either him or Jay Zukerberg was he actually began -- and

14   Mr. Klopp wasn't at Eagle at that time -- but he actually

15   began paying Mr. Klopp in 2005.

16             THE COURT:  Okay, all right.  And do you agree that

17   the scheme ended on January 31, 2011, when Eagle Nationwide

18   let go of all its employees?

19             MR. SMITH:  Your Honor, my understanding is that

20   they retained some of their branches and I think discovery

21   would be necessary with respect to the affidavit that they

22   filed, but, you know, they certainly claim that they did, but

23   my understanding is Eagle retained some branches and whether

24   those branches were ones that the loans came from or not I

25   think would require further discovery.

1    **THE COURT:**  Okay.  All right, turning to some of the

2    Rule 23(a) questions, do you agree that the predominance

3    requirement in Rule 23(b) is more stringent than the

4    traditional commonality questions in Rule 23(a)?

5          **MR. SMITH:**  Yes, Your Honor.

6          **THE COURT:**  Do you believe a separate analysis of

7    commonality is still required?

8          **MR. SMITH:**  Yes, commonality and predominance is

9    required and predominance is a stricter requirement than

10   commonality, yes, Your Honor.

11         **THE COURT:**  Okay.  And if the Court were to reach

12   the conclusion that certification is appropriate at this

13   point, do you agree that the Court would retain the authority

14   to decertify at a later date depending, again, on evidence

15   that might be developed through discovery?

16         **MR. SMITH:**  Yes, Your Honor.

17         **THE COURT:**  Okay.  You made some arguments with

18   respect to the *Thorn* case and with respect to the fact that in

19   your view the fraudulent concealment questions are largely

20   uniform amongst the people, but do you agree that it will be

21   necessary for the Court at some point to probe individual

22   class members, media consumption and exposure to information

23   in order to assess the diligence component of fraudulent

24   concealment?  Understanding your view that the concealment

25   part, the actions that were taken to conceal would be common

```
 1   amongst the class members.
 2            MR. SMITH:  Your Honor, I think with respect to
 3   satisfying the diligence requirement, that is, Your Honor, as
 4   set out in Edmondson, what a reasonably diligent residential
 5   borrower would be required to find.  I think that is common
 6   throughout the class and does not require an individual.  And
 7   letting the jury know what is common, which is, you know, if
 8   you did a LexisNexis search like an attorney does or defense
 9   counsel did in this case, this is what was out there on the
10   internet as of January the 23rd, 2015 or whatever date is
11   associated with that.  I think the jury did evaluate that on a
12   class live basis as to the reasonable diligence.  But with
13   respect to my proverbial needle in the hayfield analogy as to
14   actual notice, I think, you know, a lot of the items cited by
15   defense counsel are trade magazines or trade newspapers,
16   Mortgage Daily, Credit Union Times and stuff like that that
17   are not even available to consumers.  But, you know, if we're
18   going to chase the needle in the hayfield, and I would submit
19   that the defendants could have taken -- we have all the
20   addresses and telephone numbers and information on these
21   borrowers.  If they really thought that there was a punitive
22   class member out there that would have seen this stuff, there
23   could have been depositions taken to prove that this is not a
24   common issue, that nobody would have seen this stuff.  They
25   could have taken those depositions.  They chose to
```

1    strategically not.  I think it is highly, highly, highly

2    unlikely that anybody ever saw any of this information.  And

3    the diligence part can be done by common proof.  But if the

4    Court said, you know, hey, even though that is the remotest of

5    remote possibilities, we've got to ask each one of these folks

6    whether they saw any of this material, then it could be done

7    by questionnaire or we could design something.  And it may be

8    prudent to ask the jury in a common way even if they would

9    have seen this would it have meant anything on your own issue

10   of diligence.  Because the information never -- none of the

11   information that they cite cites Eagle, except for the Pacer

12   stuff and I can't imagine anybody signing up to subscribe to

13   search on Pacer.  So I don't know if that answers your

14   question, but I was trying to.

15              **THE COURT:**  It does, thank you.  Okay, I don't think

16   I have any more questions for you.  Before I hear from Mr.

17   Maloney, though, you raised a good point.  It does make sense

18   for me to put on the record whether is Ms. Edmondson on the

19   line?

20              **MS. EDMONDSON:**  Good morning, Your Honor.  Yes, I am

21   on the line.

22              **THE COURT:**  All right, good morning, Ms. Edmondson.

23   And Ms. Clark, do we have you on the line?

24              **MR. SMITH:**  She works at Johns Hopkins and I know

25   that --

 1          **THE COURT:**  Okay, you mentioned that.  I just wanted

 2    to make clear for the record who we had on the line as

 3    representative.

 4          All right, then Mr. Maloney, we're happy to hear

 5    from you on standing.

 6          **MR. MALONEY:**  I've now been unmuted, thank you, Your

 7    Honor.  I'll begin with what the approach should be for the

 8    Court on standing and we believe that the case law is quite

 9    clear that the Court should take the class certification

10    approach.  This was described in great detail by Judge Hazel

11    last October in the <u>Williams versus Potomac Family Dining</u>

12    case.  And he surveyed the case law on this and said that he

13    found that two other district courts in the Fourth Circuit

14    have adopted this approach.  It appears no other district

15    courts have adopted any other approach and this appears to be

16    the overwhelming approach in other circuits and other federal

17    courts.

18          In 2015 the Ninth Circuit did somewhat of a survey

19    in the *Melendres* case and they found that it was the

20    overwhelming approach adopted in most federal courts

21    throughout the United States.  We have found that it's been

22    adopted in the Second Circuit, the Third Circuit, the Fifth

23    Circuit, the Sixth Circuit, the Ninth, Tenth and Eleventh

24    Circuits.  We have found no circuit that has not adopted that

25    approach.

1          As Judge Hazel pointed out that under the class

2     certification approach, once the main plaintiff demonstrates

3     her individual standing to bring a claim, the standing inquiry

4     at that point is concluded and the Court then proceeds to

5     consider whether the Rule 23(a) prerequisites for class

6     certification have been met.  As the Tenth Circuit says, there

7     are practical reasons why you go in this direction.  Standing

8     is a threshold issue at this point only for the class

9     representatives and that at that point, the courts should

10    proceed to address the Rule 23(a) considerations about the

11    relationship between the class representative and the members

12    of the class.

13         As the District Court in West Virginia observed in

14    the *Hendrick* case in 2017, once the main litigants have

15    established standing, this conclusion does not automatically

16    establish that they meet the Rule 23 standards, but it does

17    shift the focus of the examination from the elements of

18    justiciability to the ability of the main plaintiff to fairly

19    and adequately protect the interests of the class under the

20    Rule 23 factors that Mr. Smith has just outlined and discussed

21    in detail.

22         With respect to the particular standing in this

23    case, I should note for the record that standing was not

24    raised initially in a 12(b)(6) or 12(b)(1) motion.  It was not

25    raised at any time during the lengthy appeal of this case in

```
 1      the Fourth Circuit and it was not raised until really the

 2      opposition to the Motion for Class Certification had been

 3      pending for some time.

 4              I'd like to begin on the standing issue by

 5      addressing Mary Edmondson's standing.  As the Court heard just

 6      a few moments ago, her loan was in August of 2010.  It is not

 7      in dispute that what Mr. Zukerberg did at the end of that

 8      month and in early September was he took off of each of the

 9      loans for the previous month, a sum we believe was equal to

10      approximately or more than $300.  He used that money to pay a

11      kickback.  He sent the kickback in the form of cash at that

12      point on September the 2nd.  The source of that fund was

13      line 1100, the settlement services.  What his practice was for

14      all of these was to bake in the 3 or $400 kickback into the

15      settlement services that appeared on line 1100 of the HUD.  He

16      then used those proceeds on a per loan basis each month to

17      provide the kickback which was in exchange for the referral.

18      There were no legitimate title services that were provided for

19      the amount of the kickback that was baked into the cost of the

20      settlement services.

21              The Defense has raised a report from Mr. Yerman that

22      suggests somehow that Ms. Edmondson paid below market rates.

23      We think that that actually -- that report actually shows the

24      opposite in terms of Ms. Edmondson and others which I'd like

25      to address now.
```

 1              First of all, we should point out that Mr. Yerman's

 2      report was incomplete.  His opinions and methods do not meet

 3      the requirements of Federal Rule 702.  And additionally, this

 4      should be subject to discovery cross-examination and other

 5      review and litigation that would occur with an expert opinion

 6      in the course of class certification litigation and not as

 7      being shoehorned into an opposition to class certification for

 8      the first time.  And the scheduling order that the Court has

 9      issued has provided for just that type of discovery.  I would

10      point out that Mr. Yerman did not attach HUD-1s to his report

11      and we did.  And what it showed was that Mr. Yerman had cherry

12      picked nine loans from really an undisclosed overall sample

13      presumably in the thousands or tens of thousands over his

14      30-year career.  How they were selected is unclear.  And then

15      when we look at the HUD-1s themselves, we find that a number

16      of those are not comparable in any way.  Only four of the nine

17      loans chosen for comparison list a fee for title examination.

18      And title examination is the only settlement service that was

19      listed on Ms. Edmondson's HUD-1.  Five of the HUD-1s -- the

20      other five HUD-1s that Mr. Yerman relies on do not list any

21      title examination at all.  They're not comparable and they

22      should not consider.  So we're now down from nine to four.

23              Additionally, of the cost to Ms. Edmondson, she is

24      charged an extraordinary amount for a title examination, $440

25      and I will explain now why that is extraordinary.  The first

1    two sample loans charged were $295 for a title examination,

2    but Ms. Edmondson paid $145 additional than that.  And that is

3    something that under her particular circumstances was

4    extraordinary in this case given her particular history and

5    given the limited need for title services that she had in this

6    particular case.

7            We also would point out that the same issues hold

8    true with respect to the Clark and Neil loans, and we believe

9    that Ms. Clark's abstract charge stands out three times higher

10   than what Mr. Yerman's market rates and Ms. Neil's abstract is

11   four times higher than the market rates.

12           We also in looking at the bigger picture show that

13   these charges are in an environment here when we look at the

14   HUD listings for mean, medium charges state by state, Maryland

15   is already extremely high and we believe we can show that is

16   because of the prevalent practice of kickbacks that we've

17   demonstrated in this and other cases.  But even when we look

18   at Maryland's high charges, Ms. Edmondson's $440 charge is

19   35 percent above the Maryland average, 70 percent above the

20   state median and close to the top 80 percent in fees, which is

21   extraordinarily high and we believe violative of the

22   reasonableness guidelines that show that are in 24 Code of

23   Federal Regulation 203.

24           So put simply, we believe any assertion that Ms.

25   Edmondson paid below market rates are belied by the evidence

 1    and it actually shows the opposite, that she paid much higher

 2    market rates here based upon the circumstances and based upon

 3    what happened here.

 4            I want to point out that particularly in Ms.

 5    Edmondson's case, this is extraordinarily true because her

 6    2010 refinance came only one year after a 2009 refinance.  So

 7    because it only required one year of a title search as opposed

 8    to a typical title search that may go back decades, and this

 9    was only a low cost refi for a condominium, the idea that that

10    kind of one-year title search after a 2009 refinance should

11    yield that kind of title examination is very strong evidence

12    in itself that she was excessively titled.  And then when we

13    couple that together with Mr. Zukerberg's admission that baked

14    into each one of these that the source of his funding for

15    kickbacks was these proceeds here and that as he said on

16    page 70 of his deposition that if he didn't have to do it he

17    would have willingly given the funds back or remitted them to

18    the borrowers, but he felt he had to do it to compete.  I

19    think we have strong, strong evidence of actual harm and

20    injury.  In fact, overwhelming evidence really and that we

21    compare this to the *Baehr* case recently issued by the Fourth

22    Circuit where the plaintiffs there didn't allege that they

23    had, in fact, any particular overcharging or that they paid

24    more.  Instead they made a nebulous claim that they were

25    denied the benefits of market competition, that they were not

1     prepared to quantify with any specific or concrete injuries.

2     So we believe that the standing evidence is strong and

3     particularized here.  We believe that Mr. Zukerberg's evidence

4     is strong evidence of this as well and we believe that in this

5     particular case, the pattern and practice was overwhelming

6     which was to take funds in every case and not just Ms.

7     Edmondson's, write off the line 1100 at the end of the month

8     and remit it as a kickback from the borrower.  The charge is

9     not for title services and to do it in exchange for a referral

10    in clear violation of RESPA.

11            I want to address the issues involving Chemene

12    Clark.  As the Court knows, the case was filed on behalf of

13    Chemene Clark and Janet Clark.  Janet Clark has now been

14    diagnosed with severe aphasia resulting from a stroke and

15    cannot testify.  And we do not believe she can any longer

16    fulfill the role of a class 23 representative.  And so she's

17    been withdrawn as a proposed class representative.

18            The Defense has moved to in their objection to class

19    certification, is now alleging that Chemene Clark lacks

20    standing because she went through a Chapter 7 bankruptcy in

21    2012, years before she was aware of any RESPA claim against

22    any of these particular defendants.  I want to point out that

23    this issue was never raised prior to the opposition to class

24    certification.  The defense was aware of this as recently as

25    January -- or as long ago as January the 10th, 2020.  Based

1    upon the Pacer receipt for her bankruptcy docket we had

2    interrogatories and initial disclosures where these issues

3    should have been raised, but the defense remained silent until

4    filing its opposition for class certification.

5         We want to tell the Court and we've said this in our

6    pleadings, that Ms. Clark was entitled to reopen her

7    bankruptcy estate so that she could continue to enjoy her

8    claim as a class representative.  And by doing that, she would

9    petition to apply the remaining $1,700 in bankruptcy setoffs

10   and request the bankruptcy trustee to abandon any claim for

11   the remaining value of the RESPA claims.  Once the defense

12   learned that Ms. Clark would do this and had retained

13   bankruptcy counsel for this purpose, they intervened and

14   separately and privately made an offer to the bankruptcy

15   trustee to settle Mrs. Clark's claim for more than the claim's

16   value.  And the trustee then moved for approval of the

17   settlement offer.  Ms. Clark has objected stating that the

18   offer is not a good faith settlement, but instead is being

19   made for the purpose of defeating her class action standing in

20   this case and an inexpensive way for the defense to attempt to

21   escape liability for the more than 3,400 RESPA claims in this

22   class.  So while that motion which is now pending and has not

23   been ruled on and as long as it is pending her standing is not

24   extinguished.

25         In the meantime, Mary Edmondson is more than capable

1    of representing the Eagle's class.  Additionally, we would

2    point out that the Fourth Circuit has a liberal policy in

3    favor of substitution of class representatives and that

4    district courts have routinely allowed the substitution of new

5    class representatives after the original representative has

6    been disqualified.  In view of the circumstances of this case,

7    particularly in view of the fact that Janet Clark now suffers

8    from aphasia and that we don't know what's going to happen

9    with Ms. Clark's motion before the trustee, should she be

10   disqualified, we would request the Court leave to put in a --

11   to substitute a new class member, Ms. Neil.  She meets all of

12   the qualifications to be a named plaintiff.  She's never filed

13   for bankruptcy.  Her claim is identical to all the other Eagle

14   members' claims and we would request that in the event that

15   Ms. Clark could no longer continue.

16          Your Honor, there are other things I can say about

17   Mr. Yerman, but at this point I'll wrap up the standing issue.

18   If the Court has any questions, I'll be happy to answer them.

19          **THE COURT:**  Okay, thank you.  That was very

20   comprehensive, so I just have a couple to make sure that I

21   understand your position.  So you are only raising Ms. Neil as

22   a substitute in the event that Ms. Clark does not prevail in

23   her appeal in the bankruptcy?

24          **MR. MALONEY:**  That's correct.  We'd like to proceed

25   with Ms. Clark, but if for some reason her motion and her

1    objection is not sustained and the bankruptcy proceedings

2    prevent her from proceeding, we would make a formal request to

3    the Court to substitute Ms. Neil.

4        **THE COURT:**  And in theory if Ms. Edmondson were

5    determined to have standing to pursue her claim though, you

6    would prefer to make sure you have two, but presumably we

7    could proceed simply with Ms. Edmondson if she were found to

8    have standing?

9        **MR. MALONEY:**  That's correct, Your Honor.  We could

10   proceed with just Ms. Edmondson, but things happen in life as

11   we saw from the other Ms. Clark and we certainly want to be in

12   a position to have at least two, and perhaps three.

13       **THE COURT:**  Okay.  All right, I think I understand

14   your position and I think I'm ready at this point to hear from

15   the Defendants.

16       **MR. BECKER:**  Good morning, Your Honor.  And may it

17   please the Court, let me just first start by giving a broad

18   intro to where we're going and then we'll get into the

19   details.  I think I'll start with standing even though Mr.

20   Smith admitted remarkably that there's no question that an

21   individual inquiry would have to be done related to the notice

22   issues, but I will get to that.

23           The bottom line is that Plaintiffs have not and

24   cannot meet their burden that a class can be certified here

25   for two reasons, though either one in and of itself is enough

1    to deny the motion.  First, neither of the two proposed class

2    representatives actually before the Court have standing,

3    Chemene Clark and Mary Edmondson.  And without standing,

4    individual standing, they cannot meet this constitutional

5    threshold requirement and their individual claim must fail

6    alongside the class claims.

7            Chemene Clark's claim does not belong to her.  It is

8    the property of the bankruptcy estate and therefore,

9    controlled by the estate.  Plaintiffs don't even dispute that.

10   The bankruptcy filing precludes her from pursuing that claim.

11           Mary Edmondson lacks standing because the

12   uncontroverted evidence of record before the Court shows that

13   she paid below market value for the title services she

14   complains of.  And under the Fourth Circuit's recent decision

15   in *Baehr*, this failure means Edmondson lacked the type of

16   concrete particularized harm required to proceed.  Plaintiffs'

17   improper eleventh-hour request to substitute in a brand new

18   class plaintiff identified just last week, not properly before

19   the Court.  Moreover, it's a remedy the Court has already

20   granted last December so that the Plaintiffs could add two

21   proposed class plaintiffs, which neither one of which are able

22   to serve the class representative, either of the Clarks.

23           But even if the Court could get past the

24   insurmountable standing hurdles shackling each of the proposed

25   class plaintiffs, the class still couldn't be certified

1    because the individualized issues related to the statute of

2    limitations which Mr. Smith admitted to in his argument, as

3    well as identification of class member issues that were raised

4    after *Baehr*, those overwhelm the common question such that

5    there is no way to get a class certified here.

6         There was a lot of publicly available information

7    relating to this exact supposed scheme out there and detailing

8    the very two brokers who worked with these proposed class

9    representatives.  And according to Plaintiffs, more than

10   three-quarters of the entire class that was out in the public

11   domain for years before the lawsuit was filed and class

12   members exposed to that information were either on actual or

13   inquiry notice of their claims which triggered their own

14   statute of limitations.  And the only way to determine that is

15   through individualized mini-trials to decide who knew what and

16   when.

17        Further, *Baehr* recently decided by the Fourth

18   Circuit makes clear that to pursue a civil RESPA claim, there

19   has to be an overcharge, proof that the title fees complained

20   of were unnecessarily increased and individualized issues

21   predominate as to who could even be in a RESPA class and how

22   the class can be identified.  Plaintiffs' theory is just that

23   a kickback equals an overcharge so that the class is simply

24   all borrowers from Genuine Title.  It never made sense in

25   light of the evidence in this case.  Indeed, as we point out

1    in our papers, the testimony of Genuine Title's president

2    rejected that, but now it definitely is not viable after

3    *Baehr*.  Plaintiffs have not proffered any way to identify on a

4    class-wide basis, who is in the class and actually had an

5    overcharge or their title services unnecessarily increased

6    because of a RESPA issue.  This isn't like a consumer false

7    labeling class where everybody paid the same thing for a jar

8    of falsely advertised tomato sauce.  Here everybody paid

9    different title fees and the only way to discern the

10    overcharge is to do an in-depth analysis of the title charges

11    and the Plaintiffs proffer no way to actually do that and

12    that's their burden, not ours.

13           Turning first to the individual standing issue and

14    let me start with Chemene Clark.  In light of the standing

15    arguments Defendants made in the opposition, they appear to

16    abandon Clark because that's what they did in their papers.

17    Today they seem to be hedging taking a little bit of a

18    different path.  But either way, the answer is still the same.

19           Janet Clark was originally proposed as a class

20    plaintiff in December, but then almost immediately withdrawn

21    by Plaintiffs because she had severe medical issues which they

22    recognized could not mean that she could serve as a class

23    representative.  That didn't just happen.  That's been that

24    way for a while.  So that's incorrect, which is what Mr.

25    Maloney said.  But now rather than offer any real defense of

1   the selection of Chemene Clark, they want to improperly sub in

2   Ms. Neil.  But focusing on Clark, they offer no legal argument

3   whatsoever as to why Clark has standing to pursue her claim in

4   light of the bankruptcy, nor could they because the law

5   Defendants' cited in the opposition brief which is page 15 and

6   16 is clear that since Clark filed for bankruptcy in 2012, any

7   claim she had in this case belonged to the bankruptcy estate

8   and not to her personally.  And this is true regardless of

9   whether Clark knew about that at the time she filed the

10  bankruptcy petition in 2012.  Clark filed her bankruptcy after

11  her loan closed and before she filed this case not listing the

12  claim as an asset.  And she got a discharge in 2013.  Now in

13  an exquisite confession that is the bankruptcy estate and not

14  Clark that has standing to pursue the claim, in late

15  March 2020 Clark filed a motion to reopen the bankruptcy

16  proceedings in order to schedule this claim.  Now the trustee

17  did not abandon the claim, nor was he required to, Plaintiff

18  seems to suggest, and instead moved the Bankruptcy Court for

19  the approval of a settlement that in his judgment is fair and

20  in the best interest of the creditors.  That motion is

21  properly before the Bankruptcy Court and its merits do not

22  matter here.  As such, Clark has no standing and not only

23  can't she serve as a class -- she can't serve as a class

24  representative, her claim must also be dismissed.

25          The Plaintiff's conclusionary statement that Mr.

1    Maloney just reiterated from their brief that while the motion

2    remains pending before the Bankruptcy Court is wrong as a

3    matter of law.  That conclusion when they put it in the brief

4    was unsupported by any legal citations to authority because

5    it's plainly contrary to the law that Defendants pointed out

6    in detail in our opposition.

7            The Plaintiffs now try to cast aspersions about the

8    nature of the settlement with the trustees, but the bottom

9    line is that Clark has no rights whatsoever to this claim.

10   It's the bankruptcy trustee, an attorney named Charles

11   Goldstein, who has the sole authority as the proper

12   representative of the estate to make all decisions related to

13   the claim.  That was the only person that Defendants could

14   discuss the claim with.  And this isn't an attempt to pick off

15   a class representative because Clark never had standing to

16   bring the claim in the first place.  He's not even a proper

17   party in the case.  And anything that happened as a result of

18   her own actions in filing the bankruptcy is not anything

19   Defendants did.

20           And finally, the notion that Defendants should have

21   informed Clark's own counsel of the fact that their own client

22   filed for bankruptcy by updating their discovery response is

23   just absurd on its face, Your Honor.  Defendants have no

24   obligation to provide discovery on matters equally available

25   to the Plaintiff or that are discoverable through a search of

1   public records or frankly, a conversation with their own

2   client which apparently never happened.  Plaintiffs are simply

3   scrambling to cover up their own failures to do a proper and

4   adequate investigation before filing a complaint on her

5   behalf.

6          With respect to Ms. Edmondson's standing, she lacks

7   standing because she paid below market rate for the title fees

8   at issue.  Now since the Defendant filed their opposition in

9   February, the Fourth Circuit decides in *Baehr vs. The Creig*

10  *Northrop Team* case and determined Defendants' position that an

11  unnecessary increase in title services fees is required to

12  pursue a claim into the law of this circuit.  The Fourth

13  Circuit analysis in *Baehr* provides the Court a roadmap to

14  confirm Edmondson has no standing.  Like here, *Baehr* was a

15  RESPA case where the Court was faced with allegations that

16  payment of marketing services in exchange for real estate

17  closing business referrals.  There the plaintiffs paid

18  discretionary title fees of $425.  The Court split out the

19  discretionary title fees from the rate filed title insurance

20  fees where there's not discretion.  The Court also referenced

21  that plaintiffs there paid, quote, "similar discretionary fees

22  of $520 for a prior home purchase."  *Baehr* explains that a

23  statutory violation divorced from any concrete particularized

24  harm that hurts the Plaintiff in a personal way is not enough

25  to give her standing.

1          So for civil liability under RESPA, the Plaintiff

2     must prove that there was an overcharge.  *Baehr* says, quote,

3     "recognizing that a violation of RESPA does not always result

4     in a type of harm that Congress sought to prevent is not to

5     say that kickbacks that do not cause overcharge are insulated

6     from liability under RESPA."  And the Court went on to explain

7     that the remedy in that situation is criminal penalties or

8     Government enforcement actions and the latter of which

9     actually occurred in this case.  The Court in *Baehr* held that

10    $425 paid in discretionary title fees was reasonable and they

11    said that they do not discern from *Baehr's* emphasis on the

12    payment for settlement services any harm other than the

13    Defendant's purported RESPA violation.  The Baehrs received

14    settlement services for which they paid a reasonable rate

15    regardless of whether that payment was thereafter repackaged

16    as a kickback.  The exact same thing can be said here.

17          So when the facts of this case and the record before

18    the Court are viewed through the lens of *Baehr*, the conclusion

19    should be the same here.  Edmondson lacks standing.  She paid

20    nearly an identical amount in discretionary title fees as did

21    *Baehr* -- as the Baehrs did.  $425 versus $440.  And the

22    conclusion that those fees were reasonable is supported by

23    three pieces of evidence submitted by Defendants.  By

24    contrast, Plaintiffs have offered no actual evidence to

25    dispute this.  There's the expert report first of Bill Yerman.

1    In November, Defendants served on Plaintiff the expert report

2    of Mr. Yerman who is a title services professional with

3    30 years of experience in this industry here and in Maryland

4    and nationwide.  Mr. Yerman analyzed the title fees that

5    Edmondson paid, and based on his 30 years of experience which

6    included running a title company headquartered in Baltimore at

7    the time this loan was made, concluded to a reasonable degree

8    of professional certainty that her title fees at issue were

9    well below the market rate charged at that time by other title

10   companies.  Yerman also concluded that based on his extensive

11   experience in the industry, Edmondson was not overcharged.

12   That is also consistent with the testimony of Jay Zukerberg

13   that we point out in Exhibits 38 and 39 of our opposition.  He

14   was deposed twice, two different times, each time testifying

15   that he did not change what he charged his customers based on

16   the existence of any kickbacks.  The notion that Mr. Maloney

17   and Mr. Smith said that a kickback was based into every

18   settlement fee is not supported by the record.  It's not there

19   because it's not true.  His charges were the same and then

20   what changed was how much Genuine Title would make on a given

21   loan if there was a kickback.  He specifically stated under

22   oath he was not passing on the kickbacks to the borrowers.  He

23   wasn't increasing their title fees.  He also added that JM

24   Title's rates were competitive with the other title companies

25   for those fees and they were not overpricing because of any

1     kickbacks.

2          The third piece of evidence confirming that Ms.

3     Edmondson lacks standing is what was in her good faith

4     estimate.  Prior to a loan closing, borrowers get a good faith

5     estimate of what the fees are going to be in connection with

6     closing of their loan.  Here Edmondson received a good faith

7     estimate of her total title charges, but the GFE did not come

8     from Genuine Title.  It was from another title company that

9     has never been accused of any wrongdoing.  So it offers an

10    additional data point on what a market rate was for the title

11    services on a loan like Edmondson's.  The GFE set the title

12    services there at $1,003.50.  So ultimately by using Genuine

13    Title, Edmondson actually paid less than what she would have

14    if she went with the title company chosen in the GFE.

15          So what Plaintiffs do is they resort to an attack on

16    Yerman's conclusion, but they don't offer any evidence of

17    their own to rebut them.  And the notion that there should

18    have been discovery with respect to the Yerman report as Mr.

19    Maloney raised, they had the Yerman report in the beginning of

20    November.  There was months of discovery still in the class

21    certification phase left to be done, but the Plaintiffs chose

22    to do nothing.  They never even deposed Yerman.  And their

23    attack on his conclusions are misguided for a number of

24    reasons.

25          First, his conclusions were based on his 30 years of

 1    experience. He's seen thousands and thousands of loans in his

 2    career, so he knows what title fees are reasonable.  The

 3    HUD-1s he selected were similar to Edmondson's transaction.

 4    It was a refinance deal from the same time, general time frame

 5    and geographic market as Edmondson's loan.  That's the

 6    universe he was looking at.  And that review of those HUD-1s

 7    simply confirmed his own conclusions that Edmondson's

 8    discretionary title fees were below market rates.

 9            Second, Plaintiff's desire to go HUD-1 by HUD-1 and

10    engage in an analysis of the specific types of fees paid to

11    parse out whether there was an overcharge, shows the type of

12    individualized inquiry that's needed here to determine who can

13    actually be in the class.  *Baehr* makes clear that increased

14    fees resulting from the alleged kickbacks are a prerequisite

15    to pursue recovery and they've not proffered any objectively

16    reasonable way to identify appropriate class members on that

17    basis, because their operating theory is that as long ago it

18    was Genuine Title, it must have been a kickback and it must

19    have been within the class.  But that theory is no longer

20    viable because as I said, it contradicts what Zukerberg

21    testified to, but it also is no longer viable after *Baehr*.

22    Edmondson herself is actually a prime example of that because

23    she had not one loan in the class period, but two loans.  Mr.

24    Maloney referenced her prior loan.  What he didn't say was she

25    paid $175 for title fees on that first loan.  That loan by

 1    their class definition is in this class.  So that shows surely

 2    there are other loans in this class where they concede there's

 3    no overcharge on the first loan, so there's no way to prove

 4    that there was an overcharge on a class-wide basis.

 5           Finally, their analysis as to the individual HUD-1

 6    title charges is also deeply flawed.  To rebut a Plaintiff --

 7    excuse me, to rebut Mr. Yerman's expert opinion which is

 8    relied on 30 years of experience, the Plaintiff also really --

 9    and Mr Maloney gave it away in his remarks.  He said we think,

10    we think the report is suspect.  The issue isn't what they

11    think, it's what they can prove.  And they have offered

12    nothing to prove that Mr. Yerman was incorrect.  The only

13    thing even approaching any authority offered is this supposed

14    March 2010 chart which they say is from HUD, which is a

15    two-page submission with no indication of where it's from, has

16    unexplained handwriting all over it and no context about what

17    the purpose of the chart was or how it was put together.  It's

18    hardly evidence of anything.  And let me tell you, we have

19    searched the internet far and wide.  We can't find this

20    anywhere.  There's a reason that courts require citations for

21    authority.  I have no idea where it's from or from what larger

22    continuum it might have been a part of, but I'd sure like to

23    see it.  But even if the Court were to lend any credence to

24    that study, if you can call it that, Defendants point out an

25    actual authoritative HUD study from June 2012 that we gave you

1    the entire study, Your Honor to review, and it shows that

2    reading the tea leaves on the reasons there are variations in

3    title charges is an impossible task and therefore, it cannot

4    just be assumed as Plaintiffs would like this Court to do that

5    higher fees in a particular transaction are the result of an

6    overcharge, especially in light of all the other evidence to

7    the contrary.  The bottom line is that Plaintiffs have nothing

8    to rebut Defendant's record of evidence that Edmondson charged

9    title fees were reasonable.

10          So with no overcharge to point to, the Plaintiffs

11   resort to trying to prove the particularized and concrete

12   injury *Baehr* requires a different way.  They rely on the

13   March 2000 affidavit that they drafted for Zukerberg, Your

14   Honor, but incredibly they still misrepresent what it says.

15   They claim it says a minimum of $300 of the title and

16   settlement services on Ms. Edmondson's loans were split and

17   kicked back.  Read the paragraph, Your Honor.  That's not what

18   it says.  All that paragraph says is that Zukerberg was simply

19   explaining how the kickbacks worked in a general way.  It

20   doesn't say anything about the customers or how they were

21   charged or that Edmondson's title fees were split.  This is

22   just confirmation that the harm Edmondson is complaining of is

23   simply a recitation of the RESPA statutory violation which

24   *Baehr* specifically rejects as a viable legal theory.

25          Further, the affidavit is not inconsistent with what

```
 1      Zukerberg's prior testimony was that customers were not
 2      overcharged.
 3              Second, Plaintiffs point to a contrived
 4      hypothetical.  They both, Mr. Smith and Maloney mentioned this
 5      idea that Zukerberg testified and again, this is a quote, he
 6      quote, "guesses" that if a broker asked him to give the
 7      borrower some money back instead of paying kickbacks, he would
 8      be happy to do it.  This is exactly the type of hypothetical
 9      conjured up injury that Baehr community rejects.  It's
10      literally a hypothetical.  But even if it were not a pure
11      hypothetical scenario, it doesn't shed any light on the only
12      questions that matter under Baehr.  Is there an overcharge?
13      Here the answer is no.  But if she's charged reasonable for
14      services she received, here the answer is yes.  That ends the
15      inquiry.
16              Finally, Plaintiffs point to that previous refinance
17      transaction, but as I stated before, the 2009 loan is part of
18      the same class and she paid less which is an admission that
19      that loan, there was no overcharge which leads to the same
20      individuality problem which abounds in this case.
21              Now, their answer for the fact that neither of these
22      class representatives that they've chosen lack standing is
23      they want to have this eleventh-hour substitution of a new
24      person that they identified for the first time last week in a
25      reply brief.  Their request isn't even properly before the
```

```
1    Court.  It's well settled that Plaintiffs can't do the reply
2    brief to add an entirely new party to the case.  There's no
3    motion for leave to amend, no amended complaint, and of course
4    no discovery whatsoever related to this individual.  The cases
5    that Plaintiffs rely on to claim that the liberal substitution
6    is permitted do not aid their cause.  They rely on cases where
7    the class had already been certified like Cox and Chisolm,
8    cases that did not even address the proposed class claim of
9    Article III standing, like Standard or International
10   Woodworkers, or cases where there was not a properly developed
11   record on the standing issues like International Woodworkers
12   in Mcadam.  Plaintiffs often seriously rely on Booth v. Prince
13   George's County of Maryland, but that case definitively proves
14   the very point Defendants make.  There, the Court held that
15   where a named plaintiff is dismissed for lack of standing and
16   the class has not been certified, the Class A claims must be
17   simultaneously dismissed because it's a constitutional issue.
18   In fact, there in Booth, the Court originally agreed to give
19   the plaintiffs 30 days to try to find a new class
20   representative to claim the standing problem, but the Court
21   issued a supplemental opinion saying that was wrong and they
22   relied on two Supreme Court cases.  One was Sosna v. Iowa
23   saying that they should have just dismissed the claims because
24   when a class plaintiff, proposed class plaintiff has no
25   standing, there's no class certified, there is no class to
```

 1    discuss.  The remedy is dismissal.

 2         This isn't even the first time Plaintiffs have

 3    substituted in new proposed class reps in order to address the

 4    prior standing concerns.  The Court permitted the plaintiffs

 5    to do that already in December allowing Chemene and Janet

 6    Clark to come into the case.  They've already had their chance

 7    to solve Edmondson's standing problems which contrary to what

 8    Mr. Maloney said that it wasn't raised until well after the

 9    class certification opposition, that's just simply not true.

10    Defendants raised Edmondson's lack of standing back in July

11    when we answered the complaint.  We specifically said she

12    lacks standing because she didn't pay marked rate -- she paid

13    below market rate for title services.  So their solution is

14    equally deficient.  These failures rest entirely with the

15    Plaintiffs.  So for these reasons, Your Honor, neither Ms.

16    Clark or Ms. Edmondson have standing to pursue their claims

17    and their individual claims along with the class claims that

18    they tried to represent, by law, must fail.

19         Turning now, Your Honor -- I'm going to move, Your

20    Honor, to the individualized issues, the Rule 23.  So let me

21    pause there and see if you want to break it up, ask questions

22    or if you'd like me to keep going or you'd like to ask

23    questions that are standing specific.

24         **THE COURT:**  That's fine, I'm happy to ask a few

25    standing questions now.  First, if I were to -- understanding

1  you disagree with this -- if I were to find that Ms. Edmondson

2  has standing to pursue her claims, you concede that all we

3  would need is one class representative for it to proceed

4  forward?

5      MR. BECKER:  Yes, recognizing we think Ms. Edmondson

6  has no standing, yes, Your Honor.  I would agree with that.

7      THE COURT:  And you talked something about the *Baehr*

8  case, but that case seems to be different because in that case

9  the homeowner had acknowledged and explicitly stated that she

10  was not overcharged.  Here there seems to be a factual dispute

11  between the parties as to whether there was an overcharge or

12  not.  As we heard from Mr. Maloney, the Plaintiffs are

13  claiming that they paid significantly more than what was

14  warranted and you have Mr. Yerman's expert testimony

15  suggesting otherwise.  Doesn't all of that kind of go to the

16  merits of the case rather than an initial standing issue in

17  class certification?

18      MR. BECKER:  No, Your Honor.  I think it has to be

19  decided now.  Number one, as Your Honor well knows, if the

20  class certification lacks standing, while the merits do not

21  matter and the Plaintiffs' likelihood of success on the merits

22  do not matter, there is often times some merits adjudications

23  that need to be made or considered in connection with class

24  certification.  *Baehr* also concluded that the title services

25  paid there were reasonable.  *Baehr*, if you look at the

1   opinion, *Baehr* actually concluded that the $440 paid was

2   reasonable, there was no overcharge.  So that absolutely is

3   applicable to this case.  So I don't think it's a little bit

4   different.

5          THE COURT:  Well, except the homeowner there was

6   acknowledging that the homeowner did not believe she had been

7   overcharged.  Here we have both an allegation of an overcharge

8   and a contention that the services that Ms. Edmondson received

9   were inadequate.  In *Baehr* they seem to say the services were

10  adequate, but we were not overcharged, but we should have been

11  allowed the ability to enjoy competition with respect to our

12  services.  So it seems to me to be a bit of a distinction on a

13  couple of points in terms of the precise allegations that the

14  Plaintiffs are making.

15         MR. BECKER:  But we're well past the allegations

16  point, Your Honor. We're at class cert now where they've got

17  to prove that they do have standing.  And that's a threshold

18  issue and they've offered no proof to show that there was an

19  overcharge.  That's the crux of the issue, right?  Defendants

20  have offered proof that there was no overcharge as I

21  explained, right?  The Yerman report.  The GFE.  Zukerberg's

22  own testimony.  To rebut that and this is their burden,

23  they've offered nothing.  So they can't just rely on

24  allegations and say this is what we think happened.  We have

25  actually evidence hearing proof that they can't rebut and they

1    haven't.

2              **THE COURT:**  Okay, all right.  I understand your

3    point.  Why don't you move on to the other issues.

4              **MR. BECKER:**  Happy to, Your Honor.  So moving on to

5    the fact that individualized issues relating to determine who

6    is actually in the class predominate and precludes class

7    certification here.

8              Repeatedly in Mr. Smith's argument he kept talking

9    about common questions, common questions, common questions.

10   But it doesn't matter what the common questions are.  What

11   matters according to the Supreme Court in *Dukes* is are common

12   answers possible on a class-wide basis?  And here the answer

13   is no.  The analysis of Plaintiffs misses I think both the

14   point of the commonality and the predominance inquiry, as well

15   as the key questions that must concern the Court here.

16             What the Court should be focused on here is how all

17   of the publicity evidence in the public record beginning in

18   2012, namely *Baehr*, what happened here, impact the statute of

19   limitations analysis for individual class members.  The impact

20   is significant.  There was ample information in the public

21   record laying out the details of what happened and putting

22   anyone in the class who saw the information, on notice that

23   they had a potential claim related to their mortgage loan.

24   Even putting aside the fact that lawsuits were kicking around

25   this court going all the way back to 2012 in the *Roach* case

```
 1    and then Fangman and a series of those cases that were going
 2    through the courts in 2013, '14, '15 which lays out all of the
 3    details about the scheme.  There were these Government
 4    enforcement actions that I alluded to earlier that resulted in
 5    numerous press releases, extensive coverage in local and
 6    national media outlets in 2015.  You had a first wave in
 7    January 2015.  We point to the specific articles in our brief,
 8    in our exhibits.  Those are exhibits that -- the press
 9    releases are 5 and 6.  The articles are 7 to 13.  These
10    articles, including ones in the Post and the Sun specifically
11    mention Genuine Title by name and made clear how this kickback
12    operation supposedly operated.  Then a few months later you've
13    got another wave in April, 2015 CFPB and the Maryland AG were
14    at it again issuing more press releases outlining new
15    enforcement actions against Genuine and the individual brokers
16    who worked directly with the two proposed class members here,
17    Adam Mandelberg and Gary Klopp, as well as Angela Pobletts,
18    another broker that is implicated in this case as well.  Those
19    press releases lay out in painstaking detail how the scheme
20    worked and how Klopp and Mandelberg were involved.  The press
21    releases were also covered by various local and national
22    outlets.  We put that in our brief as well.  In May there was
23    more press because the CFPB and Maryland Attorney General
24    announced proposed settlements with Genuine Title and
25    Mandelberg and Klopp and others, and those were also covered
```

1    by local and national media outlets.  We have a compendium of

2    those results at Exhibit 25.

3            So as Judge Bennett previously found, all of the

4    information about what happened here with Genuine Title and

5    these brokers and its precise contours were fully available by

6    mid-2015 at the absolute latest, more than 18 months before

7    the case was filed, in full view of any class members.

8            So with all the information out in the public for

9    years before it was filed, it begs the question of which class

10   members read, saw, or heard the news about Genuine and their

11   individual loan brokers and what they did in response to it.

12   That is the problem that prevents certification here.  Class

13   members who are on actual or inquiry notice about their claims

14   more than a year before their case was filed are barred by

15   RESPA's one-year statute of limitations, you can't be in the

16   class.  And the only way to make that determination is through

17   a class member by class member inquiry for a type of

18   individualized inquiry that the Fourth Circuit says precludes

19   certification.  I think the Plaintiffs misapprehend the issue

20   to be decided along with our arguments as to why the statute

21   of limitations issue precludes certification.  Because their

22   theory as laid out in their reply brief and expounded upon

23   today is that the only time that matters for purposes of class

24   certification is whether there was fraudulent concealment and

25   a lack of notice and diligence at the time of the loan

1    closing.  And our argument and the real issue before the Court

2    is not what happened when the loan closed, but what happened

3    in the subsequent years as word of the scheme was broadcast

4    for everyone in the world and the class to see.

5            Plaintiffs' view is that once there was an original

6    concealment, the inquiry is over.  But that's wrong as a

7    matter of law and that interpretation has staggering

8    consequences.  What Plaintiffs fail to understand is once

9    there has been a fraudulent concealment, the statute of

10   limitations inquiry isn't voided for all time.  The Fourth

11   Circuit in *Marlinton* which is Plaintiffs' favorite case, made

12   clear that the consequence of the concealment is that the

13   limitation period does not begin to run until the Plaintiff

14   discovers the fraud.

15           Another Fourth Circuit case relied on by Plaintiffs,

16   *GO Computer*, hammers this point home.  Fraudulent concealment

17   doesn't stop the clock, it just moves the clock starting it

18   from when the wrong was discovered rather than when it was

19   committed.

20           So where that leaves us is even assuming there was

21   fraudulent concealment at the time of the loan, the clock

22   would still start for each proposed class member when they

23   knew or should have known that they could have had a claim.

24   Information that could have been amply supplied by press

25   releases and the intended news articles the Defendants have

 1        shown were out in the public domain as Judge Bennett said, no

 2        later than May 2015, 18 months before the case was filed.

 3              Plaintiffs' theory is consistent with the way they

 4        conducted the case which is just goaling out new class

 5        plaintiffs by sending waves of solicitation letters whenever

 6        it's convenient for them.  They do it again on this motion

 7        claiming that they have a new proposed class plaintiff ready

 8        to go in light of the standing deficiency.  The implications

 9        of the Court signing off on that are profound because it turns

10        Plaintiffs' counsel, and not Congress, into the master of the

11        statute of limitations for RESPA claims.  And Judge Bennett

12        previously expressed concern over that exact issue.

13              The Fourth Circuit's decision in *Thorn* is

14        instructive here.  And the Court there denied certification

15        resolving the statute of limitations -- because resolving the

16        statute of limitations issues would depend on an examination

17        of the particular circumstances of each individual.  There the

18        Court was faced with certification on a case involving

19        discriminatory insurance practices.  And the position staked

20        out by the parties are similar.  Defendants argued that

21        because individual class members could have been exposed to

22        sufficient information to give them actual or constructive

23        knowledge of discrimination, required individual hearings of

24        each class member to determine when and if they learned of the

25        information that would give rise to the claim.  Plaintiffs

```
 1     claim that the question could be resolved class-wide because
 2     Defendants hadn't shown that any class member was exposed to
 3     any of the information.  This District Court denied
 4     certification that was ultimately affirmed by the Fourth
 5     Circuit.  The reason for that was because there were numerous
 6     sources of information available that could have alerted the
 7     class members that there was a problem.  And the Court, the
 8     District Court said the Court cannot assume that none of the
 9     members of the proposed class gained sufficient information to
10     put them on inquiry notice at some point which would result in
11     their claim being time barred.
12             The Fourth Circuit for its part held examination of
13     whether a particular plaintiff possessed sufficient
14     information such that he knew or should have known about his
15     cause of action would generally require individual examination
16     of testimony from each particular plaintiff to determine what
17     he knew and when he knew it.  The Court went on to say, in
18     cases where the legal issue is focused on what the Plaintiffs
19     knew, it consistently held that individual hearings are
20     required.
21             The Fourth Circuit also made clear that the record
22     must affirmatively reveal that the resolution of the statute
23     of limitations defense on its merits may be accomplished on a
24     class-wide basis.  Mr. Smith admitted that can't be done here.
25     He's talking about jury questionnaires or other things that
```

 1   they can do to try and figure out what Plaintiffs knew and

 2   when.  That absolutely is impermissible under the law in the

 3   Fourth Circuit.  It's exactly the type of individualized

 4   inquiry that requires denying class certification.

 5           The *Thorn* Court also addressed how the issue plays

 6   out in a fraudulent concealment context like the one we're

 7   dealing with here.  The Court there said, we cannot say that

 8   the class members' unawareness of their cause of action is a

 9   natural inference of the Defendant's concealment.  And at any

10   rate, evidence of unawareness of the cause of action is

11   information uniquely in the class's possession, a fact that

12   defeats and necessitates of a presumption in the class's

13   favor.

14           The Court also stated that is reason to imply that

15   what it called the analogy context of equitable tolling,

16   specifically citing the *Marlinton* case and severing *Thorn's*

17   applicability here.  The fact that Plaintiffs now say that

18   *Thorn* has nothing to do with this case is curious because

19   first they forget that they affirmatively relied on *Thorn* in

20   their own motion admitting its applicability here.  And

21   second, *Thorn* explicitly calls equitable tolling citing

22   *Marlinton* as the chief fraudulent concealment case in this

23   circuit as an analogous case.  *Thorn* is directly on point here

24   and the Court's reasoning by any situation where there needs

25   to be an inquiry of what Plaintiffs knew and how that

1    knowledge impacts the statute of limitations.

2           What they're asking this Court to do is

3    impermissible under *Thorn*.  It quite simply assumes that well,

4    there's just these articles and it was on A-12 and it was just

5    on these dates and it's likely -- Mr. Smith said likely that

6    nobody saw it.  The Court, by Fourth Circuit law, cannot make

7    that assumption.

8           So in order to sort of pivot from the implications

9    of *Thorn*, Plaintiffs rely on what happened in *Edmondson*, the

10   Fourth Circuit opinion earlier in this case.  But we need to

11   be clear about what *Edmondson* actually concluded in a

12   procedural context in which that went up to the Fourth

13   Circuit.  It was a Motion to Dismiss and the Fourth Circuit

14   was bound to accept as true the allegations in the complaint

15   which the Fourth Circuit makes clear multiple times.  The case

16   has nothing to do with class certification.  True to form, the

17   word "certification" doesn't appear anywhere in the opinion.

18   *Edmondson* merely concluded that at the pleading stage where

19   the allegations in the complaint said Plaintiffs did not know

20   of their claims until they were alerted by a letter from their

21   lawyer, there was nothing in the record that Edmondson was on

22   inquiry notice.  So it could not say as a matter of law on

23   that record that Plaintiffs failed to discover their claim.

24   That was only a determination as to name the Plaintiffs there,

25   Mary Edmondson for us, and of course didn't have any effect on

```
1      the class certification.

2              Edmondson also states generally whether Plaintiff

3      exercised due diligence in the face of public information

4      about a claim is a jury issue, a question of fact.  And the

5      implication of that is that these types of individualized fact

6      determinations prevent class certification.

7              Plaintiffs also rely on Fangman and Palombaro, two

8      prior class certification cases that were decided in the

9      Fangman round of cases.  But they're distinguished from this

10     case and offer no support. The Court there was never faced

11     with arguments against certification based on the widespread

12     notice of the claims available to the class for years before

13     the case was filed.  That's because that ultimately led -- it

14     was those lines of cases that ultimately led to the publicity

15     and notice issues that preclude certification here.  They were

16     also decided before the Fourth Circuit Baehr decisions, the

17     individualized issues resulting from that case.  So the record

18     is very different from what those Courts decided such that

19     there is recently no connection between the two.

20             Plaintiffs also seek to avoid denials of the motion

21     on this idea that the Court should create a hypothetical

22     reasonable mortgage borrower and then adjudicate whether that

23     fictional borrower would have been on notice of the claims in

24     light of the publicity surrounding the case and the

25     enforcement actions.
```

1          First, that position ignores that *Thorn* rejected

2     that specific reasonable person scenario specifically in the

3     context of the situation where what counts is what the class

4     members knew and when they knew it.  The Court clarified that

5     Defendants' argument, like here, is not that widespread

6     treatment of the issue provided a reasonable person with

7     sufficient information, instead what we're arguing is that the

8     actual class members were exposed to sufficient information to

9     give them actual or constructive notice.  So *Thorn* says you

10    can't in that situation create this reasonable person, you

11    have to actually find out what the Plaintiffs knew.

12         The Plaintiffs' position also ignores the fact that

13    according to them there's more than 3,000 plaintiffs who could

14    have seen this information out there about their own loan

15    brokers who were involved in enforcement proceedings that

16    would have put them on actual or inquiry notice that they had

17    a claim.  It also ignores the Fourth Circuit law from *GO*

18    *Computer* that says what's reasonable for each borrower depends

19    on which information was at hand for that particular borrower.

20    Each of these points goes to individualized inquiries.  And

21    Edmondson is not to the contrary.  Edmondson's passing

22    reference to a reasonable residential mortgage borrower even

23    mentions that this is a question of fact and the Court did not

24    have the benefit of the full evidentiary record this Court has

25    related to the publicity and briefing as to how that issue

1    pertains to class certification since it was on a Motion to

2    Dismiss.  A reasonable residential mortgage borrower may make

3    sense when all of the plaintiffs are similarly situated such

4    that the answer to the notice question is capable of

5    class-wide determination.  That is the case in *Edmondson* where

6    all of the main plaintiffs in the consolidated cases all said

7    the same thing.  Because it was a Motion to Dismiss, the

8    Courts have to take the allegations as true and they all said

9    that none of them were aware of the fact that they had a claim

10   until they got a letter from the lawyer.  In an instance like

11   that, the inquiry shifts to whether that position is

12   reasonable in light of the information at hand and whether it

13   was reasonable for them not to be on notice.

14         But here the situation is different.  You have 3,000

15   plus plaintiffs, assuming Plaintiffs' numbers are right, and

16   they are not similarly situated.  There's no dispute that

17   there was publicly available evidence out there for more than

18   18 months before this case was filed.  But now we have no idea

19   what each plaintiff saw or when they saw it.  And the only way

20   to know that is to ask them each individually.  And that's why

21   *Thorn* controls, because it evaluated this precise issue in the

22   context of a class certification on a class certification

23   record and not on a Motion to Dismiss record where the Court

24   had no choice but to assume what the pleadings said.  And

25   *Thorn* expressly rejects that.

```
 1              The fact that individualized inquiries predominate
 2     over common ones is also apparent from Plaintiffs' own prior
 3     arguments to the Fourth Circuit, as well as the arguments made
 4     in their reply on this motion.  Plaintiffs previously told the
 5     Fourth Circuit at oral argument that if you want to determine
 6     what the Plaintiffs knew or should have known, you have to ask
 7     them to find out.  Ask them if they read the Baltimore Sun
 8     specifically.  That's a direct quote.  That's as plain as an
 9     admission that there is.  And you can hear, we gave you the
10     link to the transcript, Your Honor.  You can hear them say it.
11     This is directly an admission as there is that individualized
12     inquiries into the statute of limitation issues would
13     overwhelm the Commonwealth.
14              Plaintiffs also repeatedly in their presentation
15     today talks about, it's a jury question, it's a jury question.
16     If they said it once, they said it ten times, Your Honor.  But
17     in that game, the Court's decision in Minter is very helpful
18     here.  Minter was another RESPA case dealing with the statute
19     of limitations concerning class certification.  And there
20     after originally certifying a timely class and a tolling
21     class, the Court decertified the tolling class because of
22     manageability concerns around the statute of limitations
23     defense.  And the Court there said, quote, "the problem is not
24     that the circumstances of class members' transactions may
25     create a jury question, it is that it only creates that jury
```

1    question as to some class members and not others.  Managing a

2    class action where some class members had a duty to inquire

3    while others do not, presents substantial logistical and

4    mental challenges for the Court and juries which warrant

5    decertification in its already complicated case."  That is a

6    precise rejection of Plaintiffs' exact arguments here and the

7    Defendants should just take the issue to the jury.

8              Finally, Your Honor, these individual issues created

9    by the statute of limitations in *Baehr* are not even the only

10   ones that are problematic here.  Individual issues predominate

11   also on whether the issue of these loans are even federally

12   related.  RESPA has a number of enumerated exemptions that

13   would take the loan outside of this coverage.  Things like

14   extensions of credit for business or commercial or

15   agricultural purposes.  Example of that how this plays out,

16   Chemene Clark did a cashout refinance where she took money

17   from the transaction at issue.  In those circumstances the

18   only way to determine if the loans are actually federally

19   related and subject to RESPA is to know what the funds were

20   actually used for.  Defendants do not track how those proceeds

21   are used.  And contrary to Plaintiffs' suggestion, the answer

22   is not going to be apparent from the HUD-1 or the loan

23   application unless the borrower knows how the money is spent.

24             The notion that Genuine Title's loan database can be

25   relied upon to provide accurate answers is incorrect.

```
 1    Defendants know from their own review of the data that Genuine
 2    Title, that much of it is not accurate and it has loans on
 3    there that never actually closed.  And Plaintiffs are well
 4    aware of this because they faced this issue repeatedly in
 5    other situations, the problems with the database.  So we can't
 6    just -- so relying on Genuine Title's database is not an
 7    adequate answer here, nor is the notion that there would be a
 8    claims process which violates the Defendants' due process
 9    rights because we have no way to challenge the voracity of the
10    claim.
11           Either way you approach this, Your Honor, whether
12    it's as a standing issue or as an individual issue
13    predominating problem, the Class cannot be certified.  Now I
14    will stop there, Your Honor, and see what questions you may
15    have.
16           THE COURT:  Okay.  Well, I do have a series of them.
17    First, when you referred to the Thorn case and kept relying on
18    the Thorn case and what should govern here, the facts of that
19    case are so different than what we're dealing with here.  The
20    identified class had $1.4 million people over multiple states
21    and a time period of over 60 years.  Here we're dealing with
22    just a much narrower situation.  We're talking about media
23    reports about some lawsuits and enforcement actions.  So you'd
24    acknowledge at least that there are some significant
25    differences there?
```

1          **MR. BECKER:**  I think there are differences in the

2     numbers, but I think the principle in *Thorn* remains the same.

3     The principle is still what Plaintiffs knew and when they knew

4     it.  And that's what has to be discerned here in order to

5     certify a class.  And I don't think the numbers make that any

6     different.  There is information in the record that anyone

7     could have seen and that raises a question as to who saw it,

8     when they saw it, and what the impact is on this very statute

9     of limitations and whether they can be a member of the class.

10    And that can only be discerned through an individualized

11    inquiry.

12          **THE COURT:**  Okay.  I don't think there was much

13    discussion of numerosity today, although you were just

14    referring to the database to some extent.  Does your side

15    concede that numerosity is not in question here?

16          **MR. BECKER:**  Yes, Your Honor.

17          **THE COURT:**  When you're talking about notice, would

18    there ever be a situation where there would not be a need for

19    individualized inquiry in class action?  I mean, you know,

20    would equitable tolling in those types of cases, in your view

21    there would always be a need for individualized inquiry,

22    correct?  And then in your view would we never be able to

23    certify a class?

24          **MR. BECKER:**  No, Your Honor.  I don't think that's

25    right.  I think you look at *Fangman* and *Palombaro* and that

1    shows you where you can certify a class.  I mean, at that time

2    the notice issues were not widespread.  They weren't widely

3    reported.  The issue was only in the sense of it coming up

4    through court filings.  And I think the Court was concerned

5    well, most normal people don't have access to court filings so

6    it's not an issue there.  But I think this is a very different

7    case.  There are a lot of public press announcements and press

8    releases and media coverage laying out exactly what happened.

9    So that makes it a different situation.

10            **THE COURT:**  And you acknowledge though that most of

11   that media coverage did not focus on Eagle?

12            **MR. BECKER:**  Yes, but what it focused on was Genuine

13   Title which was involved in all of these transactions, but

14   more importantly it focused on the individual brokers that

15   were working with these proposed class representatives,

16   actually working with them on a daily basis to get their loan

17   closed, in Edmondson's case more than once, multiple loans

18   that she worked with Mr. Mandelberg on.  So you're talking

19   about the actual individuals that these people were working

20   with, press saying these individuals have been involved

21   potentially in mortgage fraud.  So I think that's an important

22   difference.

23            **THE COURT:**  So in your view it turns on the

24   likelihood that class members would have had notice?

25            **MR. BECKER:**  No, I think it turns on the idea if the

```
1    notice is available, we've got to find out what class members
2    knew and when and the only way you can do that is through
3    individualized --
4              (Court reporter was disconnected from the call at
5              11:42 a.m. and reconnected to the call at 11:44:32
6              a.m.)
7         MR. SMITH:  --and it's whether the common issues
8    predominate regarding the main event or main element or
9    strongest element who were the individualized.  The idea,
10   again, 87 percent of the folks are outside the state of
11   Maryland.  The idea that somebody from Arizona would sign up
12   to receive press releases from Brian Frosh here in Maryland I
13   think is beyond unlikely.
14              With respect to the other aspects of the stuff, I
15   mean again, Mortgage Daily, Credit Union Times, I mean the
16   most, the most identifiable that regular residential borrowers
17   would see would be the Sun paper or the Washington Post.  I
18   think they had something in there from China or something.
19   And that's just a LexisNexis newswire search.  And so, you
20   know, most of these things don't matter whatsoever.  And the
21   only one -- none of the citations that any of the media
22   coverage include Eagle.  And only one that I'm aware of
23   included -- only one of the Sun Papers I think it was,
24   included the name Mandelberg and Klopp buried in it.  And it
25   was not even an article as I recall.  I think it was a blurb
```

```
 1        on page 12a.

 2                So, you know, I think the Court of Appeals in

 3        Edmondson identified the reasonable residential mortgage

 4        borrowers standard as the standard by which we judge

 5        diligence.  And that can be done on a common because the

 6        defendant can put forward to the extent the Court allows, what

 7        was out there.  And again, this is five years after the latest

 8        of the people that they would have had them check on the news

 9        for five years straight, every single day.  And it came out

10        not on a Sunday, not in the Sunday paper, it came out on a

11        Friday and a Thursday with respect to these.  And the bulk of

12        that was relative to Wells Fargo and Chase and not individual

13        brokers.  So that's what I have on the diligence issue.

14                With respect to the federally related just briefly,

15        Your Honor, yes we've had probably somewhere between 40 and

16        50,000 borrowers that we've had to deal with in the

17        settlement --

18                THE COURT:  Counsel, I'm sorry to interrupt.

19        Apparently our court reporter got disconnected.

20                THE COURT REPORTER:  I'm back on.  I'm back on,

21        Judge.  I got back on.  You may continue.  I did miss a little

22        bit.  It cut me off.  I got right back on and called, but it

23        took me a few minutes to get through.

24                THE COURT:  Counsel, I'll defer to you, if you want

25        to back up a little bit, if you can recall what you said
```

```
 1        roughly or whether you want to --

 2               MR. SMITH:  I don't remember where I was.  The idea

 3        that somebody five years after their settlement would be

 4        combing the papers looking for bad acts by their lender and

 5        never seeing their lender's name, and this idea, you know,

 6        Adam Mandelberg managed a branch.  Gary Klopp managed the

 7        branch.  The idea that the primary contact on a day in and day

 8        out basis -- and Gary Klopp I know was a very large branch.

 9        The idea that the personal conduct between the borrower and

10        the bank was the branch manager in each case I think belies

11        what the reality is.  And only one of the what I would call

12        community-related residential borrower publications that it

13        would have appeared on -- and again, the jury is going to

14        decide whether the diligence requires them to be doing

15        searches for this.  So you're only talking about somebody

16        consuming it in the ordinary course of business of reading

17        from page 1 through page whatever that the Sun Paper has.  And

18        remember, the Sun Paper's subscription is only 2 percent of

19        Marylanders and we have 87 percent of the people outside the

20        state of Maryland.  You know, I think it certainly doesn't

21        predominate the common issues.

22               Moving onto the federally related, you know, what

23        really happens in these issues, we can identify any ones that

24        are questioned.  In fact, I've had to do it with Mr. Moffet.

25        He sends me six to eight loans out of it and we look at the
```

```
1    loan applications are there's maybe one or two of the people
2    we have to follow-up with.  So this idea that there's the
3    exceptions for federally-related that are the Defendants'
4    burden are going to overwhelm the common issues I think belies
5    what the reality is.
6              And then just briefly on the overcharge, Edmondson
7    makes clear it specifically criticizes the failure of the
8    Defendants to itemize on the HUD-1 the referral fee.  If they
9    had done what Edmondson said, Your Honor, we would
10   specifically be pointing to line 1110 of the HUD-1 where it
11   says referral fee $300.  And we'd say Judge, that is exactly
12   what Ms. Edmondson was overcharged.  And it was paid on
13   September the 2nd, 2010.  Because they don't do what Edmondson
14   says they have to do and victimize it on there and using Mr.
15   Maloney's term, baked into the title exam and not individually
16   itemize, that they want to say well now it's not -- we've got
17   to get into this comparison and it creates an individualized
18   issue.  We know that $300 for each settlement, a minimum of
19   $300 for each settlement is being paid for the referral by
20   Adam Mandelberg.  We know that from Jay Zukerberg.  And so
21   therefore -- and we know from their actions from Mr. Yerman
22   that that as a volume discount, is typically passed on to the
23   borrower.  And in this case it didn't go -- it went to the
24   branch manager at Eagle.
25             So with respect to that, with respect to just
```

```
 1        briefly with respect to the bankruptcy, we filed the motion to
 2        reopen.  The council had conversations with the trustee's
 3        office.  There was only a little bit of difference between
 4        what Ms. Clark really could get, not the $5,000 that they
 5        offered, what she really could get and what was already
 6        exempt.  They had given preliminary indications that they were
 7        going to abandon the billing because little amount between the
 8        two.  And it wasn't until the defendants offered $5,000 which
 9        is more than -- because Mr. Clark is only entitled to half the
10        claim.  That's more than what she would be entitled to under
11        the statute that the Bankruptcy Court -- bankruptcy trustee
12        changed its mind.  But, you know, that's neither here nor
13        there.  Ms. Edmondson has standing.  And we know that had the
14        broker instead of taking or the broker or the branch manager,
15        had the broker or branch manager taken the discount or the
16        money and let it go to the borrower, we know from Mr.
17        Zukerberg himself he would have been happy to give it to the
18        borrower instead of the branch manager, but that's just not
19        the way these branch managers were doing business back then.
20        And it was setting the market and it was doing exactly what
21        Congress sought to protect.  It was unnecessarily increasing
22        the cost of settlement charges.
23                 So unless Your Honor has additional questions.
24                 THE COURT:  No, thank you.  That was helpful.  Well
25        I appreciate everyone's presentations today.  I am not going
```

1    to make a ruling right now.  I will issue a written ruling as

2    soon as possible, but I appreciate all of your patience with

3    this format that is forced upon us and your participation

4    today.  Is there anything else from either side that we need

5    to address?

6                **MR. SMITH:**  Not from the Plaintiffs.

7                **MR. BECKER:**  Not from Defendants, thank you.

8                **THE COURT:**  Thank you all.  Stay safe.

9                **(Proceeding concluded at 11:53 a.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5          **I, Nadine M. Gazic, Certified Realtime Reorter and**

6     **Registered Merit Reporter, in and for the United States**

7     **District Court for the District of Maryland, do hereby**

8     **certify, pursuant to 28 U.S.C. § 753, that the foregoing is a**

9     **true and correct transcript of the stenographically-reported**

10    **proceedings held in the above-entitled matter and that the**

11    **transcript page format is in conformance with the regulations**

12    **of the Judicial Conference of the United States.**

13

14              **Dated this <u>26th</u> day of <u>October, 2020</u>.**

15

16              *NAdine M. Gazic*

17              **NADINE M. GAZIC, CRR, RMR**

18              **FEDERAL OFFICIAL COURT REPORTER**

19

20

21

22

23

24

25

## $

**$1,003.50** [1] - 41:12
**$1,700** [1] - 30:9
**$119,000** [1] - 5:17
**$145** [1] - 27:2
**$175** [1] - 42:25
**$200** [2] - 4:9, 4:10
**$295** [1] - 27:1
**$300** [7] - 5:14, 5:24, 25:10, 44:15, 69:11, 69:18, 69:19
**$340,000** [1] - 5:16
**$400** [2] - 5:14, 25:14
**$425** [3] - 38:18, 39:10, 39:21
**$440** [4] - 26:24, 27:18, 39:21, 49:1
**$5,000** [2] - 70:4, 70:8
**$520** [1] - 38:22

## '

**'14** [1] - 51:2
**'15** [1] - 51:2

## 1

**1** [3] - 7:7, 7:9, 68:17
**1,385** [1] - 16:19
**1.4** [2] - 16:12, 63:20
**10** [1] - 18:23
**101** [1] - 1:24
**1024** [1] - 11:11
**10th** [2] - 11:15, 29:25
**1100** [4] - 7:7, 25:13, 25:15, 29:7
**1110** [1] - 69:10
**117** [1] - 17:25
**11:42** [1] - 66:5
**11:44:32** [1] - 66:5
**11:53** [1] - 71:9
**12** [1] - 11:11
**12(b)(1** [1] - 24:24
**12(b)(6** [1] - 24:24
**12a** [1] - 67:1
**13** [1] - 51:9
**15** [2] - 1:9, 36:5
**16** [1] - 36:6
**17** [1] - 18:23
**178** [1] - 17:10
**18** [3] - 52:6, 54:2, 60:18
**1911** [1] - 16:5
**1974** [1] - 16:6
**1:16-0398-SAG** [1] - 1:5

## 2

**2** [4] - 11:17, 15:9, 15:10, 68:18
**2000** [1] - 44:13
**2005** [3] - 3:9, 5:14, 19:15
**2006** [2] - 5:14, 19:9
**2007** [8] - 3:22, 7:8, 7:9, 17:24, 18:1, 18:22, 18:24
**2008** [1] - 3:14
**2009** [5] - 4:6, 18:23, 28:6, 28:10, 45:17
**2010** [7] - 4:6, 11:15, 11:17, 25:6, 28:6, 43:14, 69:13
**2011** [3] - 7:8, 7:10, 19:17
**2012** [7] - 3:22, 29:21, 36:6, 36:10, 43:25, 50:18, 50:25
**2013** [2] - 36:12, 51:2
**2015** [8] - 14:16, 14:23, 21:10, 23:18, 51:6, 51:7, 51:13, 54:2
**2016** [2] - 14:20, 18:5
**2017** [1] - 24:14
**2020** [4] - 1:9, 29:25, 36:15, 72:14
**203** [1] - 27:23
**21201** [1] - 1:25
**23** [6] - 7:15, 14:16, 24:16, 24:20, 29:16, 47:20
**23(a** [4] - 20:2, 20:4, 24:5, 24:10
**23(b** [2] - 12:5, 20:3
**23rd** [1] - 21:10
**24** [1] - 27:22
**25** [1] - 52:2
**26th** [1] - 72:14
**28** [1] - 72:8
**2nd** [2] - 25:12, 69:13

## 3

**3** [1] - 25:14
**3,000** [3] - 18:15, 59:13, 60:14
**3,400** [2] - 12:22, 30:21
**3,472** [5] - 5:3, 5:19, 7:22, 15:3, 16:18
**3,500** [1] - 9:16
**30** [5] - 40:3, 40:5, 41:25, 43:8, 46:19
**30-year** [1] - 26:14
**30th** [1] - 14:23

## 31

**31** [3] - 7:8, 7:10, 19:17
**35** [1] - 27:19
**38** [1] - 40:13
**39** [1] - 40:13

## 4

**4,000** [1] - 9:16
**40** [2] - 7:23, 67:15
**4th** [1] - 1:24

## 5

**5** [1] - 51:9
**50** [1] - 3:15
**50,000** [1] - 67:16
**536** [1] - 17:4
**55** [1] - 17:6
**5th** [1] - 14:20

## 6

**6** [1] - 51:9
**60** [1] - 63:21
**67** [1] - 16:5
**68** [2] - 5:10, 9:17

## 7

**7** [2] - 29:20, 51:9
**70** [2] - 27:19, 28:16
**702** [1] - 26:3
**753** [1] - 72:8
**76** [2] - 8:18, 13:10

## 8

**8** [2] - 5:18, 5:19
**80** [1] - 27:20
**87** [5] - 15:2, 15:3, 15:19, 66:10, 68:19

## 9

**94** [1] - 15:4

## A

**A-12** [3] - 14:16, 15:17, 57:4
**A-14** [1] - 14:17
**a.m** [3] - 66:5, 66:6, 71:9
**abandon** [4] - 30:10, 35:16, 36:17, 70:7
**ability** [2] - 24:18, 49:11
**able** [5] - 5:5, 12:16, 18:13, 33:21, 64:22

**abounds** [1] - 45:20
**above-entitled** [1] - 72:10
**absolute** [2] - 13:17, 52:6
**absolutely** [3] - 19:6, 49:2, 56:2
**abstract** [2] - 27:9, 27:10
**Abstracts** [1] - 6:21
**absurd** [1] - 37:23
**accept** [1] - 57:14
**access** [1] - 65:5
**accomplished** [1] - 55:23
**according** [3] - 34:9, 50:11, 59:13
**accounting** [1] - 13:10
**accurate** [2] - 62:25, 63:2
**accused** [1] - 41:9
**acknowledge** [2] - 63:24, 65:10
**acknowledged** [1] - 48:9
**acknowledging** [1] - 49:6
**action** [8] - 11:9, 12:3, 30:19, 55:15, 56:8, 56:10, 62:2, 64:19
**actions** [9] - 9:25, 20:25, 37:18, 39:8, 51:4, 51:15, 58:25, 63:23, 69:21
**actively** [1] - 2:7
**acts** [1] - 68:4
**actual** [11] - 21:14, 28:19, 34:12, 39:24, 43:25, 52:13, 54:22, 59:8, 59:9, 59:16, 60:2
**Adam** [6] - 5:19, 5:20, 13:9, 51:17, 68:6, 69:20
**Adam's** [1] - 5:24
**add** [3] - 3:6, 33:20, 46:2
**added** [2] - 12:8, 40:23
**additional** [6] - 5:17, 7:16, 17:16, 27:2, 41:10, 70:23
**additionally** [3] - 26:3, 26:23, 31:1
**address** [6] - 24:10, 25:25, 29:11, 46:8, 47:3, 71:5
**addressed** [1] - 56:5
**addresses** [2] - 7:18, 21:20

**addressing** [1] - 25:5
**adequacy** [2] - 11:18, 12:1
**adequate** [4] - 12:4, 38:4, 49:10, 63:7
**adequately** [1] - 24:19
**adjudicate** [1] - 58:22
**adjudications** [1] - 48:22
**Administration** [2] - 4:18, 8:14
**admission** [5] - 18:24, 28:13, 45:18, 61:9, 61:11
**admits** [1] - 3:14
**admitted** [3] - 32:20, 34:2, 55:24
**admitting** [2] - 18:21, 56:20
**adopted** [5] - 23:14, 23:15, 23:20, 23:22, 23:24
**advantage** [1] - 16:12
**Advantage** [2] - 4:10, 7:13
**advertised** [1] - 35:8
**affidavit** [4] - 5:13, 19:21, 44:13, 44:25
**affidavits** [1] - 18:3
**affirmatively** [2] - 55:22, 56:19
**affirmed** [1] - 55:4
**African** [2] - 16:7, 16:11
**AG** [1] - 51:13
**agent** [1] - 7:11
**ago** [3] - 25:6, 29:25, 42:17
**agree** [5] - 19:16, 20:2, 20:13, 20:20, 48:6
**agreed** [2] - 8:11, 46:18
**agreed-upon** [1] - 8:11
**agreement** [3] - 8:15, 8:18, 14:25
**agreements** [2] - 13:9, 17:22
**agricultural** [1] - 62:15
**aid** [1] - 46:6
**al** [2] - 1:3, 1:6
**alerted** [1] - 55:6, 57:20
**allegation** [1] - 49:7
**allegations** [7] - 38:15, 49:13, 49:15, 49:24, 57:14, 57:19, 60:8

allege [1] - 28:22
alleged [2] - 9:4, 42:14
alleging [1] - 29:19
allow [1] - 3:1
allowed [2] - 31:4, 49:11
allowing [1] - 47:5
allows [1] - 67:6
alluded [1] - 51:4
almost [1] - 35:20
alongside [1] - 33:6
amend [1] - 18:2, 46:3
amended [1] - 46:3
American [1] - 16:11
Americans [1] - 16:7
amount [8] - 2:8, 8:11, 9:22, 12:6, 25:19, 26:24, 39:20, 70:7
ample [1] - 50:20
amply [1] - 53:24
analogous [1] - 56:23
analogy [2] - 21:13, 56:15
analysis [8] - 12:7, 20:6, 35:10, 38:13, 42:10, 43:5, 50:13, 50:19
analyzed [1] - 40:4
Angela [1] - 51:17
announce [1] - 11:22
announced [1] - 51:24
announcements [1] - 65:7
answer [14] - 8:6, 8:16, 8:19, 8:22, 9:1, 31:18, 35:18, 45:13, 45:14, 45:21, 50:12, 60:4, 62:21, 63:7
answered [2] - 11:19, 47:11
answers [3] - 22:13, 50:12, 62:25
anticipate [1] - 18:6
aphasia [2] - 29:14, 31:8
apparent [2] - 61:2, 62:22
appeal [2] - 24:25, 31:23
appealed [1] - 5:12
Appeals [3] - 13:24, 15:20, 67:2
appear [3] - 15:7, 35:15, 57:17
appeared [2] - 25:15, 68:13
applicability [2] - 56:17, 56:20
applicable [3] - 5:16, 10:13, 49:3

application [3] - 17:16, 17:18, 62:23
applications [1] - 69:1
apply [4] - 10:17, 10:18, 14:9, 30:9
applying [1] - 17:8
appreciate [2] - 70:25, 71:2
approach [9] - 23:7, 23:10, 23:14, 23:15, 23:16, 23:20, 23:25, 24:2, 63:11
approaching [1] - 43:13
appropriate [2] - 20:12, 42:16
approval [2] - 30:16, 36:19
approved [2] - 7:22, 12:2
approving [1] - 11:9
April [2] - 14:23, 51:13
argued [1] - 54:20
arguing [2] - 19:8, 59:7
argument [11] - 2:22, 13:22, 14:5, 16:15, 17:20, 34:2, 36:2, 50:8, 53:1, 59:5, 61:5
arguments [10] - 10:16, 10:18, 12:25, 20:17, 35:15, 52:20, 58:11, 61:3, 62:6
arise [2] - 10:1, 10:2
Arizona [1] - 66:11
Article [1] - 46:9
article [6] - 14:18, 14:19, 14:22, 15:5, 15:17, 66:25
articles [7] - 14:25, 15:7, 51:7, 51:9, 51:10, 53:25, 57:4
ascertainability [2] - 7:15, 7:16
aside [1] - 50:24
aspects [2] - 66:14
aspersions [1] - 37:7
assertion [1] - 27:24
assess [1] - 20:23
asset [1] - 36:12
assigned [1] - 18:1
associated [1] - 21:11
Associates [1] - 6:22
assume [2] - 55:8, 60:24
assumed [1] - 44:4
assumes [1] - 57:3
assuming [2] - 53:20, 60:15

assumption [1] - 57:7
attach [1] - 26:10
attack [2] - 41:15, 41:23
attempt [2] - 30:20, 37:14
attempting [1] - 15:12
attorney [2] - 21:8, 37:10
Attorney [1] - 51:23
audio [1] - 12:10
August [2] - 11:15, 25:6
authenticate [1] - 5:15
authoritative [1] - 43:25
authority [5] - 20:13, 37:4, 37:11, 43:13, 43:21
automatically [1] - 24:15
available [14] - 10:16, 10:20, 11:3, 11:5, 13:13, 16:25, 21:17, 34:6, 37:24, 52:5, 55:6, 58:12, 60:17, 66:1
average [2] - 15:10, 27:19
avoid [2] - 2:25, 58:20
aware [5] - 29:21, 29:24, 60:9, 63:4, 66:22

**B**

backdate [1] - 8:15
backdated [2] - 8:18, 13:8
backdrop [1] - 7:2
background [1] - 3:8
bad [1] - 68:4
Baehr [27] - 28:21, 33:15, 34:4, 34:17, 35:3, 38:9, 38:13, 38:14, 38:22, 39:2, 39:9, 39:18, 39:21, 42:13, 42:21, 44:12, 44:24, 45:9, 45:12, 48:7, 48:24, 48:25, 49:1, 49:9, 50:18, 58:16, 62:9
Baehr's [1] - 39:11
Baehrs [2] - 39:13, 39:21
bake [1] - 25:14
baked [3] - 25:19, 28:13, 69:15
Baltimore [9] - 1:25, 14:15, 14:20, 15:5,

15:8, 15:11, 40:6, 61:7
BANK [1] - 1:6
bank [6] - 3:21, 14:1, 14:9, 15:17, 15:18, 68:10
Bank [4] - 2:5, 7:5, 7:11, 7:12
Bankruptcy [4] - 36:18, 36:21, 37:2, 70:11
bankruptcy [24] - 29:20, 30:1, 30:7, 30:9, 30:10, 30:13, 30:14, 31:13, 31:23, 32:1, 33:8, 33:10, 36:4, 36:6, 36:7, 36:10, 36:13, 36:15, 37:10, 37:18, 37:22, 70:1, 70:11
banks [3] - 3:17, 3:18
barred [2] - 52:14, 55:11
Barry [1] - 8:1
barters [1] - 9:2
based [12] - 5:7, 8:8, 9:22, 28:2, 29:25, 40:5, 40:10, 40:15, 40:17, 41:25, 58:11
basic [1] - 9:6
basis [15] - 6:1, 9:5, 9:9, 12:11, 12:13, 18:2, 21:12, 25:16, 35:4, 42:17, 43:4, 50:12, 55:24, 65:16, 66:8
Becker [1] - 2:16
BECKER [13] - 1:20, 2:16, 32:16, 48:5, 48:18, 49:15, 50:4, 64:1, 64:16, 64:24, 65:12, 65:25, 71:7
BEFORE [1] - 1:11
began [2] - 19:13, 19:15
begin [3] - 23:7, 25:4, 53:13
beginning [6] - 3:10, 6:6, 17:23, 18:22, 41:19, 50:17
begs [1] - 52:9
behalf [3] - 2:13, 29:12, 38:5
belied [1] - 27:25
belies [2] - 68:10, 69:4
belong [1] - 33:7
belonged [1] - 36:7
below [7] - 25:22, 27:25, 33:13, 38:7, 40:9, 42:8, 47:13

benefit [1] - 59:24
benefits [1] - 28:25
Bennett [5] - 11:8, 18:12, 52:3, 54:1, 54:11
best [1] - 36:20
between [11] - 5:14, 7:7, 8:7, 11:5, 24:11, 48:11, 58:19, 67:15, 68:9, 70:3, 70:7
beyond [1] - 66:13
big [2] - 3:17
bigger [1] - 27:12
Bill [1] - 39:25
billing [1] - 70:7
bills [2] - 4:8, 4:14
bit [9] - 2:20, 19:1, 19:10, 35:17, 49:3, 49:12, 67:22, 67:25, 70:3
black [1] - 16:9
black-owned [1] - 16:9
blacks [1] - 16:7
blurb [1] - 66:25
boils [1] - 17:15
Booth [2] - 46:12, 46:18
borrower [22] - 10:18, 10:22, 11:2, 13:12, 13:23, 14:6, 14:14, 21:5, 29:8, 45:7, 58:22, 58:23, 59:18, 59:19, 59:22, 60:2, 62:23, 68:9, 68:12, 69:23, 70:16, 70:18
borrower's [1] - 14:10
borrowers [15] - 4:24, 9:21, 9:24, 13:8, 14:21, 15:11, 15:16, 21:21, 28:18, 34:24, 40:22, 41:4, 66:16, 67:4, 67:16
bottom [3] - 32:23, 37:8, 44:7
bound [1] - 57:14
branch [24] - 3:19, 3:23, 4:3, 4:15, 4:25, 5:11, 5:20, 6:6, 6:11, 6:12, 6:14, 8:8, 9:17, 11:16, 17:23, 68:6, 68:7, 68:8, 68:10, 69:24, 70:14, 70:15, 70:18, 70:19
branches [6] - 5:12, 5:18, 8:5, 19:20, 19:23, 19:24
brand [1] - 33:17
Brandon [8] - 3:25, 4:4, 6:7, 6:8, 6:11,

7:12, 9:6, 13:4
**break** [1] - 47:21
**BRIAN** [1] - 1:18
**Brian** [2] - 2:17, 66:12
**brief** [10] - 17:9, 19:3, 36:5, 37:1, 37:3, 45:25, 46:2, 51:7, 51:22, 52:22
**briefing** [1] - 59:25
**briefly** [3] - 67:14, 69:6, 70:1
**bring** [2] - 24:3, 37:16
**broad** [1] - 32:17
**broadcast** [1] - 53:3
**broader** [1] - 11:12
**broker** [5] - 45:6, 51:18, 70:14, 70:15
**brokers** [9] - 7:4, 14:24, 34:8, 51:15, 52:5, 52:11, 59:15, 65:14, 67:13
**brokers'** [1] - 4:7
**Brown** [1] - 2:17
**BROWN** [1] - 1:19
**bulk** [2] - 10:6, 67:11
**burden** [4] - 32:24, 35:12, 49:22, 69:4
**buried** [2] - 14:25, 66:24
**business** [12] - 3:12, 3:13, 3:15, 3:16, 3:25, 4:4, 6:25, 17:4, 38:17, 62:14, 68:16, 70:19
**buying** [1] - 14:5

## C

**calculating** [1] - 9:23
**CAM** [2] - 4:14, 13:7
**candid** [1] - 8:17
**cannot** [9] - 16:21, 29:15, 32:24, 33:4, 44:3, 55:8, 56:7, 57:6, 63:13
**capable** [2] - 30:25, 60:4
**career** [2] - 26:14, 42:2
**Carolina** [1] - 11:20
**Carroll** [1] - 6:21
**case** [82] - 2:4, 2:5, 4:15, 4:17, 4:18, 6:19, 11:3, 13:18, 15:25, 16:4, 16:8, 16:13, 16:14, 16:18, 18:9, 18:11, 18:14, 20:18, 21:9, 23:8, 23:12, 23:19, 24:14, 24:23, 24:25, 27:4,

27:6, 28:5, 28:21, 29:5, 29:6, 29:12, 30:20, 31:6, 34:25, 36:7, 36:11, 37:17, 38:10, 38:15, 39:9, 39:17, 45:20, 46:2, 46:13, 47:6, 48:8, 48:16, 49:3, 50:25, 51:18, 52:7, 52:14, 53:11, 53:15, 54:2, 54:4, 54:18, 56:16, 56:18, 56:22, 56:23, 57:10, 57:15, 58:10, 58:13, 58:17, 58:24, 60:5, 60:18, 61:18, 62:5, 63:17, 63:18, 63:19, 65:7, 65:17, 68:10, 69:23
**cases** [18] - 4:12, 7:23, 9:10, 12:3, 18:15, 17:17, 46:4, 46:6, 46:8, 46:10, 46:22, 51:1, 55:18, 58:8, 58:9, 58:14, 60:6, 64:20
**cash** [7] - 4:3, 4:14, 16:25, 17:3, 17:11, 17:12, 25:11
**cashout** [2] - 17:17, 62:16
**cast** [1] - 37:7
**CCR** [1] - 1:23
**cert** [1] - 49:16
**certainly** [4] - 13:16, 19:22, 32:11, 68:20
**certainty** [1] - 40:8
**CERTIFICATE** [1] - 72:1
**certification** [37] - 7:2, 11:9, 18:10, 20:12, 23:9, 24:2, 24:6, 26:6, 26:7, 29:19, 29:24, 30:4, 41:21, 47:9, 48:17, 48:20, 48:24, 50:7, 52:12, 52:19, 52:21, 52:24, 54:14, 54:18, 55:4, 56:4, 57:16, 57:17, 58:1, 58:6, 58:8, 58:11, 58:15, 60:1, 60:22, 61:19
**Certification** [1] - 25:2
**certified** [7] - 32:24, 33:25, 34:5, 46:7, 46:16, 46:25, 63:13
**Certified** [1] - 72:5
**certify** [5] - 16:5, 64:5, 64:23, 65:1, 72:8
**certifying** [1] - 61:20
**cetera** [2] - 7:18, 8:6

**CFPB** [5] - 8:13, 14:18, 14:25, 51:13, 51:23
**CFR** [1] - 11:11
**challenge** [1] - 63:9
**challenges** [1] - 62:4
**chance** [1] - 47:6
**change** [2] - 9:22, 40:15
**changed** [2] - 40:20, 70:12
**Chapter** [1] - 29:20
**characterized** [1] - 4:12
**charge** [3] - 27:9, 27:18, 29:8
**charged** [7] - 26:24, 27:1, 40:9, 40:15, 44:8, 44:21, 45:13
**charges** [9] - 27:13, 27:14, 27:18, 35:10, 40:19, 41:7, 43:6, 44:3, 70:22
**Charles** [1] - 37:10
**chart** [2] - 43:14, 43:17
**chase** [1] - 21:18
**Chase** [2] - 14:17, 67:12
**check** [4] - 6:3, 8:11, 11:16, 67:8
**checks** [3] - 4:3, 5:16, 5:17
**Chemene** [10] - 9:11, 29:11, 29:13, 29:19, 33:3, 33:7, 35:14, 36:1, 47:5, 62:16
**cherry** [1] - 26:11
**chief** [1] - 56:22
**China** [1] - 66:18
**Chisolm** [1] - 46:7
**choice** [1] - 60:24
**choose** [1] - 8:23
**chose** [2] - 21:25, 41:21
**chosen** [4] - 6:17, 26:17, 41:14, 45:22
**churches** [1] - 16:8
**Circuit** [31] - 7:22, 10:17, 23:13, 23:18, 23:22, 23:23, 24:6, 25:1, 28:22, 31:2, 34:18, 38:9, 38:13, 52:18, 53:11, 53:15, 55:5, 55:12, 55:21, 56:3, 57:6, 57:10, 57:13, 57:15, 58:16, 59:17, 61:3, 61:5
**circuit** [3] - 23:24, 38:12, 56:23

**Circuit's** [2] - 33:14, 54:13
**circuits** [1] - 23:16
**Circuits** [1] - 23:24
**circumstances** [7] - 16:25, 27:3, 28:2, 31:6, 54:17, 61:24, 62:17
**citations** [4] - 16:3, 37:4, 43:20, 66:21
**cite** [6] - 13:1, 13:14, 16:23, 17:5, 17:9, 22:11
**cited** [3] - 11:11, 21:14, 36:5
**cites** [1] - 22:11
**citing** [2] - 56:16, 56:21
**civil** [2] - 34:18, 39:1
**CIVIL** [1] - 1:5
**claim** [41] - 10:3, 19:22, 24:3, 28:24, 29:21, 30:8, 30:10, 30:15, 31:13, 32:5, 33:5, 33:7, 33:10, 34:18, 36:3, 36:7, 36:12, 36:14, 36:16, 36:17, 36:24, 37:9, 37:13, 37:14, 37:16, 38:12, 44:15, 46:5, 46:8, 46:20, 50:23, 53:23, 54:25, 55:1, 55:11, 57:23, 58:4, 59:17, 60:9, 63:10, 70:10
**claim's** [1] - 30:15
**claiming** [2] - 48:13, 54:7
**claims** [20] - 10:1, 10:4, 10:13, 30:11, 30:21, 31:14, 33:6, 34:13, 46:16, 46:23, 47:16, 47:17, 48:2, 52:13, 54:11, 57:20, 58:12, 58:23, 63:8
**clarified** [1] - 59:4
**Clark** [36] - 11:23, 22:23, 27:8, 29:12, 29:13, 29:19, 30:6, 30:12, 30:17, 31:7, 31:15, 31:22, 31:25, 32:11, 33:3, 35:14, 35:16, 35:19, 36:1, 36:2, 36:3, 36:6, 36:9, 36:10, 36:14, 36:15, 36:22, 37:9, 37:15, 47:6, 47:16, 62:16, 70:4, 70:18
**Clark's** [7] - 9:11, 17:18, 27:9, 30:15,

31:9, 33:7, 37:21
**Clarks** [1] - 33:22
**class** [153] - 7:8, 7:20, 9:9, 9:13, 11:6, 11:9, 11:10, 12:2, 12:3, 12:11, 12:13, 13:10, 13:21, 14:4, 16:5, 16:12, 16:19, 17:10, 17:21, 18:2, 18:10, 20:22, 21:1, 21:6, 21:12, 21:22, 23:9, 24:1, 24:5, 24:8, 24:11, 24:12, 24:19, 26:6, 26:7, 29:16, 29:17, 29:18, 29:23, 30:4, 30:8, 30:19, 30:22, 31:1, 31:3, 31:5, 31:11, 32:24, 33:1, 33:6, 33:18, 33:21, 33:22, 33:25, 34:3, 34:5, 34:8, 34:10, 34:11, 34:21, 34:22, 34:23, 35:4, 35:7, 35:19, 35:22, 36:23, 37:15, 41:20, 42:13, 42:16, 42:19, 42:23, 43:1, 43:2, 43:4, 45:18, 45:22, 46:7, 46:8, 46:16, 46:19, 46:24, 46:25, 47:3, 47:9, 47:17, 48:3, 48:17, 48:20, 48:23, 49:16, 50:6, 50:12, 50:19, 50:22, 51:16, 52:7, 52:9, 52:12, 52:16, 52:17, 52:23, 53:4, 53:22, 54:4, 54:7, 54:21, 54:24, 55:1, 55:2, 55:7, 55:9, 55:24, 56:4, 56:8, 57:16, 58:1, 58:6, 58:8, 58:12, 59:3, 59:8, 60:1, 60:5, 60:22, 61:19, 61:20, 61:21, 61:24, 62:1, 62:2, 63:20, 64:5, 64:9, 64:19, 64:23, 65:1, 65:15, 65:24, 66:1
**Class** [7] - 5:2, 7:2, 9:5, 10:9, 25:2, 46:16, 63:13
**class's** [2] - 56:11, 56:12
**class-wide** [10] - 9:9, 11:10, 12:11, 12:13, 35:4, 43:4, 50:12, 55:1, 55:24, 60:5
**Class-wide** [1] - 9:5
**clear** [14] - 17:1,

18:14, 23:2, 23:9,
29:10, 34:18, 36:6,
42:13, 51:11, 53:12,
55:21, 57:11, 57:15,
69:7
**client** [2] - 37:21, 38:2
**clock** [3] - 53:17,
53:21
**close** [1] - 27:20
**closed** [5] - 5:8, 36:11,
53:2, 63:3, 65:17
**closing** [5] - 8:14,
38:17, 41:4, 41:6,
53:1
**Code** [1] - 27:22
**Columbian** [1] - 6:22
**combing** [2] - 15:16,
68:4
**coming** [1] - 65:3
**commercial** [1] -
62:14
**committed** [1] - 53:19
**committing** [1] - 15:24
**common** [33] - 7:25,
8:13, 9:20, 12:5,
12:6, 12:9, 12:14,
13:3, 13:24, 14:4,
14:12, 15:25, 17:13,
18:10, 18:12, 18:13,
20:25, 21:5, 21:7,
21:24, 22:3, 22:8,
34:4, 50:9, 50:10,
50:11, 61:2, 66:7,
67:5, 68:21, 69:4
**commonality** [8] -
7:24, 12:8, 20:4,
20:7, 20:8, 20:10,
50:14
**commonly** [1] - 16:20
**Commonwealth** [1] -
61:13
**community** [3] -
16:11, 45:9, 68:12
**community-related**
[1] - 68:12
**companies** [5] - 4:22,
6:18, 16:10, 40:10,
40:24
**company** [8] - 3:9,
3:10, 3:21, 6:19,
16:6, 40:6, 41:8,
41:14
**comparable** [2] -
26:16, 26:21
**compare** [1] - 28:21
**comparison** [2] -
26:17, 69:17
**compendium** [1] -
52:1
**compete** [3] - 4:20,

4:21, 28:18
**competition** [2] -
28:25, 49:11
**competitive** [1] -
40:24
**Competitive** [2] -
4:10, 7:13
**complained** [1] -
34:19
**complaining** [1] -
44:22
**complains** [1] - 33:14
**complaint** [6] - 4:13,
38:4, 46:3, 47:11,
57:14, 57:19
**complicated** [1] - 62:5
**component** [1] - 20:23
**comprehensive** [1] -
31:20
**Computer** [2] - 53:16,
59:18
**conceal** [3] - 8:16,
8:21, 20:25
**concealed** [4] - 10:14,
10:20, 12:19, 13:3
**concealment** [18] -
8:12, 9:4, 10:5,
10:14, 12:18, 13:2,
20:19, 20:24, 52:24,
53:6, 53:9, 53:12,
53:16, 53:21, 56:6,
56:9, 56:22
**concealments** [1] -
13:25
**concede** [3] - 43:2,
48:2, 64:15
**concern** [2] - 50:15,
54:12
**concerned** [1] - 65:4
**concerning** [1] - 61:19
**concerns** [2] - 47:4,
61:22
**concluded** [8] - 24:4,
40:7, 40:10, 48:24,
49:1, 57:11, 57:18,
71:9
**conclusion** [6] -
20:12, 24:15, 37:3,
39:18, 39:22, 41:16
**conclusionary** [1] -
36:25
**conclusions** [3] -
41:23, 41:25, 42:7
**concrete** [4] - 29:1,
33:16, 38:23, 44:11
**condominium** [1] -
28:9
**conduct** [3] - 10:2,
12:10, 68:9
**conducted** [1] - 54:4

**Conference** [1] -
72:12
**confession** [1] - 36:13
**confirm** [2] - 18:6,
38:14
**confirmation** [1] -
44:22
**confirmed** [1] - 42:7
**confirming** [1] - 41:2
**confirms** [1] - 17:25
**conformance** [1] -
72:11
**Congress** [3] - 39:4,
54:10, 70:21
**conjured** [1] - 45:9
**connection** [3] - 41:5,
48:23, 58:19
**consequence** [1] -
53:12
**consequences** [1] -
53:8
**consider** [2] - 24:5,
26:22
**consideration** [2] -
7:17, 10:12
**considerations** [1] -
24:10
**considered** [1] - 48:23
**consistent** [2] - 40:12,
54:3
**consistently** [1] -
55:19
**consolidated** [1] -
60:6
**constitutional** [2] -
33:4, 46:17
**constructive** [2] -
54:22, 59:9
**consulting** [1] - 6:18
**consumer** [2] - 17:19,
35:6
**consumers** [1] - 21:17
**consuming** [1] - 68:16
**consumption** [1] -
20:22
**contact** [1] - 68:7
**contend** [1] - 13:2
**contention** [1] - 49:8
**context** [7] - 19:9,
43:16, 56:6, 56:15,
57:12, 59:3, 60:22
**continue** [3] - 30:7,
31:15, 67:21
**continuum** [1] - 43:22
**contours** [1] - 52:5
**contradicts** [1] - 42:20
**contrary** [6] - 15:25,
37:5, 44:7, 47:7,
59:21, 62:21
**contrast** [1] - 39:24

**contrived** [1] - 45:3
**control** [1] - 3:19
**controlled** [1] - 33:9
**controls** [1] - 60:21
**convenient** [1] - 54:6
**conversation** [1] -
38:1
**conversations** [1] -
70:2
**correct** [4] - 31:24,
32:9, 64:22, 72:9
**cost** [4] - 25:19, 26:23,
28:9, 70:22
**council** [1] - 70:2
**counsel** [12] - 3:4,
12:1, 12:2, 14:8,
21:9, 21:15, 30:13,
37:21, 54:10, 67:18,
67:24
**Counsel** [2] - 2:24, 3:1
**countless** [1] - 11:24
**counts** [1] - 59:3
**County** [2] - 6:21,
46:13
**couple** [3] - 28:13,
31:20, 49:13
**course** [4] - 26:6,
46:3, 57:25, 68:16
**COURT** [33] - 1:1, 2:2,
2:14, 2:18, 18:18,
19:3, 19:7, 19:16,
20:1, 20:6, 20:11,
20:17, 22:15, 22:22,
23:1, 31:19, 32:4,
32:13, 47:24, 48:7,
49:5, 50:2, 63:16,
64:12, 64:17, 65:10,
65:23, 67:18, 67:20,
67:24, 70:24, 71:8,
72:18
**Court** [76] - 1:24, 12:3,
13:23, 15:20, 20:11,
20:13, 20:21, 22:4,
23:8, 23:9, 24:4,
24:13, 25:5, 26:8,
29:12, 30:5, 31:10,
31:18, 32:3, 32:17,
33:2, 33:12, 33:19,
33:23, 36:18, 36:21,
37:2, 38:13, 38:15,
38:18, 38:20, 39:6,
39:9, 39:18, 43:23,
44:4, 46:1, 46:14,
46:18, 46:20, 46:22,
47:4, 50:11, 50:15,
50:16, 53:1, 54:9,
54:14, 54:18, 55:3,
55:7, 55:8, 55:17,
56:5, 56:7, 56:14,
57:2, 57:6, 58:10,

58:21, 59:4, 59:23,
59:24, 60:23, 61:21,
61:23, 62:4, 65:4,
66:4, 67:2, 67:6,
70:11, 72:7
**court** [5] - 13:18,
50:25, 65:4, 65:5,
67:19
**Court's** [2] - 56:24,
61:17
**courts** [8] - 23:13,
23:15, 23:17, 23:20,
24:9, 31:4, 43:20,
51:2
**Courts** [2] - 58:18,
60:8
**cover** [1] - 38:3
**coverage** [5] - 51:5,
62:13, 65:8, 65:11,
66:22
**covered** [2] - 51:21,
51:25
**Cox** [1] - 46:7
**create** [5] - 8:15,
16:16, 58:21, 59:10,
61:25
**created** [1] - 62:8
**creates** [2] - 61:25,
69:17
**credence** [1] - 43:23
**Credit** [2] - 21:16,
66:15
**credit** [1] - 62:14
**Creditor** [1] - 13:7
**creditors** [1] - 36:20
**credits** [3] - 4:8, 4:13,
6:7
**Creig** [1] - 38:9
**criminal** [1] - 39:7
**criticizes** [1] - 69:7
**cross** [1] - 26:4
**cross-examination** [1]
- 26:4
**CRR** [1] - 72:17
**crux** [1] - 49:19
**curious** [1] - 56:18
**customers** [3] - 40:15,
44:20, 45:1
**cut** [3] - 6:3, 8:11,
67:22

---

# D

**daily** [1] - 65:16
**Daily** [2] - 21:16, 66:15
**damages** [2] - 9:20,
9:23
**data** [3] - 17:24, 41:10,
63:1
**database** [9] - 5:4,

5:7, 5:12, 7:17, 7:18, 62:24, 63:5, 63:6, 64:14
**date** [3] - 18:21, 20:14, 21:10
**Dated** [1] - 72:14
**dates** [4] - 5:6, 7:19, 7:22, 57:5
**days** [1] - 46:19
**deal** [3] - 9:18, 42:4, 67:16
**dealing** [5] - 4:22, 56:7, 61:18, 63:19, 63:21
**debt** [1] - 17:19
**decades** [1] - 28:8
**December** [5] - 7:8, 7:10, 33:20, 35:20, 47:5
**decertification** [1] - 62:5
**decertified** [1] - 61:21
**decertify** [1] - 20:14
**decide** [2] - 34:15, 68:14
**decided** [6] - 34:17, 48:19, 52:20, 58:8, 58:16, 58:18
**decides** [1] - 38:9
**decipher** [1] - 19:10
**decision** [3] - 33:14, 54:13, 61:17
**decisions** [2] - 37:12, 58:16
**deeply** [1] - 43:6
**defeating** [1] - 30:19
**defeats** [1] - 56:12
**Defendant** [3] - 15:21, 15:23, 38:8
**defendant** [1] - 67:6
**Defendant's** [6] - 12:25, 14:8, 17:15, 39:13, 44:8, 56:9
**Defendants** [25] - 1:7, 1:17, 2:15, 2:17, 2:22, 7:11, 13:14, 14:13, 16:15, 32:15, 35:15, 37:5, 37:13, 37:19, 37:20, 39:23, 40:1, 43:24, 46:14, 53:25, 55:2, 62:7, 63:1, 69:8, 71:7
**defendants** [10] - 15:13, 17:11, 21:19, 29:22, 37:23, 47:10, 49:19, 54:20, 62:20, 70:8
**Defendants'** [6] - 16:3, 36:5, 38:10, 59:5, 63:8, 69:3

**defense** [12] - 10:1, 10:11, 11:2, 21:8, 21:15, 29:24, 30:3, 30:11, 30:20, 35:25, 55:23, 61:23
**Defense** [2] - 25:21, 29:18
**defense's** [1] - 10:15
**defenses** [1] - 10:3
**defer** [1] - 67:24
**deficiency** [1] - 54:8
**deficient** [1] - 47:14
**defined** [1] - 7:4
**definitely** [1] - 35:2
**definition** [3] - 17:6, 18:2, 43:1
**definitively** [1] - 46:13
**degree** [1] - 40:7
**demonstrated** [1] - 27:17
**demonstrates** [1] - 24:2
**denials** [1] - 58:20
**denied** [3] - 28:25, 54:14, 55:3
**deny** [1] - 33:1
**denying** [1] - 56:4
**depo** [1] - 11:21
**depos** [1] - 11:20
**deposed** [3] - 5:21, 40:14, 41:22
**deposition** [7] - 17:22, 18:5, 18:22, 19:1, 19:8, 19:12, 28:16
**depositions** [2] - 21:23, 21:25
**depth** [1] - 35:10
**described** [3] - 5:25, 13:25, 23:10
**design** [1] - 22:7
**desire** [1] - 42:9
**detail** [4] - 23:10, 24:21, 37:6, 51:19
**detailing** [1] - 34:7
**details** [3] - 32:19, 50:21, 51:3
**determination** [3] - 52:16, 57:24, 60:5
**determinations** [1] - 58:6
**determine** [11] - 10:21, 11:1, 12:3, 13:11, 34:14, 42:12, 50:5, 54:24, 55:16, 61:5, 62:18
**determined** [2] - 32:5, 38:10
**developed** [2] - 20:15, 46:10
**diagnosed** [1] - 29:14

**difference** [2] - 65:22, 70:3
**differences** [2] - 63:25, 64:1
**different** [12] - 35:9, 35:18, 40:14, 44:12, 48:8, 49:4, 58:18, 60:14, 63:19, 64:6, 65:6, 65:9
**difficult** [1] - 19:10
**diligence** [15] - 10:22, 11:1, 13:1, 13:22, 14:5, 20:23, 21:3, 21:12, 22:3, 22:10, 52:25, 58:3, 67:5, 67:13, 68:14
**diligent** [2] - 13:12, 21:4
**Dining** [1] - 23:11
**direct** [1] - 61:8
**direction** [1] - 24:7
**directly** [3] - 51:16, 56:23, 61:11
**disagree** [2] - 13:16, 48:1
**discern** [2] - 35:9, 39:11
**discerned** [2] - 64:4, 64:10
**discharge** [1] - 36:12
**disclosed** [1] - 8:25
**disclosures** [1] - 30:2
**disconnected** [2] - 66:4, 67:19
**discount** [2] - 69:22, 70:15
**discover** [1] - 57:23
**discoverable** [1] - 37:25
**discovered** [1] - 53:18
**discovers** [1] - 53:14
**discovery** [12] - 11:19, 12:20, 19:20, 19:25, 20:15, 26:4, 26:9, 37:22, 37:24, 41:18, 41:20, 46:4
**discretion** [1] - 38:20
**discretionary** [6] - 38:18, 38:19, 38:21, 39:10, 39:20, 42:8
**discriminating** [1] - 16:7
**discrimination** [1] - 54:23
**discriminatory** [1] - 54:19
**discuss** [2] - 37:14, 47:1
**discussed** [2] - 8:8, 24:20

**discussion** [1] - 64:13
**Dismiss** [4] - 57:13, 60:2, 60:7, 60:23
**dismissal** [1] - 47:1
**dismissed** [4] - 36:24, 46:15, 46:17, 46:23
**dispute** [5] - 25:7, 33:9, 39:25, 48:10, 60:16
**disqualified** [2] - 31:6, 31:10
**distinction** [1] - 49:12
**distinguished** [1] - 58:9
**distortion** [1] - 12:10
**district** [3] - 23:13, 23:14, 31:4
**District** [5] - 24:13, 55:3, 55:8, 72:7
**DISTRICT** [2] - 1:1, 1:1
**divorced** [1] - 38:23
**Dlott** [1] - 18:12
**docket** [1] - 30:1
**documents** [3] - 11:19, 12:13, 17:11
**domain** [2] - 34:11, 54:1
**done** [8] - 17:7, 22:3, 22:6, 32:21, 41:21, 55:24, 67:5, 69:9
**down** [2] - 17:15, 26:22
**drafted** [1] - 44:13
**drove** [1] - 11:20
**due** [4] - 11:1, 13:11, 58:3, 63:8
**Dukes** [1] - 50:11
**during** [7] - 3:1, 3:21, 4:16, 5:2, 5:16, 7:9, 24:25
**duty** [2] - 15:22, 62:2

## E

**Eagle** [39] - 2:5, 3:21, 3:23, 4:25, 5:11, 5:22, 5:24, 6:6, 6:9, 6:13, 7:1, 7:5, 7:11, 7:19, 8:5, 8:19, 8:20, 8:23, 9:2, 9:15, 14:19, 14:22, 15:1, 16:18, 17:10, 17:22, 18:1, 18:8, 19:14, 19:17, 19:23, 22:11, 31:13, 65:11, 66:22, 69:24
**EAGLE** [1] - 1:6
**Eagle's** [1] - 31:1
**early** [4] - 17:24, 18:22, 19:9, 25:8

**Edmondson** [51] - 2:4, 8:1, 9:11, 10:19, 11:13, 11:20, 13:24, 15:21, 21:4, 22:18, 22:22, 25:22, 25:24, 26:23, 27:2, 27:25, 30:25, 32:4, 32:7, 32:10, 33:3, 33:11, 33:15, 38:14, 39:19, 40:5, 40:11, 41:3, 41:6, 41:13, 42:22, 44:8, 44:22, 47:16, 48:1, 48:5, 49:8, 57:9, 57:11, 57:18, 57:21, 57:25, 58:2, 59:21, 60:5, 67:3, 69:6, 69:9, 69:12, 69:13, 70:13
**EDMONDSON** [2] - 1:2, 22:20
**Edmondson's** [17] - 11:14, 25:5, 26:19, 27:18, 28:5, 29:7, 38:6, 41:11, 42:3, 42:5, 42:7, 44:16, 44:21, 47:7, 47:10, 59:21, 65:17
**effect** [1] - 57:25
**effectively** [1] - 12:7
**eight** [6] - 11:6, 14:3, 14:7, 15:16, 15:19, 68:25
**either** [8] - 6:17, 19:13, 32:25, 33:22, 34:12, 35:18, 63:11, 71:4
**element** [4] - 16:2, 16:18, 66:8, 66:9
**elements** [2] - 24:17
**eleventh** [2] - 33:17, 45:23
**Eleventh** [1] - 23:23
**eleventh-hour** [2] - 33:17, 45:23
**Emery** [1] - 4:18
**emphasis** [1] - 39:11
**employee** [1] - 7:10
**employees** [5] - 14:19, 14:22, 14:23, 17:23, 19:18
**end** [5] - 3:3, 6:1, 6:16, 25:7, 29:7
**ended** [1] - 19:17
**ends** [1] - 45:14
**enforcement** [6] - 39:8, 51:4, 51:15, 58:25, 59:15, 63:23
**engage** [1] - 42:10
**English** [1] - 2:13
**ENGLISH** [1] - 1:14

**enjoy** [2] - 30:7, 49:11
**entire** [6] - 13:21, 14:4, 14:16, 18:7, 34:10, 44:1
**entirely** [2] - 46:2, 47:14
**entitled** [4] - 30:6, 70:9, 70:10, 72:10
**enumerated** [1] - 62:12
**environment** [1] - 27:13
**equal** [1] - 25:9
**equally** [2] - 37:24, 47:14
**equals** [1] - 34:23
**equitable** [3] - 56:15, 56:21, 64:20
**escape** [1] - 30:21
**especially** [1] - 44:6
**Esquire** [6] - 1:14, 1:14, 1:16, 1:18, 1:19, 1:20
**ESSA** [1] - 7:12
**establish** [1] - 24:16
**established** [1] - 24:15
**estate** [7] - 30:7, 33:8, 33:9, 36:7, 36:13, 37:12, 38:16
**estimate** [4] - 8:25, 41:4, 41:5, 41:7
**et** [4] - 1:3, 1:6, 7:18, 8:6
**evaluate** [3] - 13:11, 14:12, 21:11
**evaluated** [2] - 14:4, 60:21
**evaluates** [1] - 13:22
**event** [3] - 31:14, 31:22, 66:8
**evidence** [33] - 8:2, 9:8, 10:12, 10:23, 11:4, 13:11, 16:8, 18:4, 18:10, 18:13, 20:14, 27:25, 28:11, 28:19, 28:20, 29:2, 29:3, 29:4, 33:12, 34:25, 39:23, 39:24, 41:2, 41:16, 43:18, 44:6, 44:8, 49:25, 50:17, 56:10, 60:17
**evidentiary** [1] - 59:24
**exact** [4] - 34:7, 39:16, 54:12, 62:6
**exactly** [5] - 45:8, 56:3, 65:8, 69:11, 70:20
**exam** [1] - 69:15
**examination** [11] -

24:17, 26:4, 26:17, 26:18, 26:21, 26:24, 27:1, 28:11, 54:16, 55:12, 55:15
**example** [2] - 42:22, 62:15
**Excel** [1] - 5:5
**except** [2] - 22:11, 49:5
**exceptions** [1] - 69:3
**excessively** [1] - 28:12
**exchange** [4] - 18:7, 25:17, 29:9, 38:16
**excluded** [1] - 17:4
**excuse** [1] - 43:7
**exempt** [1] - 70:6
**exempted** [2] - 7:8, 17:8
**exemptions** [2] - 16:16, 62:12
**exercised** [1] - 58:3
**Exhibit** [1] - 52:2
**Exhibits** [1] - 40:13
**exhibits** [2] - 51:8
**existence** [1] - 40:16
**existing** [1] - 16:21
**expected** [1] - 17:10
**experience** [6] - 5:7, 40:3, 40:5, 40:11, 42:1, 43:8
**expert** [5] - 26:5, 39:25, 40:1, 43:7, 48:14
**explain** [2] - 26:25, 39:6
**explained** [1] - 49:21
**explaining** [1] - 44:19
**explains** [1] - 38:22
**explicitly** [3] - 4:23, 48:9, 56:21
**exported** [1] - 5:5
**exposed** [4] - 34:12, 54:21, 55:2, 59:8
**exposure** [1] - 20:22
**expounded** [1] - 52:22
**expressed** [1] - 54:12
**expressly** [1] - 60:25
**exquisite** [1] - 36:13
**extensions** [1] - 62:14
**extensive** [2] - 40:10, 51:5
**extent** [2] - 64:14, 67:6
**extinguished** [1] - 30:24
**extraordinarily** [2] - 27:21, 28:5
**extraordinary** [3] - 26:24, 26:25, 27:4

**extremely** [1] - 27:15

## F

**face** [2] - 37:23, 58:3
**faced** [4] - 38:15, 54:18, 58:10, 63:4
**fact** [22] - 6:8, 6:16, 13:17, 13:18, 20:18, 28:20, 28:23, 31:7, 37:21, 45:21, 46:18, 50:5, 50:24, 56:11, 56:17, 58:4, 58:5, 59:12, 59:23, 60:9, 61:1, 68:24
**factors** [2] - 7:16, 24:20
**facts** [4] - 10:9, 18:13, 39:17, 63:18
**factual** [2] - 7:1, 48:10
**fail** [2] - 33:5, 47:18, 53:8
**failed** [2] - 12:3, 57:23
**failure** [2] - 33:15, 69:7
**failures** [2] - 38:3, 47:14
**fair** [1] - 36:19
**fairly** [1] - 24:18
**faith** [5] - 8:25, 30:18, 41:3, 41:4, 41:6
**falls** [1] - 11:14
**false** [1] - 35:6
**falsely** [1] - 35:8
**Family** [1] - 23:11
**Fangman** [1] - 11:8, 51:1, 58:7, 58:9, 64:25
**far** [1] - 43:19
**Fargo** [3] - 14:17, 14:20, 67:12
**favor** [2] - 31:3, 56:13
**favorite** [1] - 53:11
**February** [2] - 14:20, 38:9
**Federal** [3] - 1:24, 26:3, 27:23
**FEDERAL** [1] - 72:18
**federal** [2] - 23:16, 23:20
**federally** [6] - 7:3, 62:11, 62:18, 67:14, 68:22, 69:3
**federally-related** [2] - 7:3, 69:3
**fee** [4] - 26:17, 40:18, 69:8, 69:11
**feedback** [2] - 2:8, 2:20
**fees** [27] - 8:24, 9:3,

27:20, 34:19, 35:9, 38:7, 38:11, 38:18, 38:19, 38:20, 38:21, 39:10, 39:20, 39:22, 40:4, 40:8, 40:23, 40:25, 41:5, 42:2, 42:8, 42:10, 42:14, 42:25, 44:5, 44:9, 44:21
**fell** [1] - 12:18
**felt** [1] - 28:18
**few** [4] - 25:6, 47:24, 51:12, 67:23
**FHA** [2] - 17:4, 17:7
**fictional** [1] - 58:23
**fields** [1] - 15:14
**Fifth** [3] - 5:21, 9:8, 23:22
**figure** [2] - 15:18, 56:1
**filed** [19] - 19:22, 29:12, 31:12, 34:11, 36:6, 36:9, 36:10, 36:11, 36:15, 37:22, 38:8, 38:19, 52:7, 52:9, 52:14, 54:2, 58:13, 60:18, 70:1
**files** [1] - 7:19
**filing** [5] - 19:4, 30:4, 33:10, 37:18, 38:4
**filings** [2] - 65:4, 65:5
**finally** [4] - 37:20, 43:5, 45:16, 62:8
**fine** [1] - 47:24
**finish** [1] - 3:2
**finished** [1] - 2:25
**first** [20] - 13:1, 13:3, 26:1, 26:8, 26:25, 32:17, 33:1, 35:13, 37:16, 39:25, 41:25, 42:25, 43:3, 45:24, 47:2, 47:25, 51:6, 56:19, 59:1, 63:17
**fishy** [2] - 6:16, 8:22
**five** [9] - 11:5, 14:3, 15:16, 15:18, 26:19, 26:20, 67:7, 67:9, 68:3
**flawed** [1] - 43:6
**Floor** [1] - 1:24
**focus** [2] - 24:17, 65:11
**focused** [4] - 50:16, 55:18, 65:12, 65:14
**focusing** [1] - 36:2
**folks** [7] - 8:20, 9:15, 15:6, 18:8, 22:5, 66:10
**follow** [1] - 69:2
**follow-up** [1] - 69:2
**following** [1] - 6:3

**forced** [1] - 71:3
**foregoing** [1] - 72:8
**forget** [1] - 56:19
**form** [3] - 8:20, 25:11, 57:16
**formal** [1] - 32:2
**format** [2] - 71:3, 72:11
**formed** [1] - 16:10
**formula** [1] - 9:21
**forward** [2] - 48:4, 67:6
**four** [3] - 26:16, 26:22, 27:11
**Fourth** [26] - 10:17, 23:13, 25:1, 28:21, 31:2, 33:14, 34:17, 38:9, 38:12, 52:18, 53:10, 53:15, 54:13, 55:4, 55:12, 55:21, 56:3, 57:6, 57:10, 57:12, 57:13, 57:15, 58:16, 59:17, 61:3, 61:5
**Fox** [1] - 1:21
**frame** [2] - 17:21, 42:4
**frankly** [4] - 8:1, 9:9, 18:9, 38:1
**fraud** [2] - 53:14, 65:21
**fraudulent** [13] - 8:12, 10:5, 10:13, 12:18, 13:2, 20:19, 20:23, 52:24, 53:9, 53:16, 53:21, 56:6, 56:22
**Friday** [3] - 14:15, 14:19, 67:11
**Frosh** [1] - 66:12
**fulfill** [1] - 29:16
**full** [2] - 52:7, 59:24
**fully** [1] - 52:5
**fund** [1] - 25:12
**funding** [1] - 28:14
**funds** [3] - 28:17, 29:6, 62:19
**funnel** [1] - 6:23

## G

**gained** [1] - 55:9
**Gallagher** [1] - 2:3
**GALLAGHER** [1] - 1:11
**game** [1] - 61:17
**Gary** [9] - 5:11, 5:14, 5:16, 9:7, 13:9, 17:23, 51:17, 68:6, 68:8
**Gazic** [2] - 1:23, 72:5
**GAZIC** [1] - 72:17

**General** [1] - 51:23
**general** [2] - 42:4, 44:19
**generally** [3] - 6:2, 55:15, 58:2
**generate** [3] - 3:13, 3:25, 6:25
**Genuine** [36] - 3:8, 3:11, 3:15, 3:22, 3:24, 4:1, 4:2, 4:5, 4:7, 4:10, 4:14, 5:4, 5:12, 5:23, 6:20, 7:6, 7:12, 7:17, 14:23, 17:24, 18:1, 34:24, 35:1, 40:20, 41:8, 41:12, 42:18, 51:11, 51:15, 51:24, 52:4, 52:10, 62:24, 63:1, 63:6, 65:12
**geographic** [1] - 42:5
**George's** [1] - 46:13
**GFE** [4] - 41:7, 41:11, 41:14, 49:21
**GFEs** [1] - 13:6
**Gildea** [1] - 1:15
**given** [5] - 27:4, 27:5, 28:17, 40:20, 70:6
**Glickstein** [6] - 3:25, 4:4, 6:7, 7:13, 9:7, 13:5
**GO** [2] - 53:16, 59:17
**goaling** [1] - 54:4
**Goldstein** [1] - 37:11
**govern** [1] - 63:18
**Government** [4] - 13:15, 13:17, 39:8, 51:3
**granted** [1] - 33:20
**great** [1] - 23:10
**Greenwald** [1] - 1:16
**Group** [1] - 7:13
**grown** [1] - 15:14
**guess** [1] - 15:14
**guesses** [1] - 45:6
**guidance** [1] - 17:17
**guidelines** [3] - 16:23, 17:7, 27:22
**guy** [3] - 4:2, 4:5

## H

**half** [1] - 70:9
**hammers** [1] - 53:16
**hand** [2] - 59:19, 60:12
**handwriting** [1] - 43:16
**happy** [8] - 4:24, 18:17, 23:4, 31:18, 45:8, 47:24, 50:4,

70:17
**harder** [1] - 19:1
**hardly** [1] - 43:18
**harm** [6] - 28:19, 33:16, 38:24, 39:4, 39:12, 44:22
**Harriet** [2] - 8:2, 9:12
**Harry** [1] - 9:12
**hate** [1] - 15:14
**hayfield** [2] - 21:13, 21:18
**haystack** [1] - 15:13
**Hazel** [2] - 23:10, 24:1
**headquartered** [1] - 40:6
**hear** [7] - 11:22, 18:19, 22:16, 23:4, 32:14, 61:9, 61:10
**heard** [3] - 25:5, 48:12, 52:10
**hearing** [7] - 2:8, 2:19, 2:21, 3:1, 3:3, 19:4, 49:25
**hearings** [2] - 54:23, 55:19
**heart** [1] - 12:15
**Heavyweight** [1] - 3:11
**hedging** [1] - 35:17
**held** [5] - 39:9, 46:14, 55:12, 55:19, 72:10
**helped** [1] - 9:25
**helpful** [2] - 61:17, 70:24
**Hendrick** [1] - 24:14
**hereby** [1] - 72:7
**herself** [1] - 42:22
**high** [3] - 27:15, 27:18, 27:21
**higher** [4] - 27:9, 27:11, 28:1, 44:5
**highly** [3] - 22:1
**himself** [1] - 70:17
**history** [1] - 27:4
**hold** [1] - 27:7
**home** [2] - 38:22, 53:16
**Homeowner** [1] - 9:12
**homeowner** [4] - 8:2, 48:9, 49:5, 49:6
**Honor** [43] - 2:12, 2:16, 3:5, 7:21, 11:8, 15:2, 17:15, 18:9, 18:25, 19:11, 19:19, 20:5, 20:10, 20:16, 21:2, 21:3, 22:20, 23:7, 31:16, 32:9, 32:16, 37:23, 44:1, 44:14, 44:17, 47:15, 47:19, 47:20, 48:6,

48:18, 48:19, 49:16, 50:4, 61:10, 61:16, 62:8, 63:11, 63:14, 64:16, 64:24, 67:15, 69:9, 70:23
**Honorable** [1] - 1:11
**Hopkins** [1] - 22:24
**hospital** [1] - 11:24
**hour** [2] - 33:17, 45:23
**hours** [1] - 11:24
**HUD** [5] - 11:11, 25:15, 27:14, 43:14, 43:25
**HUD-1** [11] - 7:7, 8:24, 17:18, 26:19, 42:9, 43:5, 62:22, 69:8, 69:10
**HUD-1s** [9] - 7:20, 8:24, 13:6, 26:10, 26:15, 26:19, 26:20, 42:3, 42:6
**hurdles** [1] - 33:24
**hurts** [1] - 38:24
**hypothetical** [5] - 45:4, 45:8, 45:10, 45:11, 58:21

## I

**idea** [14] - 16:1, 28:9, 43:21, 45:5, 58:21, 60:18, 65:25, 66:9, 66:11, 68:2, 68:5, 68:7, 68:9, 69:2
**identical** [2] - 31:13, 39:20
**identifiable** [1] - 66:16
**identification** [1] - 34:3
**identified** [13] - 5:2, 5:3, 5:15, 5:17, 7:7, 7:16, 13:20, 16:19, 33:18, 34:22, 45:24, 63:20, 67:3
**identifies** [1] - 3:16
**identify** [5] - 5:6, 7:20, 35:3, 42:16, 68:23
**ignores** [3] - 59:1, 59:12, 59:17
**III** [1] - 46:9
**imagine** [2] - 14:5, 22:12
**immediately** [1] - 35:20
**impact** [3] - 50:18, 50:19, 64:8
**impacts** [1] - 57:1
**impermissible** [2] - 56:2, 57:3
**implicated** [1] - 51:18

**implication** [1] - 58:5
**implications** [2] - 54:8, 57:8
**imply** [1] - 56:14
**importance** [1] - 13:16
**important** [1] - 65:21
**importantly** [1] - 65:14
**impossible** [1] - 44:3
**improper** [1] - 33:17
**improperly** [1] - 36:1
**IN** [1] - 1:1
**in-depth** [1] - 35:10
**inadequate** [1] - 49:9
**Inc** [1] - 7:13
**include** [2] - 15:1, 66:22
**included** [3] - 40:6, 66:23, 66:24
**including** [3] - 7:20, 14:24, 51:10
**incomplete** [1] - 26:2
**inconsistent** [1] - 44:25
**incorrect** [3] - 35:24, 43:12, 62:25
**increase** [1] - 38:11
**increased** [3] - 34:20, 35:5, 42:13
**increasing** [2] - 40:23, 70:21
**incredibly** [1] - 44:14
**indeed** [1] - 34:25
**indication** [1] - 43:15
**indications** [1] - 70:6
**individual** [24] - 12:9, 20:21, 21:6, 24:3, 32:21, 33:4, 33:5, 35:13, 43:5, 46:4, 47:17, 50:19, 51:15, 52:11, 54:17, 54:21, 54:23, 55:15, 55:19, 62:8, 62:10, 63:12, 65:14, 67:12
**individuality** [1] - 45:20
**individualized** [21] - 16:16, 16:17, 34:1, 34:15, 34:20, 42:12, 47:20, 50:5, 52:18, 56:3, 58:5, 58:17, 59:20, 61:1, 61:11, 64:10, 64:19, 64:21, 66:3, 66:9, 69:17
**individually** [2] - 60:20, 69:15
**individuals** [3] - 7:3, 65:19, 65:20
**industry** [2] - 40:3, 40:11
**inexpensive** [1] -

30:20
**inference** [1] - 56:9
**info** [2] - 11:2, 14:1
**information** [29] - 5:3, 13:13, 13:14, 20:22, 21:20, 22:2, 22:10, 22:11, 34:6, 34:12, 50:20, 50:22, 52:4, 52:8, 53:24, 54:22, 54:25, 55:3, 55:6, 55:9, 55:14, 56:11, 58:3, 59:7, 59:8, 59:14, 59:19, 60:12, 64:6
**informed** [1] - 37:21
**initial** [2] - 30:2, 48:16
**injuries** [1] - 29:1
**injury** [3] - 28:20, 44:12, 45:9
**inquire** [1] - 62:2
**inquiries** [3] - 59:20, 61:1, 61:12
**inquiry** [21] - 17:13, 24:3, 32:21, 34:13, 42:12, 45:15, 50:14, 52:13, 52:17, 52:18, 53:6, 53:10, 55:10, 56:4, 56:25, 57:22, 59:16, 60:11, 64:11, 64:19, 64:21
**instance** [2] - 13:4, 60:10
**instead** [8] - 4:9, 28:24, 30:18, 36:18, 45:7, 59:7, 70:14, 70:18
**institution** [1] - 9:17
**instructive** [1] - 54:14
**insulated** [1] - 39:5
**insurance** [4] - 16:6, 16:10, 38:19, 54:19
**Insurance** [2] - 4:18, 8:13
**insurmountable** [1] - 33:24
**intended** [1] - 53:25
**interest** [1] - 36:20
**interests** [1] - 24:19
**International** [2] - 46:9, 46:11
**internet** [1] - 11:5, 13:14, 13:25, 21:10, 43:19
**interpretation** [1] - 53:7
**interrogatories** [1] - 30:2
**interrupt** [1] - 67:18
**interrupting** [1] - 2:25
**intervened** [1] - 30:13

intro [1] - 32:18
introduce [1] - 2:10
investigate [2] - 13:12, 15:23
investigation [1] - 38:4
investment [2] - 16:22, 17:3
involve [1] - 10:5
involved [9] - 12:12, 13:9, 13:24, 14:9, 16:4, 51:20, 59:15, 65:13, 65:20
involves [1] - 10:12
involving [2] - 29:11, 54:18
Iowa [1] - 46:22
issue [45] - 3:22, 9:23, 9:24, 10:13, 11:13, 13:1, 14:3, 14:11, 18:21, 21:24, 22:9, 24:8, 25:4, 29:23, 31:17, 35:6, 35:13, 38:8, 40:8, 43:10, 46:17, 48:16, 49:18, 49:19, 52:19, 52:21, 53:1, 54:12, 55:18, 56:5, 58:4, 59:6, 59:25, 60:21, 62:7, 62:11, 62:17, 63:4, 63:12, 65:3, 65:6, 67:13, 69:18, 71:1
issued [4] - 11:16, 26:9, 28:21, 46:21
issues [35] - 7:25, 8:12, 12:6, 12:7, 12:9, 12:14, 12:21, 13:3, 15:25, 16:16, 16:17, 17:13, 27:7, 29:11, 30:2, 32:22, 34:1, 34:3, 34:20, 35:21, 46:11, 47:20, 50:3, 50:5, 54:16, 58:15, 58:17, 61:12, 62:8, 62:10, 65:2, 66:7, 68:21, 68:23, 69:4
issuing [1] - 51:14
itemize [2] - 69:8, 69:16
items [1] - 21:14
itself [2] - 28:12, 32:25

## J

Janet [5] - 29:13, 31:7, 35:19, 47:5
January [8] - 7:7, 7:9, 14:15, 19:17, 21:10, 29:25, 51:7

jar [1] - 35:7
Jay [18] - 3:8, 3:14, 3:25, 4:1, 4:17, 4:19, 5:13, 5:22, 5:25, 6:13, 8:4, 9:10, 11:14, 13:4, 17:21, 19:13, 40:12, 69:20
Jim [3] - 6:5, 6:9
JM [1] - 40:23
Johns [1] - 22:24
Joseph [1] - 1:16
judge [1] - 67:4
Judge [13] - 1:11, 2:2, 9:9, 11:8, 18:11, 18:12, 23:10, 24:1, 52:3, 54:1, 54:11, 67:21, 69:11
Judgment [1] - 14:11
judgment [1] - 36:19
Judicial [1] - 72:12
July [1] - 47:10
June [1] - 43:25
juries [1] - 62:4
jurors [1] - 14:5
jury [16] - 10:21, 10:25, 13:10, 13:22, 14:12, 21:7, 21:11, 22:8, 55:25, 58:4, 61:15, 61:25, 62:7, 68:13
jury's [1] - 10:12
justiciability [1] - 24:18

## K

keep [1] - 47:22
kept [2] - 50:8, 63:17
key [1] - 50:15
kickback [17] - 8:4, 8:10, 11:16, 15:18, 17:22, 25:11, 25:14, 25:17, 25:19, 29:8, 34:23, 39:16, 40:17, 40:21, 42:18, 51:11
kickbacks [30] - 3:12, 3:16, 3:23, 4:17, 4:19, 4:21, 4:24, 5:22, 5:23, 6:4, 6:8, 6:12, 6:15, 6:20, 8:16, 8:21, 8:25, 10:4, 18:7, 19:8, 27:16, 28:15, 39:5, 40:16, 40:22, 41:1, 42:14, 44:19, 45:7
kicked [1] - 44:17
kicking [1] - 50:24
kind [4] - 18:20, 28:10, 28:11, 48:15
Klimchak [1] - 6:11

Klopp [17] - 5:14, 5:16, 6:22, 8:6, 8:17, 9:7, 13:9, 14:24, 17:23, 19:14, 19:15, 51:17, 51:20, 51:25, 66:24, 68:6, 68:8
Klopp's [4] - 5:11, 6:19, 19:7, 19:12
Kniest [2] - 6:5, 6:10
Kniest's [1] - 6:9
knowledge [2] - 54:23, 57:1
known [4] - 16:20, 53:23, 55:14, 61:6
knows [4] - 29:12, 42:2, 48:19, 62:23

## L

Laake [1] - 1:16
labeling [1] - 35:7
lack [4] - 45:22, 46:15, 47:10, 52:25
lacked [1] - 33:15
lacks [7] - 29:19, 33:11, 38:6, 39:19, 41:3, 47:12, 48:20
laid [1] - 52:22
large [1] - 68:8
largely [1] - 20:19
larger [1] - 43:21
last [6] - 6:2, 8:10, 23:11, 33:18, 33:20, 45:24
late [1] - 36:14
latest [2] - 52:6, 67:7
latter [1] - 39:8
law [12] - 23:8, 23:12, 36:4, 37:3, 37:5, 38:12, 47:18, 53:7, 56:2, 57:6, 57:22, 59:17
lawsuit [1] - 34:11
lawsuits [2] - 50:24, 63:23
lawyer [3] - 2:9, 57:21, 60:10
lay [1] - 51:19
laying [2] - 50:21, 65:8
lays [1] - 51:2
leads [2] - 6:25, 45:19
learned [2] - 30:12, 54:24
leases [1] - 13:18
least [3] - 12:4, 32:12, 63:24
leave [2] - 31:10, 46:3
leaves [2] - 44:2, 53:20
led [2] - 58:13, 58:14

left [2] - 18:20, 41:21
legal [5] - 10:2, 36:2, 37:4, 44:24, 55:18
legitimate [1] - 25:18
lend [1] - 43:23
lender [1] - 68:4
lender's [1] - 68:5
lengthy [1] - 24:25
lens [1] - 39:18
less [2] - 41:13, 45:18
letter [3] - 19:4, 57:20, 60:10
letters [1] - 54:5
letting [1] - 21:7
LexisNexis [3] - 14:7, 21:8, 66:19
liability [3] - 30:21, 39:1, 39:6
liberal [2] - 31:2, 46:5
lien [1] - 17:1
life [1] - 32:10
light [8] - 34:25, 35:14, 36:4, 44:6, 45:11, 54:8, 58:24, 60:12
likelihood [2] - 48:21, 65:24
likely [4] - 5:8, 15:15, 57:5
limit [1] - 2:8
limitation [2] - 53:13, 61:12
limitations [15] - 34:2, 34:14, 50:19, 52:15, 52:21, 53:10, 54:11, 54:15, 54:16, 55:23, 57:1, 61:19, 61:22, 62:9, 64:9
limited [3] - 16:25, 17:2, 27:5
line [14] - 2:3, 2:11, 18:23, 22:19, 22:21, 22:23, 23:2, 25:13, 25:15, 29:7, 32:23, 37:9, 44:7, 69:10
lines [1] - 58:14
link [1] - 61:10
list [2] - 26:17, 26:20
listed [1] - 26:19
listing [1] - 36:11
listings [1] - 27:14
literally [1] - 45:10
litigants [1] - 24:14
litigation [2] - 26:5, 26:6
live [2] - 6:25, 21:12
LLC [4] - 1:15, 6:4, 7:12, 7:14
LLCs [7] - 6:15, 6:17, 6:20, 6:23, 8:20,

8:22, 13:7
LLP [1] - 1:21
loan [40] - 3:17, 4:3, 4:15, 5:15, 7:19, 8:5, 8:7, 14:2, 14:3, 16:21, 17:11, 17:16, 25:6, 25:16, 36:11, 40:7, 40:21, 41:4, 41:6, 41:11, 42:5, 42:23, 42:24, 42:25, 43:3, 45:17, 45:19, 50:23, 52:11, 52:25, 53:2, 53:21, 59:14, 62:13, 62:22, 62:24, 65:16, 69:1
loans [47] - 5:3, 5:6, 5:9, 5:10, 5:19, 6:10, 7:19, 7:22, 8:9, 8:19, 9:1, 9:16, 13:21, 15:2, 15:3, 15:4, 15:10, 15:19, 16:16, 16:19, 16:20, 17:2, 17:4, 17:5, 17:6, 17:9, 17:10, 17:25, 19:24, 25:9, 26:12, 26:17, 27:1, 27:8, 42:1, 42:23, 43:2, 44:16, 62:11, 62:18, 63:2, 65:17, 68:25
local [3] - 51:5, 51:21, 52:1
located [1] - 18:24
logistical [1] - 62:3
Lombard [1] - 1:24
look [8] - 6:16, 8:21, 26:15, 27:13, 27:17, 48:25, 64:25, 68:25
looking [2] - 27:12, 42:6, 68:4
low [1] - 28:9
lowering [1] - 4:21

## M

magazines [1] - 21:15
main [9] - 3:24, 16:2, 16:18, 24:2, 24:14, 24:18, 60:6, 66:8
Maloney [15] - 2:13, 3:6, 18:16, 18:20, 22:17, 23:4, 35:25, 37:1, 40:16, 41:19, 42:24, 43:9, 45:4, 47:8, 48:12
MALONEY [4] - 1:16, 23:6, 31:24, 32:9
Maloney's [1] - 69:15
manageability [1] - 61:22
managed [3] - 6:11,

68:6
**manager** [6] - 6:6, 68:10, 69:24, 70:14, 70:15, 70:18
**managers** [8] - 3:19, 3:23, 4:3, 4:15, 4:25, 6:14, 17:23, 70:19
**managing** [2] - 18:15, 62:1
**Mandelberg** [16] - 5:20, 5:21, 8:6, 8:17, 9:7, 9:8, 11:16, 13:9, 14:24, 51:17, 51:20, 51:25, 65:18, 66:24, 68:6, 69:20
**Mandelberg's** [1] - 5:20
**manner** [2] - 12:14, 12:19
**March** [3] - 36:15, 43:14, 44:13
**marked** [1] - 47:12
**market** [5] - 4:19, 25:22, 27:10, 27:11, 27:25, 28:2, 28:25, 33:13, 38:7, 40:9, 41:10, 42:5, 42:8, 47:13, 70:20
**marketing** [8] - 4:6, 4:8, 4:11, 4:13, 6:7, 6:24, 16:10, 38:16
**Marketing** [2] - 4:11, 13:7
**Marlinton** [3] - 53:11, 56:16, 56:22
**Mary** [8] - 2:4, 8:1, 9:11, 25:5, 30:25, 33:3, 33:11, 57:25
**MARY** [1] - 1:2
**Maryland** [18] - 1:25, 4:17, 4:19, 8:13, 15:4, 15:8, 15:10, 15:20, 27:14, 27:19, 40:3, 46:13, 51:13, 51:23, 66:11, 66:12, 68:20, 72:7
**MARYLAND** [1] - 1:1
**Maryland's** [1] - 27:18
**Marylanders** [2] - 15:9, 68:19
**master** [1] - 54:10
**material** [1] - 22:6
**materials** [2] - 4:11, 6:24
**matter** [11] - 12:15, 36:22, 37:3, 45:12, 48:21, 48:22, 50:10, 53:7, 57:22, 66:20, 72:10
**matters** [3] - 37:24,

50:11, 52:23
**Mcadam** [1] - 46:12
**mean** [9] - 4:2, 10:23, 15:6, 27:14, 35:22, 64:19, 65:1, 66:15
**means** [4] - 4:23, 15:9, 16:1, 33:15
**meant** [1] - 22:9
**meantime** [1] - 30:25
**measures** [1] - 12:22
**Media** [1] - 7:13
**media** [9] - 13:19, 20:22, 51:6, 52:1, 63:22, 65:8, 65:11, 66:21
**median** [1] - 27:20
**medical** [1] - 35:21
**medium** [1] - 27:14
**meet** [4] - 24:16, 26:2, 32:24, 33:4
**meets** [1] - 31:11
**Melendres** [1] - 23:19
**MELISSA** [1] - 1:14
**Melissa** [1] - 2:13
**member** [11] - 7:10, 9:12, 21:22, 31:11, 34:3, 52:17, 53:22, 54:24, 55:2, 64:9
**members** [20] - 7:23, 20:22, 21:1, 24:11, 34:12, 42:16, 50:19, 51:16, 52:7, 52:10, 52:13, 54:21, 55:7, 55:9, 59:4, 59:8, 62:1, 62:2, 65:24, 66:1
**members'** [3] - 31:14, 56:8, 61:24
**mental** [1] - 62:4
**mention** [3] - 14:21, 15:17, 51:11
**mentioned** [2] - 23:1, 45:4
**mentions** [1] - 59:23
**merely** [1] - 57:18
**Merit** [1] - 72:6
**merits** [7] - 18:3, 36:21, 48:16, 48:20, 48:21, 48:22, 55:23
**met** [1] - 24:6
**methods** [1] - 26:2
**MICHAEL** [2] - 1:14, 1:19
**Michael** [3] - 2:12, 2:17, 3:5
**mid-2015** [1] - 52:6
**might** [3] - 15:23, 20:15, 43:22
**Miles** [1] - 1:19
**million** [2] - 16:12,

63:20
**mind** [1] - 70:12
**mini** [1] - 34:15
**mini-trials** [1] - 34:15
**minimum** [3] - 5:24, 44:15, 69:18
**Minter** [2] - 61:17, 61:18
**minutes** [1] - 67:23
**misapprehend** [1] - 52:19
**misguided** [1] - 41:23
**misrepresent** [1] - 44:14
**miss** [1] - 67:21
**misses** [1] - 50:13
**missing** [1] - 19:10
**Moffet** [2] - 2:17, 68:24
**MOFFET** [1] - 1:18
**moments** [1] - 25:6
**money** [13] - 4:2, 4:5, 5:1, 6:6, 6:23, 6:25, 25:10, 45:7, 62:16, 62:23, 70:16
**month** [7] - 6:2, 6:3, 14:7, 25:8, 25:9, 25:16, 29:7
**monthly** [3] - 6:1, 6:3, 8:11
**months** [5] - 41:20, 51:12, 52:6, 54:2, 60:18
**moreover** [1] - 33:19
**morning** [5] - 2:2, 2:16, 22:20, 22:22, 32:16
**Mortgage** [4] - 7:5, 7:12, 21:16, 66:15
**mortgage** [9] - 3:21, 7:4, 14:24, 50:23, 58:22, 59:22, 60:2, 65:21, 67:3
**most** [7] - 7:25, 23:20, 65:5, 65:10, 66:16, 70:1
**move** [3] - 7:2, 47:19, 50:3
**moved** [3] - 29:18, 30:16, 36:18
**moves** [1] - 53:17

**moving** [2] - 50:4, 68:22
**MR** [29] - 2:12, 2:16, 3:5, 18:25, 19:6, 19:11, 19:19, 20:5, 20:8, 20:16, 21:2, 22:24, 23:6, 31:24, 32:9, 32:16, 48:5, 48:18, 49:15, 50:4, 64:1, 64:16, 64:24, 65:12, 65:25, 66:7, 68:2, 71:6, 71:7
**MS** [1] - 22:20
**multiple** [3] - 57:15, 63:20, 65:17
**must** [9] - 33:5, 36:24, 39:2, 42:18, 46:16, 47:18, 50:15, 55:22
**mute** [2] - 2:6, 2:19

## N

**NADINE** [1] - 72:17
**Nadine** [2] - 1:23, 72:5
**name** [4] - 51:11, 57:24, 66:24, 68:5
**named** [3] - 31:12, 37:10, 46:15
**namely** [1] - 50:18
**names** [1] - 6:16
**narrower** [1] - 63:22
**National** [3] - 2:5, 7:1, 7:11
**NATIONAL** [1] - 1:6
**national** [3] - 51:6, 51:21, 52:1
**Nationwide** [4] - 7:1, 7:5, 7:11, 19:17
**nationwide** [1] - 40:4
**natural** [1] - 56:9
**nature** [2] - 17:13, 37:8
**nearly** [1] - 39:20
**nebulous** [1] - 28:24
**necessarily** [1] - 15:22
**necessary** [2] - 19:21, 20:21
**necessitates** [1] - 56:12
**need** [7] - 27:5, 48:3, 48:23, 57:10, 64:18, 64:21, 71:4
**needed** [2] - 6:23, 42:12
**needle** [6] - 15:13, 15:14, 15:15, 15:24, 21:13, 21:18
**needs** [1] - 19:2
**Neil** [5] - 27:8, 31:11, 31:21, 32:3, 36:2

**Neil's** [1] - 27:10
**Network** [1] - 6:22
**never** [17] - 9:23, 13:5, 13:6, 13:8, 22:10, 29:23, 31:12, 34:24, 37:15, 38:2, 41:9, 41:22, 58:10, 63:3, 64:22, 68:5
**new** [10] - 31:4, 31:11, 33:17, 45:23, 46:2, 46:19, 47:3, 51:14, 54:4, 54:7
**news** [3] - 52:10, 53:25, 67:8
**newspapers** [1] - 21:15
**newswire** [1] - 66:19
**nine** [4] - 15:11, 26:12, 26:16, 26:22
**Ninth** [2] - 23:18, 23:23
**NO** [1] - 1:5
**nobody** [2] - 21:24, 57:6
**none** [6] - 15:1, 15:15, 22:10, 55:8, 60:9, 66:21
**normal** [2] - 6:18, 65:5
**normally** [2] - 8:10, 19:2
**North** [1] - 11:20
**NORTHERN** [1] - 1:1
**Northrop** [1] - 38:10
**note** [1] - 24:23
**notebook** [1] - 19:2
**nothing** [11] - 14:18, 15:2, 15:6, 16:3, 41:22, 43:12, 44:7, 49:23, 56:18, 57:16, 57:21
**notice** [20] - 15:21, 21:14, 32:21, 34:13, 50:22, 52:13, 52:25, 55:10, 57:22, 58:12, 58:15, 58:23, 59:9, 59:16, 60:4, 60:13, 64:17, 65:2, 65:24, 66:1
**notion** [5] - 37:20, 40:16, 41:17, 62:24, 63:7
**November** [2] - 40:1, 41:20
**Number** [1] - 48:19
**number** [5] - 2:5, 12:2, 26:15, 41:23, 62:12
**numbers** [5] - 7:18, 21:20, 60:15, 64:2, 64:5
**numerosity** [4] - 7:21,

7:23, 64:13, 64:15
**numerous** [2] - 51:5, 55:5
**nurse** [1] - 11:24

## O

**oath** [1] - 40:22
**objected** [1] - 30:17
**objection** [2] - 29:18, 32:1
**objective** [1] - 10:25
**objectively** [1] - 42:15
**obligation** [1] - 37:24
**observed** [1] - 24:13
**obtained** [1] - 5:4
**obviously** [1] - 18:14
**occur** [1] - 26:5
**occurred** [2] - 9:19, 39:9
**October** [2] - 23:11, 72:14
**OF** [2] - 1:1, 72:1
**offer** [7] - 30:14, 30:17, 30:18, 35:25, 36:2, 41:16, 58:10
**offered** [8] - 39:24, 43:11, 43:13, 49:18, 49:20, 49:23, 70:5, 70:8
**offers** [1] - 41:9
**office** [1] - 70:3
**officer** [1] - 7:10
**officers** [3] - 3:17, 4:4, 4:15
**OFFICIAL** [2] - 72:1, 72:18
**Official** [1] - 1:24
**often** [3] - 8:9, 46:12, 48:22
**once** [9] - 2:18, 14:6, 24:2, 24:14, 30:11, 53:5, 53:8, 61:16, 65:17
**one** [29] - 2:25, 5:9, 9:16, 9:17, 12:17, 12:18, 12:23, 15:21, 18:14, 19:4, 22:5, 28:6, 28:7, 28:10, 28:14, 32:25, 33:21, 42:23, 46:22, 48:3, 48:19, 52:15, 56:6, 66:21, 66:22, 66:23, 68:11, 69:1
**one-year** [2] - 28:10, 52:15
**ones** [8] - 3:19, 12:9, 17:12, 19:24, 51:10, 61:2, 62:10, 68:23
**operated** [1] - 51:12

**operating** [1] - 42:17
**operation** [1] - 51:12
**opinion** [7] - 18:11, 26:5, 43:7, 46:21, 49:1, 57:10, 57:17
**opinions** [1] - 26:2
**opposed** [2] - 12:23, 28:7
**opposite** [2] - 25:24, 28:1
**opposition** [10] - 25:2, 26:7, 29:23, 30:4, 35:15, 36:5, 37:6, 38:8, 40:13, 47:9
**oral** [1] - 61:5
**order** [8] - 3:12, 4:4, 20:23, 26:8, 36:16, 47:3, 57:8, 64:4
**ordinary** [1] - 68:16
**original** [2] - 31:5, 53:5
**originally** [3] - 35:19, 46:18, 61:20
**originated** [1] - 7:5
**otherwise** [1] - 48:15
**outlets** [3] - 51:6, 51:22, 52:1
**outlined** [1] - 24:20
**outlining** [1] - 51:14
**outset** [1] - 2:6
**outside** [6] - 15:3, 15:4, 15:19, 62:13, 66:10, 68:19
**overall** [1] - 26:12
**overcharge** [19] - 34:19, 34:23, 35:5, 35:10, 39:2, 39:5, 42:11, 43:3, 43:4, 44:6, 44:10, 45:12, 45:19, 48:11, 49:2, 49:7, 49:19, 49:20, 69:6
**overcharged** [6] - 40:11, 45:2, 48:10, 49:7, 49:10, 69:12
**overcharging** [1] - 28:23
**overpricing** [1] - 40:25
**overwhelm** [3] - 34:4, 61:13, 69:4
**overwhelming** [4] - 23:16, 23:20, 28:20, 29:5
**own** [14] - 22:9, 34:13, 37:18, 37:21, 38:1, 38:3, 41:17, 42:7, 49:22, 56:20, 59:14, 61:2, 63:1
**owned** [3] - 3:8, 16:6, 16:9

**owner** [1] - 4:1

## P

**PA** [1] - 1:16
**Pacer** [4] - 13:19, 22:11, 22:13, 30:1
**page** [10] - 14:16, 15:17, 18:23, 28:16, 36:5, 43:15, 67:1, 68:17, 72:11
**paid** [33] - 3:23, 4:3, 4:14, 6:9, 9:22, 17:19, 17:22, 19:9, 25:22, 27:2, 27:25, 28:1, 28:23, 33:13, 35:7, 35:8, 38:7, 38:17, 38:21, 39:10, 39:14, 39:19, 40:5, 41:13, 42:10, 42:25, 45:18, 47:12, 48:13, 48:25, 49:1, 69:12, 69:19
**painstaking** [1] - 51:19
**Palomboro** [2] - 58:7, 64:25
**pandemic** [1] - 11:25
**Paper** [1] - 68:17
**paper** [4] - 14:16, 15:1, 66:17, 67:10
**Paper's** [4] - 15:16, 35:1, 35:16, 68:4
**papers** [4] - 15:16, 35:1, 35:16, 68:4
**Papers** [1] - 66:23
**paragraph** [2] - 44:17, 44:18
**parse** [1] - 42:11
**part** [9] - 3:12, 11:11, 11:23, 16:10, 20:25, 22:3, 43:22, 45:17, 55:12
**participating** [1] - 2:7
**participation** [1] - 71:3
**particular** [12] - 24:22, 27:3, 27:4, 27:6, 28:23, 29:5, 29:22, 44:5, 54:17, 55:13, 55:16, 59:19
**particularized** [4] - 29:3, 33:16, 38:23, 44:11
**particularly** [2] - 28:4, 31:7
**parties** [3] - 2:9, 48:11, 54:20
**party** [2] - 17:17, 46:2
**pass** [1] - 4:24
**passed** [1] - 69:22

**passing** [2] - 40:22, 59:21
**past** [4] - 5:7, 14:10, 33:23, 49:15
**path** [1] - 35:18
**patience** [1] - 71:2
**pattern** [3] - 11:12, 11:14, 29:5
**pause** [1] - 47:21
**pay** [6] - 4:7, 4:10, 4:14, 8:4, 8:7, 8:9, 8:22, 25:10, 47:12
**paying** [6] - 3:12, 4:9, 5:14, 5:23, 19:15, 45:7
**payment** [4] - 6:2, 38:16, 39:12, 39:15
**payments** [1] - 13:6
**PC** [1] - 1:19
**penalties** [1] - 39:7
**pending** [4] - 25:3, 30:22, 30:23, 37:2
**people** [1] - 2:19, 2:25, 3:24, 16:12, 20:20, 63:20, 65:5, 65:19, 67:8, 68:19, 69:1
**per** [5] - 4:9, 5:14, 5:24, 13:23, 25:16
**percent** [20] - 3:15, 5:10, 5:18, 5:19, 8:18, 9:17, 13:10, 15:2, 15:3, 15:4, 15:9, 15:10, 15:19, 17:6, 27:19, 27:20, 66:10, 68:18, 68:19
**perhaps** [1] - 32:12
**period** [7] - 4:16, 5:2, 5:16, 7:9, 42:23, 53:13, 63:21
**permitted** [2] - 46:6, 47:4
**person** [7] - 7:9, 10:7, 37:13, 45:24, 59:2, 59:6, 59:10
**person's** [1] - 9:17
**personal** [2] - 38:24, 68:9
**personally** [1] - 36:8
**pertains** [1] - 60:1
**petition** [2] - 30:9, 36:10
**phase** [1] - 41:21
**phone** [3] - 2:20, 3:1, 11:21
**phones** [2] - 2:6, 2:19
**pick** [1] - 37:14
**picked** [1] - 26:12
**picture** [1] - 27:12
**piece** [1] - 41:2

**pieces** [1] - 39:23
**pinpoint** [1] - 18:23
**pivot** [1] - 57:8
**place** [2] - 13:3, 37:16
**places** [1] - 4:25
**plain** [1] - 61:8
**plainly** [1] - 37:5
**plaintiff** [12] - 24:2, 24:18, 31:12, 33:18, 35:20, 46:15, 46:24, 54:7, 55:13, 55:16, 60:19
**Plaintiff** [7] - 36:17, 37:25, 38:24, 39:1, 40:1, 43:6, 43:8, 53:13, 58:2
**Plaintiff's** [2] - 36:25, 42:9
**Plaintiffs** [49] - 1:4, 1:13, 2:10, 2:13, 2:22, 2:23, 3:6, 13:15, 14:11, 15:22, 18:6, 32:23, 33:20, 34:9, 35:11, 35:21, 37:7, 39:24, 41:15, 41:21, 44:4, 44:7, 44:10, 45:3, 45:16, 46:1, 46:5, 47:2, 47:15, 48:12, 49:14, 50:13, 52:19, 53:8, 53:15, 54:25, 55:18, 56:1, 56:17, 56:25, 57:9, 57:19, 57:23, 57:24, 59:11, 61:6, 63:3, 64:3, 71:6
**plaintiffs** [21] - 11:19, 28:22, 33:9, 33:21, 33:25, 35:3, 38:2, 38:17, 38:21, 46:12, 46:19, 47:4, 54:5, 58:7, 58:20, 59:13, 60:3, 60:6, 60:15, 61:4, 61:14
**Plaintiffs'** [9] - 3:3, 48:21, 53:11, 54:10, 59:12, 60:15, 61:2, 62:6, 62:21
**plaintiffs'** [4] - 33:16, 34:22, 53:5, 54:3
**plan** [1] - 3:12
**players** [1] - 6:5
**plays** [2] - 56:5, 62:15
**pleading** [1] - 57:18
**pleadings** [2] - 30:6, 60:24
**plus** [1] - 60:15
**Pobletts** [1] - 51:17
**point** [33] - 11:4, 16:13, 18:2, 20:13, 20:21, 22:17, 24:4,

24:8, 24:9, 25:12,
26:1, 26:10, 27:7,
28:4, 29:22, 31:2,
31:17, 32:14, 34:25,
40:13, 41:10, 43:24,
44:10, 45:3, 45:16,
46:14, 49:16, 50:3,
50:14, 51:7, 53:16,
55:10, 56:23
**pointed** [4] - 15:20,
15:21, 24:1, 37:5
**pointing** [1] - 69:10
**points** [2] - 49:13,
59:20
**policy** [1] - 31:2
**portion** [1] - 18:17
**position** [8] - 31:21,
32:12, 32:14, 38:10,
54:19, 59:1, 59:12,
60:11
**possessed** [1] - 55:13
**possession** [1] -
56:11
**possibilities** [1] - 22:5
**possibility** [1] - 17:3
**possible** [2] - 50:12,
71:2
**Post** [4] - 14:15, 15:6,
51:10, 66:17
**potential** [3] - 15:22,
15:23, 50:23
**potentially** [1] - 65:21
**Potomac** [1] - 23:11
**practical** [1] - 24:7
**practice** [5] - 11:12,
11:14, 25:13, 27:16,
29:5
**practices** [1] - 54:19
**preaching** [1] - 16:9
**precise** [4] - 49:13,
52:5, 60:21, 62:6
**preclude** [1] - 58:15
**precluded** [1] - 17:7
**precludes** [4] - 33:10,
50:6, 52:18, 52:21
**predominance** [8] -
12:16, 12:23, 13:1,
16:1, 20:2, 20:8,
20:9, 50:14
**predominate** [10] -
12:6, 12:9, 16:17,
17:13, 34:21, 50:6,
61:1, 62:10, 66:8,
68:21
**predominates** [1] -
15:24
**predominating** [1] -
63:13
**prefer** [1] - 32:6
**preferable** [1] - 18:14

**preferred** [1] - 4:21
**preliminary** [1] - 70:6
**prepared** [1] - 29:1
**prerequisite** [1] -
42:14
**prerequisites** [1] -
24:5
**presentation** [2] - 3:2,
61:14
**presentations** [1] -
70:25
**presents** [1] - 62:3
**president** [1] - 35:1
**press** [12] - 13:16,
51:5, 51:8, 51:14,
51:19, 51:20, 51:23,
53:24, 65:7, 65:20,
66:12
**presumably** [2] -
26:13, 32:6
**presumption** [1] -
56:12
**prevail** [1] - 31:22
**prevalent** [1] - 27:16
**prevent** [3] - 32:2,
39:4, 58:6
**prevents** [1] - 52:12
**previous** [2] - 25:9,
45:16
**previously** [1] - 52:3,
54:12, 61:4
**prices** [1] - 4:21
**primarily** [1] - 17:2
**primary** [1] - 16:22,
68:7
**prime** [1] - 42:22
**Prince** [1] - 46:12
**principals** [1] - 12:12
**principle** [2] - 64:2,
64:3
**privately** [1] - 30:14
**probe** [1] - 20:21
**problem** [4] - 4:19,
16:9, 45:20, 46:20,
52:12, 55:7, 61:23,
63:13
**problematic** [1] -
62:10
**problems** [2] - 47:7,
63:5
**procedural** [1] - 57:12
**proceed** [7] - 2:21,
24:10, 31:24, 32:7,
32:10, 33:16, 48:3
**proceeding** [1] - 32:2
**Proceeding** [1] - 71:9
**Proceedings** [1] - 1:9
**proceedings** [4] -
32:1, 36:16, 59:15,
72:10

**proceeds** [4] - 24:4,
25:16, 28:15, 62:20
**process** [3] - 11:23,
63:8
**processing** [1] - 17:25
**professional** [2] -
40:2, 40:8
**proffer** [1] - 35:11
**proffered** [1] - 35:3,
42:15
**profound** [1] - 54:9
**prong** [1] - 13:1
**proof** [8] - 10:15,
11:10, 14:12, 22:3,
34:19, 49:18, 49:20,
49:25
**proper** [3] - 37:11,
37:16, 38:3
**properly** [4] - 33:18,
36:21, 45:25, 46:10
**properties** [1] - 17:3
**property** [2] - 17:1,
33:8
**proposed** [15] - 29:17,
33:1, 33:21, 33:24,
34:8, 35:19, 46:8,
46:24, 47:3, 51:16,
51:24, 53:22, 54:7,
55:9, 65:15
**protect** [2] - 24:19,
70:21
**prove** [9] - 11:12,
12:12, 21:23, 39:2,
43:3, 43:11, 43:12,
44:11, 49:17
**proverbial** [2] - 15:24,
21:13
**proves** [1] - 46:13
**provide** [5] - 17:16,
19:3, 25:17, 37:24,
62:25
**provided** [5] - 7:6,
11:19, 25:18, 26:9,
59:6
**provides** [1] - 38:13
**prudent** [1] - 22:8
**public** [8] - 34:10,
38:1, 50:17, 50:20,
52:8, 54:1, 58:3,
65:7
**publications** [1] -
68:12
**publicity** [4] - 50:17,
58:14, 58:24, 59:25
**publicly** [2] - 34:6,
60:17
**punitive** [2] - 9:13,
21:21
**purchase** [2] - 6:25,
38:22

**pure** [1] - 45:10
**purported** [1] - 39:13
**purpose** [5] - 16:22,
17:4, 30:13, 30:19,
43:17
**purposes** [5] - 16:23,
17:8, 17:17, 52:23,
62:15
**pursuant** [1] - 72:8
**pursue** [8] - 32:5,
34:18, 36:3, 36:14,
38:12, 42:15, 47:16,
48:2
**pursuing** [1] - 33:10
**put** [15] - 2:6, 2:19,
8:23, 12:16, 13:5,
13:6, 22:18, 27:24,
31:10, 37:3, 43:17,
51:22, 55:10, 59:16,
67:6
**putting** [2] - 50:21,
50:24

### Q

**qualifications** [1] -
31:12
**quantify** [1] - 29:1
**quarters** [1] - 34:10
**questioned** [1] - 68:24
**questionnaire** [1] -
22:7
**questionnaires** [1] -
55:25
**questions** [23] - 2:24,
3:2, 8:2, 9:6, 12:5,
18:17, 18:19, 20:2,
20:4, 20:19, 22:16,
31:18, 45:12, 47:21,
47:23, 47:25, 50:9,
50:10, 50:15, 63:14,
70:23
**quite** [2] - 23:8, 57:3
**quote** [9] - 6:15, 6:16,
6:17, 38:21, 39:2,
45:5, 45:6, 61:8,
61:23

### R

**raised** [11] - 22:17,
24:24, 24:25, 25:1,
25:21, 29:23, 30:3,
34:3, 41:19, 47:8,
47:10
**raises** [1] - 64:7
**raising** [1] - 31:21
**ran** [1] - 6:20
**rate** [8] - 38:7, 38:19,
39:14, 40:9, 41:10,

47:12, 47:13, 56:10
**rates** [7] - 25:22,
27:10, 27:11, 27:25,
28:2, 40:24, 42:8
**rather** [3] - 35:25,
48:16, 53:18
**reach** [1] - 20:11
**reaching** [1] - 14:24
**read** [5] - 14:16,
18:11, 44:17, 52:10,
61:7
**reading** [3] - 14:14,
44:2, 68:16
**ready** [2] - 32:14, 54:7
**real** [3] - 35:25, 38:16,
53:1
**reality** [2] - 68:11, 69:5
**really** [9] - 14:13,
21:21, 25:1, 26:12,
28:20, 43:8, 68:23,
70:4, 70:5
**Realtime** [1] - 72:5
**reason** [4] - 31:25,
43:20, 55:5, 56:14
**reasonable** [28] -
10:18, 10:22, 11:1,
13:11, 13:23, 14:6,
14:9, 21:12, 39:10,
39:14, 39:22, 40:7,
42:2, 42:16, 44:9,
45:13, 48:25, 49:2,
58:22, 59:2, 59:6,
59:10, 59:18, 59:22,
60:2, 60:12, 60:13,
67:3
**reasonableness** [1] -
27:22
**reasonably** [1] - 21:4
**reasoning** [1] - 56:24
**reasons** [5] - 24:7,
32:25, 41:24, 44:2,
47:15
**rebut** [6] - 41:17, 43:6,
43:7, 44:8, 49:22,
49:25
**rebuttal** [1] - 2:23
**receipt** [1] - 30:1
**receive** [3] - 6:15,
8:20, 66:12
**received** [5] - 6:12,
39:13, 41:6, 45:14,
49:8
**recent** [1] - 33:14
**recently** [4] - 28:21,
29:24, 34:17, 58:19
**recitation** [1] - 44:23
**recognized** [1] - 35:22
**recognizing** [1] - 39:3,
48:5
**recollection** [2] -

19:11, 19:12
reconnected [1] - 66:5
record [18] - 22:18,
23:2, 24:23, 33:12,
39:17, 40:18, 44:8,
46:11, 50:17, 50:21,
55:21, 57:21, 57:23,
58:17, 59:24, 60:23,
64:6
records [1] - 38:1
recovery [1] - 42:15
refer [1] - 18:21
reference [1] - 59:22
referenced [2] - 38:20,
42:24
referral [11] - 4:9,
5:24, 6:13, 8:24, 9:3,
11:17, 25:17, 29:9,
69:8, 69:11, 69:19
referrals [3] - 8:23,
18:7, 38:17
referred [7] - 4:12,
6:10, 8:5, 9:2, 18:1,
18:4, 63:17
referring [2] - 5:12,
64:14
refi [1] - 28:9
refinance [7] - 16:20,
28:6, 28:10, 42:4,
45:16, 62:16
refinanced [1] - 16:19
refinances [2] - 17:11,
17:12
regarding [2] - 11:11,
66:8
regardless [2] - 36:8,
39:15
regards [1] - 7:3
regional [2] - 3:18,
3:21
Registered [1] - 72:6
regular [1] - 66:16
regulation [1] - 11:11
Regulation [1] - 27:23
regulations [1] - 72:11
regulators [1] - 8:16
reiterated [1] - 37:1
rejected [2] - 35:2,
59:1
rejection [1] - 62:6
rejects [3] - 44:24,
45:9, 60:25
related [15] - 4:18,
6:17, 7:3, 32:21,
34:1, 37:12, 46:4,
50:23, 59:25, 62:12,
62:19, 67:14, 68:12,
68:22, 69:3
relating [1] - 34:7,
50:5

relationship [1] -
24:11
relative [1] - 67:12
release [1] - 13:16
releases [8] - 51:5,
51:9, 51:14, 51:19,
51:21, 53:25, 65:8,
66:12
relied [5] - 43:8,
46:22, 53:15, 56:19,
62:25
relies [2] - 11:2, 26:20
rely [7] - 44:12, 46:5,
46:6, 46:12, 49:23,
57:9, 58:7
relying [2] - 63:6,
63:17
remained [1] - 30:3
remaining [3] - 17:9,
30:9, 30:11
remains [2] - 37:2,
64:2
remarkable [1] - 18:10
remarkably [1] - 32:20
remarked [1] - 18:12
remarks [1] - 43:9
remedy [3] - 33:19,
39:7, 47:1
remember [9] - 9:10,
9:11, 9:13, 9:18,
10:8, 68:2, 68:18
remit [1] - 29:8
remitted [1] - 28:17
remote [1] - 22:5
remotest [1] - 22:4
reopen [3] - 30:6,
36:15, 70:2
Reorter [1] - 72:5
repackaged [1] -
39:15
repeatedly [3] - 50:8,
61:14, 63:4
reply [4] - 45:25, 46:1,
52:22, 61:4
report [10] - 25:21,
25:23, 26:2, 26:10,
39:25, 40:1, 41:18,
41:19, 43:10, 49:21
reported [2] - 65:3,
72:9
Reported [1] - 1:22
Reporter [2] - 1:24,
72:6
reporter [2] - 66:4,
67:19
REPORTER [3] -
67:20, 72:1, 72:18
reports [1] - 63:23
represent [2] - 15:9,
47:18

representative [14] -
11:18, 23:3, 24:11,
29:16, 29:17, 30:8,
31:5, 33:22, 35:23,
36:24, 37:12, 37:15,
46:20, 48:3
representatives [7] -
24:9, 31:3, 31:5,
33:2, 34:9, 45:22,
65:15
representing [1] -
31:1
reps [1] - 47:3
request [6] - 30:10,
31:10, 31:14, 32:2,
33:17, 45:25
require [6] - 7:25,
11:1, 19:25, 21:6,
43:20, 55:15
required [10] - 10:22,
20:7, 20:9, 21:5,
25:8, 33:16, 36:17,
38:11, 54:23, 55:20
requirement [5] -
12:8, 20:3, 20:9,
21:3, 33:5
requirements [1] -
26:3
requires [5] - 13:23,
14:6, 44:12, 56:4,
68:14
reserve [2] - 2:24, 3:2
residential [15] -
10:18, 10:22, 11:1,
13:12, 13:23, 14:6,
14:10, 16:23, 17:2,
21:4, 59:22, 60:2,
66:16, 67:3, 68:12
Residential [1] - 17:16
resolution [1] - 55:22
resolved [1] - 55:1
resolving [2] - 54:15
resort [2] - 41:15,
44:11
RESPA [23] - 7:4,
9:25, 10:3, 12:2,
12:13, 16:16, 29:10,
29:21, 30:11, 30:21,
34:18, 34:21, 35:6,
38:15, 39:1, 39:3,
39:6, 39:13, 44:23,
54:11, 61:18, 62:12,
62:19
RESPA's [1] - 52:15
respect [33] - 5:9,
5:18, 7:15, 7:21,
7:24, 8:12, 10:1,
11:18, 12:1, 12:5,
12:20, 12:25, 13:13,
16:13, 16:24, 17:20,

19:21, 20:18, 21:2,
21:13, 24:22, 27:8,
38:6, 41:18, 49:11,
66:14, 67:11, 67:14,
69:25, 70:1
respectfully [1] -
14:17
response [2] - 37:22,
52:11
rest [1] - 47:14
restrictions [1] - 17:5
result [4] - 37:17,
39:3, 44:5, 55:10
resulted [1] - 51:4
resulting [3] - 29:14,
42:14, 58:17
results [1] - 52:2
retain [1] - 20:13
retained [3] - 19:20,
19:23, 30:12
reveal [1] - 55:22
review [4] - 26:5, 42:6,
44:1, 63:1
rights [2] - 37:9, 63:9
rise [1] - 54:25
RMR [2] - 1:23, 72:17
Roach [1] - 50:25
roadmap [1] - 38:13
role [1] - 29:16
Rothschild [1] - 1:21
roughly [1] - 68:1
round [1] - 58:9
routinely [1] - 31:4
Rule [11] - 7:15, 12:5,
20:2, 20:3, 20:4,
24:5, 24:10, 24:16,
24:20, 26:3, 47:20
ruled [1] - 30:23
ruling [2] - 71:1
run [3] - 6:1, 6:4,
53:13
running [1] - 40:6
RYAN [1] - 1:20
Ryan [1] - 2:16

S

safe [1] - 71:8
SAG-16-3938 [1] - 2:5
sample [2] - 26:12,
27:1
sat [1] - 11:19
satisfied [1] - 7:23
satisfying [1] - 21:3
sauce [1] - 35:8
savings [1] - 4:25
saw [11] - 14:17, 22:2,
22:6, 32:11, 50:22,
52:10, 57:6, 60:19,
64:7, 64:8

scenario [2] - 45:11,
59:2
schedule [1] - 36:16
scheduled [1] - 11:21
scheduling [1] - 26:8
scheme [1] - 11:12,
12:17, 18:22, 19:17,
34:7, 51:3, 51:19,
53:3
Schmidt [1] - 1:15
scour [1] - 13:25
scrambling [1] - 38:3
search [6] - 11:2,
14:7, 21:8, 22:13,
28:7, 28:8, 28:10,
37:25, 66:19
searched [1] - 43:19
searches [1] - 68:15
Second [1] - 23:22
second [3] - 42:9,
45:3, 56:21
Section [1] - 7:7
secured [1] - 17:1
see [8] - 14:8, 17:17,
18:25, 43:23, 47:21,
53:4, 63:14, 66:17
seeing [1] - 68:5
seek [1] - 58:20
seem [2] - 35:17, 49:9
selected [2] - 26:14,
42:3
selection [1] - 36:1
sending [1] - 54:5
sends [1] - 68:25
sense [5] - 18:18,
22:17, 34:24, 60:3,
65:3
sent [2] - 8:5, 25:11
separate [1] - 20:6
separately [1] - 30:14
September [4] - 11:17,
25:8, 25:12, 69:13
series [2] - 51:1, 63:16
seriously [1] - 46:12
serve [4] - 33:22,
35:22, 36:23
served [1] - 40:1
service [2] - 7:6, 26:18
services [26] - 3:20,
8:15, 8:18, 13:8,
25:13, 25:15, 25:18,
25:20, 27:5, 29:9,
33:13, 35:5, 38:11,
38:16, 39:12, 39:14,
40:2, 41:11, 41:12,
44:16, 45:14, 47:13,
48:24, 49:8, 49:9,
49:12
set [6] - 6:4, 6:14,
9:21, 10:19, 21:4,

41:11
setoffs [1] - 30:9
setting [1] - 70:20
settle [2] - 11:6, 30:15
settled [3] - 13:21, 14:18, 46:1
settlement [28] - 5:4, 5:6, 7:6, 7:19, 7:22, 9:12, 10:5, 11:7, 13:24, 14:1, 14:21, 25:13, 25:15, 25:20, 26:18, 30:17, 30:18, 36:19, 37:8, 39:12, 39:14, 40:18, 44:16, 67:17, 68:3, 69:18, 69:19, 70:22
settlements [2] - 8:10, 51:24
Settlements [1] - 6:21
settles [1] - 11:15
severe [2] - 29:14, 35:21
severing [1] - 56:16
shackling [1] - 33:24
Sham [1] - 13:7
sham [1] - 8:15
shed [1] - 45:11
shift [1] - 24:17
shifts [1] - 60:11
shoehorned [1] - 26:7
show [5] - 17:12, 27:12, 27:15, 27:22, 49:18
showed [1] - 26:11
showing [1] - 17:25
shown [2] - 54:1, 55:2
shows [7] - 25:23, 28:1, 33:12, 42:11, 43:1, 44:1, 65:1
side [3] - 2:11, 64:14, 71:4
sign [2] - 8:17, 66:11
significant [2] - 50:20, 63:24
significantly [1] - 48:13
signing [2] - 22:12, 54:9
silent [1] - 30:3
similar [4] - 17:5, 38:21, 42:3, 54:20
similarly [2] - 60:3, 60:16
simply [9] - 27:24, 32:7, 34:23, 38:2, 42:7, 44:18, 44:23, 47:9, 57:3
simultaneously [1] - 46:17
single [1] - 67:9

situated [2] - 60:3, 60:16
situation [8] - 39:7, 56:24, 59:3, 59:10, 60:14, 63:22, 64:18, 65:19
situations [1] - 63:5
six [1] - 68:25
Sixth [1] - 23:23
smaller [1] - 3:18
SMITH [15] - 1:14, 2:12, 3:5, 18:25, 19:6, 19:11, 19:19, 20:5, 20:8, 20:16, 21:2, 22:24, 66:7, 68:2, 71:6
Smith [10] - 1:15, 2:12, 3:5, 24:20, 32:20, 34:2, 40:17, 45:4, 55:24, 57:5
Smith's [1] - 50:8
software [1] - 17:25
sole [1] - 37:11
solicitation [1] - 54:5
solution [1] - 47:13
solve [1] - 47:7
somewhat [2] - 23:18
somewhere [1] - 67:15
soon [1] - 71:2
sorry [1] - 67:18
sort [1] - 57:8
Sosna [1] - 46:22
sought [2] - 39:4, 70:21
sounded [1] - 6:18
source [3] - 12:10, 25:12, 28:14
sources [1] - 55:6
speaking [1] - 2:25
specific [2] - 10:7, 29:1, 42:10, 47:23, 51:7, 59:2
specifically [11] - 3:18, 10:6, 40:21, 44:24, 47:11, 51:10, 56:16, 59:2, 61:8, 69:7, 69:10
spent [1] - 62:23
split [3] - 38:18, 44:16, 44:21
spreadsheet [1] - 5:5
stage [1] - 57:18
staggering [1] - 53:7
staked [1] - 54:19
Standard [1] - 46:9
standard [3] - 10:25, 67:4
standards [1] - 24:16
standing [58] - 18:16,

18:20, 23:5, 23:8, 24:3, 24:7, 24:15, 24:22, 24:23, 25:4, 25:5, 29:2, 29:20, 30:19, 30:23, 31:17, 32:5, 32:8, 32:19, 33:2, 33:3, 33:4, 33:11, 33:24, 35:13, 35:14, 36:3, 36:14, 36:22, 37:15, 38:6, 38:7, 38:14, 38:25, 39:19, 41:3, 45:22, 46:9, 46:11, 46:15, 46:20, 46:25, 47:4, 47:7, 47:10, 47:12, 47:16, 47:23, 47:25, 48:2, 48:6, 48:16, 48:20, 49:17, 54:8, 63:12, 70:13
stands [1] - 27:9
start [7] - 3:3, 3:6, 18:20, 32:17, 32:19, 35:14, 53:22
started [4] - 3:9, 3:11, 5:13
starting [2] - 2:10, 53:17
starts [1] - 4:5
state [7] - 15:3, 15:4, 27:14, 27:20, 66:10, 68:20
statement [1] - 36:25
states [2] - 58:2, 63:20
States [3] - 23:21, 72:6, 72:12
STATES [1] - 1:1
stating [1] - 30:17
statistics [1] - 17:8
statute [17] - 34:1, 34:14, 50:18, 52:15, 52:20, 53:9, 54:11, 54:15, 54:16, 55:22, 57:1, 61:12, 61:18, 61:22, 62:9, 64:8, 70:11
statutory [2] - 38:23, 44:23
stay [1] - 71:8
stenographically [1] - 72:9
stenographically-reported [1] - 72:9
STEPHANIE [1] - 1:11
still [7] - 20:7, 33:25, 35:18, 41:20, 44:14, 53:22, 64:3
Stockbridge [1] - 1:19
stop [2] - 53:17, 63:14
straight [1] - 67:9
strategically [1] - 22:1

Street [1] - 1:24
stricter [1] - 20:9
stringent [1] - 20:3
stroke [1] - 29:14
strong [5] - 28:11, 28:19, 29:2, 29:4
strongest [3] - 16:1, 16:18, 66:9
study [3] - 43:24, 43:25, 44:1
stuff [5] - 21:16, 21:22, 21:24, 22:12, 66:14
sub [1] - 36:1
subject [4] - 4:16, 11:10, 26:4, 62:19
submission [1] - 43:15
submit [1] - 21:18
submitted [1] - 39:23
subscribe [2] - 15:10, 22:12
subscribers [2] - 15:7, 15:8
subscription [2] - 15:12, 68:18
subsequent [1] - 53:3
substantial [1] - 62:3
substitute [4] - 31:11, 31:22, 32:3, 33:17
substituted [1] - 47:3
substitution [4] - 31:3, 31:4, 45:23, 46:5
success [1] - 48:21
suffers [1] - 31:7
sufficient [5] - 54:22, 55:9, 55:13, 59:7, 59:8
suggest [1] - 36:18
suggesting [1] - 48:15
suggestion [1] - 62:21
suggests [1] - 25:22
sum [1] - 25:9
Summary [1] - 14:11
Sun [13] - 14:15, 14:20, 15:5, 15:8, 15:11, 15:12, 51:10, 61:7, 66:17, 66:23, 68:17, 68:18
Sunday [2] - 67:10
superiority [1] - 12:20, 12:24
supplemental [1] - 46:21
supplied [1] - 53:24
supplying [1] - 4:11
support [1] - 58:10
supported [3] - 3:15, 39:22, 40:18

supposed [2] - 34:7, 43:13
supposedly [1] - 51:12
Supreme [2] - 46:22, 50:11
surely [1] - 43:1
surrounding [1] - 58:24
survey [1] - 23:18
surveyed [1] - 23:12
suspect [1] - 43:10
sustained [1] - 32:1
switches [2] - 4:5, 4:6
swoop [1] - 12:18

## T

talks [1] - 61:15
tally [1] - 8:10
targets [3] - 3:16, 3:17, 3:18
task [1] - 44:3
tea [1] - 44:2
Team [1] - 38:10
Teleconference [1] - 1:10
telephone [2] - 7:18, 21:20
ten [1] - 61:16
tens [2] - 9:24, 26:13
Tenth [2] - 23:23, 24:6
term [1] - 69:15
terms [2] - 25:24, 49:13
test [2] - 10:18, 14:10
testified [10] - 4:23, 5:20, 6:8, 6:12, 9:5, 11:15, 17:21, 18:5, 42:21, 45:5
testifies [2] - 4:17, 6:14
testify [5] - 8:4, 8:9, 12:17, 13:5, 29:15
testifying [1] - 40:14
testimony [11] - 10:6, 10:15, 12:10, 12:21, 19:12, 35:1, 40:12, 45:1, 48:14, 49:22, 55:16
textbook [1] - 18:9
THE [32] - 1:1, 2:2, 2:14, 2:18, 18:18, 19:3, 19:7, 19:16, 20:1, 20:6, 20:11, 20:17, 22:15, 22:22, 23:1, 31:19, 32:4, 32:13, 47:24, 48:7, 49:5, 50:2, 63:16, 64:12, 64:17, 65:10,

65:23, 67:18, 67:20, 67:24, 70:24, 71:8
**themselves** [3] - 2:10, 5:1, 26:15
**theory** [8] - 10:2, 32:4, 34:22, 42:17, 42:19, 44:24, 52:22, 54:3
**thereafter** [1] - 39:15
**therefore** [3] - 33:8, 44:3, 69:21
**they've** [7] - 9:22, 42:15, 45:22, 47:6, 49:16, 49:18, 49:23
**third** [1] - 41:2
**Third** [1] - 23:22
**Thorn** [17] - 16:3, 20:18, 54:13, 56:5, 56:18, 56:19, 56:21, 56:23, 57:3, 57:9, 59:1, 59:9, 60:21, 60:25, 63:17, 63:18, 64:2
**thorn** [1] - 16:4
**Thorn's** [1] - 56:16
**thousands** [5] - 9:24, 26:13, 42:1
**three** [6] - 6:20, 6:23, 27:9, 32:12, 34:10, 39:23
**three-quarters** [1] - 34:10
**threshold** [3] - 24:8, 33:5, 49:17
**throughout** [8] - 4:1, 5:23, 6:9, 6:13, 9:14, 9:25, 21:6, 23:21
**Thursday** [2] - 14:22, 67:11
**Tim** [2] - 2:12, 3:6
**timely** [1] - 61:20
**TIMOTHY** [1] - 1:16
**Title** [29] - 3:8, 3:11, 3:22, 3:24, 4:1, 4:2, 4:5, 4:7, 4:10, 4:14, 5:4, 5:12, 5:23, 6:20, 7:6, 7:12, 7:17, 18:1, 34:24, 40:20, 41:8, 41:13, 42:18, 51:11, 51:24, 52:4, 63:2, 65:13
**title** [53] - 3:10, 3:20, 6:19, 8:15, 8:18, 13:8, 25:18, 26:17, 26:18, 26:21, 26:24, 27:1, 27:5, 28:7, 28:8, 28:10, 28:11, 29:9, 33:13, 34:19, 35:5, 35:9, 35:10, 38:7, 38:11, 38:18, 38:19, 39:10, 39:20,

40:2, 40:4, 40:6, 40:8, 40:9, 40:23, 40:24, 41:7, 41:8, 41:10, 41:11, 41:14, 42:2, 42:8, 42:25, 44:6, 44:3, 44:9, 44:15, 44:21, 47:13, 48:24, 69:15
**Title's** [7] - 3:15, 14:23, 17:24, 35:1, 40:24, 62:24, 63:6
**titled** [1] - 28:12
**today** [9] - 2:4, 2:21, 18:3, 35:17, 52:23, 61:15, 64:13, 70:25, 71:4
**together** [2] - 28:13, 43:17
**tolling** [5] - 56:15, 56:21, 61:20, 61:21, 64:20
**tomato** [1] - 35:8
**took** [7] - 4:22, 5:21, 15:18, 19:11, 25:8, 62:16, 67:23
**top** [1] - 27:20
**topics** [1] - 3:7
**total** [1] - 41:7
**totals** [1] - 6:1
**Town** [1] - 11:10
**track** [1] - 62:20
**trade** [2] - 21:15
**traditional** [1] - 20:4
**transaction** [4] - 42:3, 44:5, 45:17, 62:17
**transactions** [2] - 61:24, 65:13
**Transcript** [1] - 1:9
**transcript** [3] - 61:10, 72:9, 72:11
**treatment** [1] - 59:6
**trial** [1] - 19:2
**trials** [1] - 34:15
**tried** [1] - 47:18
**trigger** [1] - 15:22
**triggered** [1] - 34:13
**true** [10] - 9:1, 27:8, 28:5, 36:8, 40:19, 47:9, 57:14, 57:16, 60:8, 72:9
**Trust** [1] - 7:12
**trustee** [7] - 30:10, 30:15, 30:16, 31:9, 36:16, 37:10, 70:11
**trustee's** [1] - 70:2
**trustees** [1] - 37:8
**try** [4] - 8:15, 37:7, 46:19, 56:1
**trying** [5] - 15:13, 16:4, 22:14, 44:11

**turning** [3] - 20:1, 35:13, 47:19
**turns** [3] - 54:9, 65:23, 65:25
**twice** [1] - 40:14
**two** [19] - 3:16, 3:24, 23:13, 27:1, 32:6, 32:12, 32:25, 33:1, 33:20, 34:8, 40:14, 42:23, 43:15, 46:22, 51:16, 58:7, 58:19, 69:1, 70:8
**two-page** [1] - 43:15
**type** [7] - 26:9, 33:15, 39:4, 42:11, 45:8, 52:17, 56:3
**types** [4] - 3:16, 42:10, 58:5, 64:20
**typical** [1] - 28:8
**typicality** [2] - 10:1, 1:13
**typically** [1] - 69:22

## U

**U.S** [1] - 7:3
**U.S.C** [1] - 72:8
**ultimately** [4] - 41:12, 55:4, 58:13, 58:14
**unawareness** [2] - 56:8, 56:10
**unclear** [1] - 26:14
**uncontroverted** [1] - 33:12
**uncover** [1] - 18:13
**under** [12] - 7:4, 24:1, 24:19, 27:3, 33:14, 39:1, 39:6, 40:21, 45:12, 56:2, 57:3, 70:10
**underlies** [1] - 10:3
**undisclosed** [1] - 26:12
**unexplained** [1] - 43:16
**uniform** [2] - 13:15, 20:20
**Uniform** [1] - 17:16
**uniformity** [3] - 10:14, 10:19, 10:20
**Union** [2] - 21:16, 66:15
**uniquely** [1] - 56:11
**United** [3] - 23:21, 72:6, 72:12
**UNITED** [1] - 1:1
**universe** [3] - 10:16, 10:21, 42:6
**unless** [2] - 62:23, 70:23

**unlike** [1] - 9:10
**unlikely** [2] - 22:2, 66:13
**unmuted** [1] - 23:6
**unnecessarily** [3] - 34:20, 35:5, 70:21
**unnecessary** [1] - 38:11
**unsupported** [1] - 37:4
**up** [10] - 6:4, 6:14, 8:10, 11:20, 12:22, 14:7, 18:15, 22:12, 31:17, 38:3, 45:9, 47:21, 57:12, 65:3, 66:11, 67:25, 69:2
**updating** [1] - 37:22

## V

**VA** [7] - 16:19, 16:21, 16:23, 17:1, 17:2, 16:7
**VAIRRL** [1] - 16:20
**value** [3] - 30:11, 30:16, 33:13
**variations** [1] - 44:2
**various** [1] - 51:21
**vary** [1] - 8:8
**vendor** [1] - 6:19
**versus** [3] - 2:5, 23:11, 39:21
**via** [2] - 4:8, 5:13
**viable** [4] - 35:2, 42:20, 42:21, 44:24
**victimize** [1] - 69:14
**view** [9] - 20:19, 20:24, 31:6, 31:7, 52:7, 53:5, 64:20, 64:22, 65:23
**viewed** [1] - 39:18
**violated** [1] - 12:14
**violates** [1] - 63:8
**violation** [5] - 29:10, 38:23, 39:3, 39:13, 44:23
**violations** [1] - 12:19
**violative** [1] - 27:21
**Virginia** [2] - 15:5, 24:13
**voided** [1] - 53:10
**volume** [1] - 69:22
**voracity** [1] - 63:9
**vs** [2] - 1:5, 38:9

## W

**warrant** [1] - 62:4
**warranted** [1] - 48:14
**Washington** [3] -

14:15, 15:6, 66:17
**wave** [2] - 51:6, 51:13
**waves** [1] - 54:5
**week** [2] - 33:18, 45:24
**weekday** [1] - 15:7
**weighed** [1] - 10:21
**Wells** [3] - 14:17, 14:20, 67:12
**West** [2] - 11:10, 24:13
**whatsoever** [4] - 36:3, 37:9, 46:4, 66:20
**white** [1] - 16:6
**white-owned** [1] - 16:6
**whopping** [1] - 5:10
**wide** [13] - 9:5, 9:9, 10:10, 11:10, 12:11, 12:13, 35:4, 43:4, 43:19, 50:12, 55:1, 55:24, 60:5
**widely** [1] - 65:2
**widespread** [4] - 58:11, 59:5, 65:2
**Williams** [1] - 23:11
**willingly** [1] - 28:17
**withdrawn** [2] - 29:17, 35:20
**witness** [1] - 12:17
**witnesses** [2] - 9:10, 10:8
**Woodworkers** [2] - 46:10, 46:11
**word** [2] - 53:3, 57:17
**works** [2] - 6:1, 22:24
**world** [1] - 53:4
**wrap** [1] - 31:17
**write** [1] - 29:7
**written** [1] - 71:1
**wrongdoing** [2] - 14:9, 41:9
**wrongs** [1] - 15:23

## Y

**year** [5] - 28:6, 28:7, 28:10, 52:14, 52:15
**years** [21] - 11:6, 13:21, 14:1, 14:3, 14:7, 15:16, 15:19, 16:5, 29:21, 34:11, 40:3, 40:5, 41:25, 43:8, 52:9, 53:3, 58:12, 63:21, 67:7, 67:9, 68:3
**Yerman** [15] - 25:21, 26:10, 26:11, 26:20, 31:17, 39:25, 40:2, 40:4, 40:10, 41:18,

41:19, 41:22, 43:12,
49:21, 69:21
**Yerman's** [5] - 26:1,
27:10, 41:16, 43:7,
48:14
**yield** [1] - 28:11

## Z

**Zukerberg** [27] - 3:9,
3:14, 3:25, 4:17,
4:20, 5:13, 5:15,
5:25, 6:13, 8:4, 8:14,
9:11, 11:15, 13:4,
17:21, 18:5, 18:6,
18:21, 19:13, 25:7,
40:12, 42:20, 44:13,
44:18, 45:5, 69:20,
70:17
**Zukerberg's** [4] -
28:13, 29:3, 45:1,
49:21

## §

**§** [1] - 72:8