# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **MARY E. EDMONDSON,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil No. SAG-16-3938** |
| **EAGLE NATIONAL BANK,** *et al.,* | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Mary E. Edmondson ("Edmondson") represents a class of borrowers (the "Eagle Class" and, collectively with Edmondson, "Plaintiffs") who had a federally related loan brokered by Defendant Eagle Nationwide Mortgage Company ("ENMC"), a subsidiary of Defendant Eagle National Bank ("ENB" and, collectively with ENMC, "Eagle"). Edmondson asserts that Eagle and its employees violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, by referring loans to a title services provider, Genuine Title, in exchange for kickbacks. Defendants, which also include ENB's parent company, Eagle National Bancorp, Inc. ("EN Bancorp"), and their successors in interest, ESSA Bank & Trust and ESSA Bancorp, Inc., have filed three motions: (1) a motion to exclude certain testimony by Edmondson's expert witness, William Watkins, ECF 156; (2) a motion seeking summary judgment in their favor on all claims, or, alternatively, as to the claims of certain class members, ECF 157; and (3) a motion to decertify the Eagle Class previously certified on May 21, 2020, ECF 158.

This Court has reviewed the parties' motions, oppositions, replies, and the exhibits attached thereto. *See* ECF 165, 166, 167, 173, 174. A hearing was held on July 7, 2023. For the reasons

below, Defendants' motion to exclude Watkins's testimony, ECF 156, will be granted in part and denied in part. The motion for summary judgment, ECF 157, will be granted in part and denied in part, with judgment being granted in favor of all Defendants except ENMC. The motion to decertify the class, ECF 158, will be denied, subject to (1) the amended class definition described herein, and (2) the substitution of a new named plaintiff to replace Edmondson, who does not fall within the amended class. Finally, the parties will be ordered to confer on schedules for the trial of Edmondson's individual RESPA claim and discovery as to the new named plaintiff.

## I.    FACTUAL BACKGROUND

At the time of the relevant events, ENB was a Pennsylvania corporation and independently owned bank. ECF 60 ¶ 7. ENMC was a wholly owned subsidiary of ENB, also based in Pennsylvania. *Id.* ¶ 8. Genuine Title was a title service company operating in Maryland and elsewhere. ECF 164-4 ¶ 2. Edmondson is a Maryland resident who refinanced her mortgage through ENMC in 2009 and again in 2010. ECF 60 ¶ 1; ECF 160-5; ECF 160-6. Edmondson alleges that, from 2007 through 2011, Eagle brokers referred hundreds of loans (including her two loans) to Genuine Title for title settlement services as part of an illegal kickback scheme. *See* ECF 55 ¶ 50. Genuine Title's former president, Jay Zukerberg, and another Genuine Title employee, Brandon Glickstein, both stated that Genuine Title paid cash kickbacks, marketing credits, and other things of value to various ENMC employees in exchange for their referring loans to Genuine Title. ECF 164-4 ¶¶ 4-6; ECF 164-8 ¶¶ 4-6. One of the ENMC employees who was part of this scheme was Adam Mandelberg, a loan officer and Branch Manager who originated both of Edmondson's loans. ECF 164-3 at 27:6-27:14. In a sworn affidavit, Zukerberg stated that he paid Mandelberg kickbacks of $300 to $600 for each loan referred to Genuine Title. ECF 164-4 ¶ 4.

The first of Edmondson's two loans closed in February, 2009. ECF 160-5 at 1. Genuine Title charged her $175 in title service fees—including $100 for a "Abstract or title search" and $75 for a "Title Examination"—and $839.04 for title insurance. *Id*. at 2. *Id*. Edmondson's second loan closed in August, 2010. ECF 160-6 at 2. This time, Genuine Title charged her $440 for a title examination[1] and $504.00 for title insurance. *Id* at 3.

This case was filed in December, 2016, with only Edmondson as named Plaintiff. ECF 1. When the Amended Complaint was filed in December, 2019, three named Plaintiffs were identified: Chemene Clark, Janet Clark, and Edmondson. ECF 55. Janet Clark subsequently withdrew as a named Plaintiff due to health issues. ECF 63 at 7 n.1. This Court granted Plaintiffs' motion to certify a class action via a Memorandum Opinion and Order issued on May 21, 2020. ECF 77, 78.[2] Specifically, Plaintiffs received certification of the following class of individuals:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) from, brokered or originated by Eagle National Bank or Eagle Nationwide Mortgage Company for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2007, and January 31, 2011. Exempted from this class is any person who, during the period of January 1, 2007 through January 31, 2011, was an employee, officer, member and/or agent of Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, ESSA Bank & Trust, Genuine Title LLC, Brandon Glickstein, Inc., and/or Competitive Advantage Media Group LLC.

ECF 78. This Court also rejected Defendants' argument that Edmondson lacked Article III standing, concluding that Plaintiffs had alleged sufficient facts indicating that she suffered an actual injury in fact—namely, that she was overcharged for her 2010 title examination as a result of the kickback scheme. ECF 176 at 7. However, the Court noted that "[a]s more factual

---

[1] Unlike her 2009 loan, Edmondson was not charged for an abstract or title search. ECF 160-6 at 3.

[2] The Memorandum Opinion was amended on June 12, 2020, ECF 81, and again on May 11, 2023, ECF 176.

development occurs, it may become clear that Plaintiffs were not overcharged for title and settlement services," and therefore "Defendants are welcome to continue to challenge Plaintiffs' Article III standing as this litigation proceeds, particularly at the summary judgment stage." *Id*. at 7 n.3.[3]

## II.   MOTION TO EXCLUDE EXPERT WITNESS TESTIMONY

### A.  LEGAL STANDARD

"A motion in limine is a request for guidance by the court regarding an evidentiary question." *Hunt Valley Baptist Church, Inc. v. Baltimore Cnty.*, Civ. No. ELH-17-804, 2018 WL 2717834, at *7 (D. Md. June 6, 2018) (quoting *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983), *aff'd*, 469 U.S. 38 (1984)). Typically, pretrial motions in limine seek to exclude prejudicial evidence before it is offered at trial. *Changzhou Kaidi Elec. Co., Ltd. v. Okin Am., Inc.*, 102 F. Supp. 3d 740, 745 (D. Md. 2015) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). These motions help to streamline a case by allowing a court to avoid "lengthy argument at, or interruption of, the trial." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987); *see also Changzhou Kaidi*, 102 F. Supp. 3d at 745 ("[Motions in limine] are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" (quoting *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013))). Motions in limine further promote judicial efficiency by preserving the issues raised for appeal and eliminating the need for parties to renew their objections at trial, "just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it." *United States*

---

[3] The parties also contested Chemene Clark's standing at the certification stage, with Plaintiffs proposing the substitution of a new class representative if Chemene Clark were found to lack standing. *See* ECF 176 at 7-8. This Court ultimately declined to address the substitution question in light of its conclusion that Edmondson had standing. *Id*. at 8. At the motions hearing, class counsel confirmed that Chemene Clark's claim in this action had been extinguished.

*v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996); *see* Fed. R. Evid. 103(a); *cf.* R. 103(a) advisory committee's note to 2000 amendment (acknowledging that Rule 103(a) "applies to all rulings on evidence . . . including so-called 'in limine' rulings").

Generally, courts should grant a motion in limine "only when the evidence is clearly inadmissible on all potential grounds." *Dorman v. Anne Arundel Med. Ctr.*, Civ. No. MJG-15-1102, 2018 WL 2431859, at *1 (D. Md. May 30, 2018) (quoting *Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017)). Ultimately, rulings on these motions fall within the trial court's "broad discretion." *Kauffman v. Park Place Hospitality Grp.*, 468 F. App'x 220, 222 (4th Cir. 2012); *see also United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (noting that evidentiary rulings fall within a trial court's discretion).

Here, Eagle seeks to exclude certain testimony by Edmondson's expert witness. Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provides five non-exhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has

gained "general acceptance." *Daubert*, 509 U.S. at 592-94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010). However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case. *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and are not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 341 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, Civ. No. GJH-14-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Id.* at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, Civ. No. JFM-08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp.

2d at 340; *Daubert*, 509 U.S. at 592 n.10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has a greater potential to mislead than to enlighten." *Id.* If so, the testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 341 (noting such testimony would be barred by Federal Rule of Evidence 403).

## B.  ANALYSIS

Defendants seek to exclude the opinions of Plaintiffs' expert, William Watkins, only as to whether Edmondson was overcharged for title services—including examination, search, and abstract fees—and title insurance premiums in connection to her 2009 and 2010 loans. For the reasons stated below, this Court concludes that Watkins's opinion that Edmondson was overcharged for title services on her 2010 loan must be excluded because to the extent Watkins offers any methodology behind his opinions, it is not reliable and was not applied reliably to the facts of this case. However, this Court will permit Watkins to offer his opinion as to whether Edmondson was overcharged for title insurance in connection with her 2010 loan.

*1. Expert Qualification*

As threshold matter, Defendants contend that Watkins lacks the requisite knowledge, skill, experience, training, or education to opine on the cost of title services and insurance. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("[O]nly experts qualified by 'knowledge, skill, experience, training, or education' may submit an opinion." (quoting Fed. R. Evid. 702)). Defendants note that Watkins has never worked for a title company, *see* ECF 159-1 at 249:13-18, and that he did not oversee title companies or enforce RESPA during his 15 years in government service—although Watkins did receive training on RESPA during that time, *id*. at 55:12-22, 53:16-54:13. Furthermore, while Watkins claims to have conducted title searches and reviewed "hundreds" of HUD-1 forms, ECF 160-1 at 8, 17, his interactions with such forms primarily occurred during Watkins's tenure working for banks in another state, and in some instances took place decades ago. At his deposition, when asked what he recalls about the costs of title services from the HUD-1s he reviewed while working in banking, Watkins repeatedly said he could not recall. ECF 159-1 at 199:22-200:19, 224:7-225:9, 237:12-238:8. Moreover, he conceded that the title examination fees he reviewed "would be all over the map." *Id*. at 237:15-17. Thus, Watkins's deposition testimony contradicts the statements in his report that during his banking career he "learned what was typically being charged to the mortgage subsidiary customers . . . for title insurance and other title services" and "applied that specific knowledge (as well as my knowledge from being in the banking industry for more than 53 years) in analyzing the facts of the present case." ECF 160-1 at 17.

Nonetheless, while a close call, this Court declines to categorically exclude Watkins on the simple grounds that his opinions are unqualified. Although he has never worked for a title company, Watkins does possess more than five decades of experience working in the banking

8

industry. ECF 160-1 at 8, 17. He has extensive experience supervising, monitoring, and consulting with banks on matters of regulatory compliance, both during his 15 years of service with the Office of the Comptroller of the Currency ("OCC") and his time spent as an executive officer and board member for several banks. *Id.* at 7-8. In those roles, and in his position as a Supervisor for the Texas Department of Banking, Watkins not only regularly reviewed and approved residential mortgage loans, but was involved in developing policies and procedures for bank operations, including residential mortgage lending. *Id.* at 7. And Watkins stated he relied on that experience in assessing whether Edmondson incurred an overcharge that could be traced to a kickback scheme. *Id.* at 17. In light of his extensive experience, and the fact that this case at its core involves an alleged scheme of fraudulent conduct involving a bank (a topic Watkins is well-versed in), this Court declines to exclude Watkins's testimony on the basis of his limited connection to the title industry alone. As explained below, however, Watkins's inability to recall the cost typically charged for title services on the many HUD-1 forms he reviewed, combined with his lack of direct exposure to the Maryland market where Edmondson's title services and insurance were procured, is relevant in assessing whether Watkins's opinions reflect a reliable methodology.

### 2. *Title Services*

As noted above, while Watkins has the appropriate credentials to offer an expert opinion as to whether Edmondson was overcharged, he still must use a reliable methodology to reach his conclusions. *See* Fed. R. Evid. 702(c)-(d). With respect to his opinion that Edmondson was overcharged for title services in connection with her 2010 loan, Watkins has failed to do so.

It is worth noting initially that at the class certification stage, Edmondson did not rely on Watkins to suggest she had been overcharged. Rather, she relied on a chart reflecting mean, median, and 80th percentile cost of "Title Exam, Search, [and] Abstract Fees," which she

represented to be from "the Department of Housing and Urban Development." ECF 70 at 7-8; ECF 70-4. That chart has subsequently been identified as having been created by Wells Fargo Bank in March 2010. In a very similar case before another judge, Watkins relied on the Wells Fargo Chart as one of the bases for his opinion that the plaintiffs in that case were overcharged. *See Sam Wilson, et al., v. Eagle National Bank, et al.*, Civ. No. JRR-20-1344 (D. Md); *see also* ECF 160-3 at 23, 25. However, that chart is not mentioned in Watkins's export report in this case, even though (1) the report was prepared less than one year after Watkins filed his expert report in *Wilson*, and (2) the Eagle Class Plaintiffs rely heavily on the Wells Fargo Chart as evidence of class-wide overcharges. At his deposition, Watkins stated that the chart was not presented to him for his consideration in this case and that he did not need the chart to confirm that Edmondson was overcharged. *See* ECF 159-1 at 286:16-287:10. While Watkins was not required to utilize any particular method to prove an overcharge, the omission of the Wells Fargo Chart in this case seems fortuitous given that it tends to *disprove* that Edmondson was overcharged for title services. That is, the amounts that Edmondson was charged for title services on her 2009 and 2010 loans—$175 and $440, respectively—both fall below the 80th percentile threshold ($497) used by Wells Fargo employees to indicate when title service charges were unreasonable. ECF 160-4 at 69:14-70:7.

Regardless, absent the Wells Fargo Chart, Watkins must base his overcharge opinion on another reliable methodology. In explaining his opinion, Watkins's report relies primarily on the discrepancy between the $175 Edmondson paid "for title search and title prep" in 2009[4] and the $440 she was charged for a title examination 18 months later. The report states as follows:

> In my opinion, there is no reason Ms. Edmondson's 2010 title examination should have cost $440. This amount for a bring forward title examination for an 18-month period was excessive. Zukerberg stated in his 3/28/16 Affidavit that he paid

---

[4] The actual text of the 2009 HUD-1 shows a charge of $100 to Genuine Title for "abstract or title search" and $75 for "title examination."

Mandelberg $300-$600 for each loan referred to Genuine Title. If one were to subtract $300 from Ms. Edmonson's 2010 title examination fee, the $140 remaining would have been a reasonable fee for a bring forward title examination for an 18-month period. In my opinion, the evidence in this case shows that Genuine Title built in the cost of the kickback it paid Mandelberg into Ms. Edmondson's title examination fee.

ECF 160-1 at 28.

Notably, nowhere in Watkins's conclusory analysis does he provide any objective, outside data to support his conclusion that a $440 title examination charge was "excessive." *See JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 322 (D. Md. 2017) ("Expert testimony rooted in subjective belief or unsupported speculation does not suffice." (quoting *Zuckerman v. Wal–Mart Stores E., L.P.*, 611 Fed. Appx. 138, 138 (4th Cir. 2015))). And for the reasons explained above, Watkins cannot rely on his own experience from reviewing "hundreds" of HUD-1s during his time in the banking industry, given that he has no pertinent recollections from those forms that would inform his judgment about the appropriateness of a fee. Rather, the crux of Watkins's conclusion appears to be that one can infer an overcharge because the title examination fee Edmondson paid in 2010 was more than double the examination, search, and abstract fees she paid in 2009. But the fact that Watkins paid more for title services eighteen months later does not mean she was "overcharged" vis-à-vis what those services were actually worth. *See Freeman v. Quicken Loans, Inc.*, 626 F.3d 799, 802 (5th Cir. 2010), aff'd, 566 U.S. 624 (2012) (defining "overcharge" in the RESPA context as a circumstance "where a service provider charges a borrower for services actually performed but in excess of the service's reasonable value"). Furthermore, as Watkins acknowledged at his deposition, title fees can range "all over the map," ECF 159-1 at 237:15-17, and are affected by a variety of factors, ranging from the type of title search or examination being conducted, to the type of and amount of the loan, to which party actually performs the title services, *id*. at 168:16-173-10, 177:6-178:2. Watkins's report fails to adequately address these factors with

11

respect to the 2010 loan, outside of brief references to the type of title examination (a "bring forward" examination) and the relatively brief amount of time that elapsed between the two loans. In short, to the extent that any methodology underlies Watkins's conclusion that Edmondson was overcharged in 2010, it is plainly insufficient to satisfy the requirements of Rule 702.

Watkins's related conclusions that $140 represents a "reasonable" cost for the 2010 title examination and that "Genuine Title built in the cost" of the kickbacks to the $440 fee, *see* ECF 160-1 at 28, are even more speculative. As to the $140 figure, Watkins once again fails to provide any objective basis for concluding that a such a fee is in fact customary for the type of title examination performed in this case. Asked directly during his deposition whether he had "any information as to what other title companies in Maryland were charging in 2010 for a bring-forward title search," Watkins stated "I can't recall seeing anything." ECF 159-1 at 279:1-6. Rather, Watkins reached that total by subtracting $300—the lowest range of the kickback amount Zukerberg admitted to paying Mandelberg—from the amount Edmondson paid for her 2010 title examination. ECF 159-1 at 274:21-275:7; ECF 160-1 at 28. Notably, Watkins admitted he did not have evidence regarding the specific amount of the kickback that was paid in relation to Edmondson's loan, but settled on the $300 figure because he considered it "fair." ECF 159-1 at 276:1. Based on this $300 discrepancy and the apparent evidence of a kickback agreement, Watkins concluded that Genuine Title had "built in" the cost of its kickbacks to the cost of Edmondson's 2010 title examination. ECF 160-1 at 28; *see also* ECF 160-2 at 9 ("In my opinion, Edmondson was overcharged $300.00 for the [2010] title examination . . . .") But this logic is entirely circular: Watkins effectively states that (1) a $140 fee is "reasonable" because it is $300 less than what Edmondson paid, and (2) kickbacks were built into Edmondson's title examination

because she paid $300 more than the "reasonable" amount.[5] Such ipse dixit reasoning cannot be the basis for an admissible expert opinion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (quoting *Joiner*, 522 U.S. at 146)).

For the reasons stated, then, this Court concludes that Watkins's opinion that Edmondson was overcharged for title services is not the byproduct of a reliable, or reliably applied, methodology. Accordingly, Watkins's overcharge opinion with respect to title services will be excluded.

### 3. Title Insurance

Watkins's rebuttal opinion also points to another possible source of overcharge: the amount of title insurance Edmondson paid in connection with her 2010 loan. Specifically, the rebuttal opinion notes that, according to her HUD-1 form, Edmondson was charged $504 for a title insurance policy from Southern Title. ECF 160-2 at 11; *see also* ECF 160-6 at 3. As Defendants' expert, J. Bushnell Nielsen, concluded in his expert report, this $504 figure was apparently reached

---

[5] When pressed at his deposition, Watkins repeatedly stated that the $140 figure was based entirely on his conclusion that $300 was a "fair" number to subtract from Edmondson's title examination fee, even stating that "[i]if I took a higher amount, then my conclusion would have been that the reasonable fee would have been even less than $140." ECF 275:20-22. This ultimately led to the following exchange:

> **Counsel:** And you don't have any of that information to know what the kickback was paid for Ms. Edmondson?
> **Watkins:** Correct.
> **Counsel:** But you used $300 and not any other amount to make your determination that she was overcharged by $300.
> **Watkins:** That's correct.

*Id*. at 278:15-22

13

by charging a "substitution rate," representing 60 percent of the original rate Edmondson was charged on her 2009 loan. ECF 164-13 at 73-74.[6] However, after reviewing the same Southern Title rate manual consulted by Nielsen, Watkins concluded that Edmondson should have been charged even less for title insurance—though he provided different overcharge figures in his rebuttal report and at his deposition. ECF 159-1 at 13:20-14:9; ECF 160-2 at 11.[7] Watkins further opined at his deposition on the source of this overcharge, explaining that while Edmondson was apparently charged a 60 percent substitution rate, she should in fact have been charged a 30 percent substitution rate. ECF 159-1 at 12:17-13:9. And indeed, a review of the Southern Title rate manual consulted by both Watkins and Nielsen shows that the 30 percent substitution rate, which is available to a borrower when the loan being replaced is three years old or less, would appear to be applicable to Edmondson, whose had refinanced her home only 18 months earlier. *See* ECF 164-21 at 9.

Of course, this Court takes no position on whether Edmondson was in fact entitled to a 30 percent substitution rate, as Watkins claims. However, for the purposes of the motion in limine, this Court is satisfied that the methodology underlying Watkins's opinion that Edmondson was overcharged for title insurance satisfies Rule 702's reliability standard. Specifically, Watkins considered the Southern Title rate manual, the amount of Edmondson's loan, and her prior

---

[6] According to the Southern Title rate manual a "substitution rate" is available when the loan "is made to the same borrower on the same property" as the original loan that is being replaced, "provided the outstanding policy is presented and the Company is informed of the unpaid balance of the loan." ECF 164-21 at 9.

[7] Specifically, in his rebuttal report Watkins concluded that Edmondson was overcharged $84 for title insurance in 2010, ECF 160-2 at 11, while at his deposition he clarified that, in his view, she was actually overcharged $252, ECF 159-1 at 13:20-14:9. While this discrepancy in results arguably cuts against the admissibility of Watkins's opinion, this Court is persuaded that his explanation at his deposition as to how he reached his overcharge conclusion (that is, by reviewing the Southern Title rate manual and applying its contents to the facts of this case) demonstrates a reliable application of methods and principles under Rule 702.

transaction history to conclude that she was due, but did not receive, a particular substitution rate. Accordingly, this Court will permit Watkins to testify as to his opinion that Edmondson was overcharged for title insurance.

## III.   MOTIONS FOR SUMMARY JUDGMENT AND TO DECERTIFY CLASS

Although Defendants have filed separate motions for summary judgment and to decertify the Eagle Class, *see* ECF 157, 158, these the two motions involve overlapping issues and analysis. In particular, whether Defendants are entitled to summary judgment on Edmondson's individual claim for lack of standing directly affects this Court's resolution of the motion to decertify. Accordingly, this Court will address the two motions together.

### A.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey*, 823 F. Supp. 2d at 348 (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Casey*, 823 F. Supp. 2d at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot

rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Summary judgment shall also be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Regarding Defendants' motion to decertify the Eagle Class, Federal Rule of Civil Procedure 23(c)(1)(C) provides that "an order that grants or denies class certification may be altered or amended before final Judgment." "Indeed, 'an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Minter v. Wells Fargo Bank, N.A.*, Civ. No. WMN-07-3442, 2013 WL 1795564, *2 (D. Md. Apr. 26, 2013) (quoting *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir.1990)). However, "commentators have cautioned that courts should be wary of motions to decertify which simply reargue certification 'in the absence of materially changed or clarified circumstances.'" *Id.* (quoting 3 Newberg on Class Actions § 7:47 (4th ed. 2012) (alteration adopted)).

"[A] motion to decertify is reviewed against the same standards as a motion to certify (i.e., the requirements of Rule 23)." *Id.* (citing *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 544 (E.D. Va. 2000)). Specifically, Rule 23(a) requires that (1) the alleged class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the representatives' claims are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. After satisfying the Rule 23(a) prerequisites, the plaintiffs must show that the proposed class action satisfies one of the enumerated conditions in Rule 23(b). *E.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Here, Plaintiffs sought and were granted class certification pursuant to Rule 23(b)(3). Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## B. ANALYSIS

### 1. Edmondson's Claim

Defendants first seek summary judgment on Edmondson's individual claim, contending that she has not introduced admissible evidence showing an injury in fact and, as a result, lacks standing. *See Planmatics, Inc. v. Showers*, 137 F. Supp. 2d 616, 620 (D. Md. 2001) ("On a motion for summary judgment, a district court may only consider evidence that would be admissible at trial." (citations omitted)). Standing is a doctrine rooted in the traditional understanding of an Article III "case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Id*. (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The burden is on the plaintiff to establish these elements. *Id*. To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339 (quoting *Lujan*, 504 U.S. at 560). Importantly, "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (quoting *Lujan*, 504 U.S. at 561). "In response to a summary judgment request, the named plaintiff [in a class action] is obliged to 'set forth by affidavit or other evidence specific facts' that, when taken as true, establish each element of Article III standing." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Lujan*, 504 U.S. at 561).

Since *Spokeo*, a plaintiff may not satisfy the strictures of Article III by alleging "a bare procedural violation." 578 U.S. at 341. Rather, the plaintiff must have suffered a concrete harm as a result of the "defendant's statutory violation [that] is the type of harm Congress sought to prevent when it enacted the statute." *Baehr*, 953 F.3d at 253 (quoting *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240-41 (4th Cir. 2019)). The Fourth Circuit has explained that under RESPA, "the deprivation of impartial and fair competition between settlement services providers" is not the kind of harm Congress sought to prevent and, thus, will not confer Article III standing. *Id*. at 254. Rather, "the harm it sought to prevent is the increased costs . . . for settlement services." *Id*. (holding that deprivation of fair competition "untethered from any evidence that the deprivation increased settlement costs—is not a concrete injury under RESPA").

Thus, to survive Defendants' motion for summary judgment, Edmondson must point to competent evidence showing she was overcharged for title or settlement charges as a result of

kickbacks paid by Genuine Title to ENMC. At class certification, Edmondson relied on the theory that she had been overcharged specifically for title services in connection with her 2010 refinance loan. This Court agreed, concluding that, at the certification stage, Edmondson had proffered enough overcharge evidence to establish standing based on (1) the discrepancy between the $175 Edmondson paid for title search and abstract frees in 2009, and the $440 she paid for a title examination fee in 2010; and (2) a fee table, which has since been established to have been created by Wells Fargo Bank, indicating that that the $440 amount paid by Edmondson in 2010 was above the mean and median cost of similar title services in Maryland. ECF 176 at 6-7.

While the above-mentioned proffers were sufficient at class certification, this Court now concludes that Edmondson has failed to adduce sufficient admissible evidence to create a genuine dispute as to whether she was overcharged for title services on her 2010 refinance loans.[8] Edmondson points to "numerous pieces" of evidence which she claims support her title services overcharge theory, including (1) Watkins's expert opinion; (2) the Wells Fargo Chart; (3) a Wells Fargo "News flash" purporting to state the reasonable cost for a title examination in a refinance transaction; and (4) deposition testimony from Zukerberg. ECF 165 at 10-17. As explained above, however, this Court has already excluded Watkins's overcharge testimony with respect to title services. Furthermore, none of the other evidence cited by Edmondson is sufficient to show that she was overcharged for title services in relation her 2010 loan.

Beginning with the Wells Fargo Chart, that piece of evidence consists of a table reflecting the mean, median, and 80th percentile cost for "Title Exam, Search, [and] Abstract Fees" in each

_____

[8] While Edmondson contends she incurred overcharges on both her 2009 and 2010 loans, she does not appear to argue that she was overcharged for title services on her 2009 loan. Rather, her theory of overcharge on that initial loan is that she was overcharged for title insurance because she was charged an undiscounted rate rather than a lower, substitution rate. *See* ECF 165 at 13.

state. ECF 159-5. The figures in the Chart are based on data from loans closed and funded by Wells

Fargo's retail lending unit. ECF 160-4 at 71:6-9. The Chart was distributed to Wells Fargo's retail

loan processing employees in March 2010 for use as a reference when analyzing title costs for

certain types of loans. ECF 160-4 at 143:18-144:2. According to the Chart, the mean cost of title

services in Maryland during the relevant time period was $322.18; the median cost was $260; and

the 80th percentile cost was $497. ECF 159-5. Thus, the $440 Edmondson paid for title services in

connection with her 2010 refinance loan is above the mean and median amounts for Maryland, but

below the 80th percentile value. At class certification, this Court noted that Edmondson's 2010 fees

were above the mean and median amounts in concluding that Edmondson had proffered evidence

showing an injury in fact. ECF 176 at 7. Subsequently, however, Wells Fargo's corporate designee

stated in a deposition that the bank employees who used the Chart only considered the 80th

percentile amounts because that value "was most representative of the fee averages or fee amounts

that were being charged by settlement agents that would be acceptable" and "the best

representation of what was fair and consistent within the markets." ECF 160-4 at 69:14-70:7. In

other words, additional scrutiny of title exam, search, and abstract costs was only triggered when

the amount charged exceeded the 80th percentile value. *See id*. at 153:1-14. Edmondson now tries

to move the needle, arguing that any amount exceeding the median or mean number constitutes

enough evidence of an unreasonable charge to reach the jury. This Court disagrees. While it is fair

to contend that the 80th percentile number is an indicator of unreasonableness in light of Wells

Fargo's use of the numbers,[9] the same cannot be said for any number exceeding the median or

mean. To the contrary, given the deposition testimony of Wells Fargo's corporate designee, there

---

[9] Obviously, a jury may disagree that the Wells Fargo Chart's 80th percentile figures from a single past year are sufficient to prove the unreasonableness of title service charges paid by any or all of the Eagle Class. At present, however, the evidence suffices to present that issue to the jury.

is no evidentiary foundation in support of Edmondson's contention that the mean and median amounts are probative of an overcharge. Furthermore, the fact that Edmondson's 2010 title examination exceeded the mean and median cost says nothing about whether any deviation from those totals is statistically significant. *See, e.g.*, A. Gallo, *A Refresher on Statistical Significance*, Harv. Bus. Rev., Feb. 16, 2016 ("Statistical significance helps quantify whether a result is likely due to chance or to some factor of interest."). Given that the data underlying Wells Fargo Chart is unavailable, there is simply no method that would allow this Court (or a jury) to assess whether Edmondson's 2010 title examination fee exceeds the mean or median amounts in a way that indicates a potential overcharge. Accordingly, the Chart does not create a material dispute as to whether Edmondson was overcharged.

Similarly, the Wells Fargo "News flash" cannot be used to create a genuine issue about the reasonableness of Edmondson's 2010 title examination fee. The News flash is an internal communication that was sent to certain Wells Fargo employees on January 12, 2010. ECF 164-17, ECF 175-1 at 206:12-13. Under a section titled "VA Allowable Fees," the document instructs that "[t]ypically title exam/search or abstract for a *refinance transaction* will not exceed $250," and further that charges "should be questioned and the closer is required to validate the settlement fee in cases where it exceeds $250." ECF 164-17 (emphasis in original). Assuming that the News flash, which only applies to wholesale VA loans, is applicable to Edmondson's non-VA loan, it is still inadmissible because Wells Fargo's corporate designee was unable to provide any basis for the $250 figure. The designee testified at his deposition that he was not aware of what, if any, data the News flash relied upon. ECF 175-1 at 231:15-18. To the contrary, he stated that he believed the $250 figure was not likely the product of any analysis, but rather "a generalization to state when someone should ask more questions." *Id*. at 232:2-233:3. Thus, the News flash is

21

distinguishable from the 80th percentile figures from the Wells Fargo Chart, which are based on actual loan data. Furthermore, the reliability of the $250 benchmark is belied by the fact that the cost of title services vary significantly from state to state. Indeed, the 80th percentile values on the Wells Fargo Chart range from $27.80 (California) to $762 (Oklahoma). It is simply untenable that the one-size-fits-all, $250 figure is sufficiently probative of whether Edmondson was overcharged when she paid $440 for a title examination in Maryland.

Finally, Edmondson argues that Zukerberg's testimony that he tried "to get top dollar for your fee" and "charge[d] what I could charge" creates a genuine issue of fact as to whether she was overcharged for title services. *See* ECF 159-17 at 25:21, 68:4. But the mere fact that Zukerberg charged as much as the market would allow says nothing about whether Genuine Title's title examination, search, and abstract fees were increased as a result of kickbacks. The probative value of these vague and nonspecific statements are further diminished by the fact that Zukerberg stated unequivocally, in deposition testimony and a later affidavit, that he did not pass along the cost of kickbacks to borrowers, but rather "it just came out of, you know, out of our profits." ECF 159-17 at 26:15-22; *see also* ECF 159-15 ¶ 7 (Affidavit of J. Zukerberg dated Feb. 24, 2023) ("Genuine Title did not charge different or higher fees for title services based on whether it was paying for the referral of the loan. . . . Genuine Title's business model was based on increasing volume and gaining market share rather than charging above-market for title services.").

Thus, as to title service fees, Edmondson has failed to adduce sufficient evidence showing that she was overcharged. However, she now advocates for standing on an additional theory: that she was overcharged for title *insurance* in connection with both her 2009 and 2010 loans. Specifically, Edmondson contends that Genuine Title (1) charged her an undiscounted rate for title insurance in 2009, even though she was entitled to a lower "substitution" rate; and (2)

inappropriately charged her a substitution policy rate in 2010 that was applicable to a much older loan. ECF 165 at 13. This Court concludes that, at least as to the 2010 loan, Edmondson has identified evidence establishing a material dispute as to whether she was overcharged.

Initially, Defendants contend that Edmondson's reliance on title insurance as a basis for her claim and those of the Eagle Class members is procedurally improper. They note that Edmondson failed to mention title insurance in her prior filings in this case (including the motion for class certification), and further that Edmondson prejudiced Defendants by waiting until February, 2023—four months after the close of discovery and two weeks before the deadline for dispositive motions—to produce any evidence relating to title insurance. *See Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987) ("The burden rests primarily upon the plaintiff to amend his complaint, not upon the defendant to anticipate a new claim."). As explained in greater detail below, this Court agrees with Defendants that Edmondson's new theory of harm presents significant issues *as it pertains to her ability to represent the Eagle Class*. However, the instant motion seeks summary judgment only with respect to Edmondson's *individual standing*. As to that issue, this Court declines to preclude Edmondson from relying on title insurance overcharges to establish an injury in fact. While Defendants frame the title insurance theory as unfairly prejudicial, their own expert proactively addressed title insurance in his report issued on November 14, 2022, concluding that Edmondson had not been inappropriately charged for policies carrying higher premium costs. ECF 164-13 at 72-75. Watkins then addressed Nielsen's title insurance conclusions in his expert rebuttal report issued on December 14, 2022, ECF 168-3 at 11, and both experts discussed title insurance during their subsequent depositions in January, 2023. *See* ECF 164-12, 164-15. This belies Defendants contention that the issue of title insurance was sprung on them in February, 2023. To the contrary, this Court finds no prejudice in allowing Edmondson to assert a title insurance

overcharge theory, where Defendants and their expert had ample opportunity to consider and address the title insurance issue prior to the instant summary judgment motion.

Furthermore, a review of the record reveals sufficient evidence, as to the 2010 loan, to create a material dispute as to whether Edmondson was overcharged for title insurance. Nielsen stated in his expert report and at deposition that Edmondson was charged a substitution rate for her 2010 policy that was applicable to a five- to-ten-year-old loan. *See* ECF 164-13 at 73-74; ECF 164-15 at 60:4-16, 62:17-18. But Edmondson's previous loan was only 18 months old at the time she refinanced in 2010, a fact Nielsen conceded at deposition. ECF 164-15 at 63:18-64:6.[10] Indeed, Genuine Title had also provided title services for Edmondson's previous 2009 refinance loan. Accordingly, Watkins concluded that Edmondson should have been charged an even lower substitution rate applicable when the loan being replaced is less than three years old. ECF 159-1 at 12:17-14:9. In Watkins's estimation, this resulted in Edmondson being overcharged by $252. *Id*. The above evidence, combined with Zukerberg's admissions that he paid kickbacks to Edmondson's loan agent, Mandelberg, are sufficient to create a genuine dispute as to whether Edmondson was overcharged for title insurance as a result of the alleged kickback scheme. Therefore, Edmondson has standing to bring her claim, and Defendants' motion for summary judgment on her individual claim will be denied.

### 2. Class Certification Issues

This Court will next consider Defendants' motion to decertify. Initially, this Court need not address Defendants' argument that the Eagle Class must be decertified and the case dismissed

---

[10] Nielsen did not, however, concede that Edmondson was overcharged because she received the five- to ten-year substitution rate, stating that he could not determine whether Edmondson was given the "wrong tier" unless he knew what kind of information was provided to Genuine Title at the time the 2010 policy was being ordered. ECF 164-15 at 63:1-13.

because Edmondson lacked standing at the start of this lawsuit and, as a result, this Court never acquired subject matter jurisdiction. *See, e.g.*, *Crosby v. Bowater Inc. Ret. Plan*, 382 F.3d 587, 597 (6th Cir. 2004) ("[W]here the named plaintiff's claim is one over which 'federal jurisdiction never attached,' there can be no class action." (quoting *Walters v. Edgar*, 163 F.3d 430, 432-33 (7th Cir. 1998)). For the reasons explained above, Edmondson has adduced sufficient evidence at this stage that she was overcharged for title insurance in 2010. Furthermore, this apparent injury-in-fact has existed continuously from the inception of this lawsuit. Therefore, this Court will not dismiss this case on the grounds that federal jurisdiction never attached prior to class certification.

Defendants also contend, however, that decertification is required even if Edmondson's individual claim survives. Specifically, they assert that (1) Edmondson is not a typical or adequate class representative, and (2) individualized issues with respect to proving injury and damages for each class member predominate over class-wide issues. With respect to that second issue, this Court agrees with Defendants that common questions no longer predominate, in light of Plaintiffs' attempt to now assert title insurance overcharges as an additional basis for recovery. Rather than decertify the class, however, this Court will amend the class definition as described below. In light of that amended definition, Edmondson is no longer a member of the Eagle Class and, for that reason, cannot be an adequate class representative. Once again, however, in lieu of decertification, this Court will permit Plaintiffs the opportunity to substitute a new named plaintiff.

### i. Predominance

This Court will begin with Defendants' argument that the Eagle Class no longer satisfies the predominance requirement of Rule 23(b)(3). Once again, that rule requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Defendants contend that individual

issues predominate in this case because loan-specific analysis will be required to prove standing and damages for each Eagle Class member.

As this Court recently noted in a related case, "the fact that Plaintiffs may have been overcharged by different amounts as a result of the kickbacks at issue neither destroys their standing nor the predominance of the common legal and factual issues related to their claims." *Brasko v. Howard Bank*, Civ. No. SAG-20-3489, 2022 WL 951771, at *5 (D. Md. Mar. 29, 2022). Similarly, with respect to damages, the Fourth Circuit has made clear that "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification." *Gunnells*, 348 F.3d at 427-28. However, while some individualized assessment of damages is expected and will not alone doom certification, common questions cannot predominate where a theory of injury relies too much on the unique circumstances of individual class members. *See Broussard*, 155 F.3d at 343-44 (decertifying class because, inter alia, damages theory was too "dependent upon consideration of the unique circumstances pertinent to each class member"); *Branch v. GEICO*, 323 F.R.D. 539, 551-52 (E.D. Va. 2018) (predominance not met where "individualized questions remain about which class members suffered a concrete injury").

In support of their argument that common questions continue to predominate, Plaintiffs point to this Court's recent opinion in *Bezek*. There, this Court refused to decertify the class on the grounds that the plaintiffs would need to show how much each class member was overcharged to prove injury and damages. *Bezek*, 2023 WL 348967, at *19. The Court noted that Plaintiffs had introduced common, objective evidence—including the same Wells Fargo Chart that the majority of the Eagle Class members rely on here—that could be applied across the class to determine if individuals was overcharged for title exam, search, and abstract services:

> If Plaintiffs' arguments prevail, comparing these objective numbers against the title costs on the class members' HUD-1 forms should be a relatively streamlined endeavor, particularly given the manageable size of the First Mariner Class. Likewise, this Court is not convinced at this stage that the need to account for lender credits on certain loans is sufficient to overcome common questions in determining whether the class plaintiffs were indeed overcharged for title services.

*Id*.

However, this case is different from *Bezek* in an important respect. Now, seven years into this dispute, Plaintiffs assert for the first time that they seek damages not only for title services—that is, the examination, search, and abstract fees reflected on the Wells Fargo Chart—but also for overcharges linked to the title insurance policies selected by Genuine Title employees. For example, Plaintiffs assert that of the 233 loans made to Maryland-based Eagle Class members in the relevant time period, 166 involved an overcharge for title insurance. ECF 164-29. In addition, a small but non-negligible portion of class members rely solely on title insurance overcharges as their basis for standing.[11] These overcharges allegedly occurred through the charging of higher premiums for unnecessary, "expanded" insurance policies; the failure to provide discounted "substitution" rates to borrowers who were otherwise entitled to them; or a combination of both. *See id*.

Although it did not have the opportunity to address the title insurance issue during the 2020 dispute over class certification, this Court now concludes that claims involving title insurance are not amenable to class resolution. Plaintiffs have failed to identify a common comparator, such as the Wells Fargo Chart, that could be applied in a streamlined way to determine if an individual was overcharged for title insurance. Rather, such an assessment requires a highly individualized analysis of various factors specific to each loan transaction. Edmondson's claim is instructive. She

---

[11] At the motions hearing, class counsel represented that there are 168 Eagle Class members for whom "title insurance overcharges will be dispositive."

contends that she was improperly denied discount substitution rates on both her 2009 and 2010 loans. *See, e.g.*, ECF 165 at 13. But whether Edmondson was entitled to a particular substitution rate in either instance would require, at minimum, an assessment of (1) the terms of her loan transactions; (2) when each loan transaction occurred; and (3) whether she satisfied the insurer's eligibility requirements for discounted rates, including potentially whether she disclosed her previous loan to Genuine Title at the time of her transaction.[12] Each of these inquiries is highly individualized and not susceptible to common, class-wide proof. *See Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699, 703 (5th Cir. 2011) (finding predominance lacking where individualized, fact-based inquiries into each title insurance purchase transaction would have been required to ascertain "whether particular persons qualify for the discount and were denied it"); *Randleman v. Fidelity Nat. Title Ins. Co.*, 646 F.3d 347, 353 (6th Cir. 2011) (same). Similarly, assuming that paying more for an expanded policy—which by definition offers greater protections and benefits to the borrower—can be considered an "overcharge," individual inquiries would be needed to determine why and how each borrower obtained expanded title insurance to determine whether such a policy was in fact inappropriate. Permitting Plaintiffs to proceed with their title insurance theory would therefore necessitate dozens of mini trials to assess whether, and by how much, individual class members were overcharged for title insurance. It is no wonder, then, that courts routinely reject class actions based on title insurance overcharges. *See Benavides*, 636 F.3d at 703; *Randleman*, 646 F.3d at 353; *Haskins v. First Am. Title Ins. Co.*, 2014 WL 294654, *14 (D.N.J.

---

[12] As Defendants note, the Southern Title rate manual that Edmondson relies on states "[w]hen a substitution loan is made to the same borrower on the same property" the discounted substitution rate "will be charged for issuing the policy in connection with the new loan *provided the outstanding policy is presented* . . . ." ECF No. 164-21 at 9 (emphasis added). Thus, there could arise a dispute as to whether Edmondson provided the outstanding policy to the Genuine Title employee that handled her loan, or otherwise provided sufficient information such that Genuine Title should have known that she was entitled to a lower substitution rate.

Jan. 27, 2014) ("[F]iles from each putative class member's transaction would need to be examined to determine whether a new loan was used to refinance a prior mortgage and whether the transaction involved the same borrowers, the same property, the amount of the prior loans, and the disposition of those loans per the requirements of the Rate Manual.").[13]

Accordingly, for the reasons stated above, this Court concludes that the inclusion of title insurance overcharges as a basis for class member standing and damages would destroy predominance and require decertification of the class. However, this Court is mindful that "decertification is a drastic step, not to be taken lightly." *Alig v. Quicken Loans Inc.*, No. 5:12-CV-114, 2017 WL 5054287, at *10 (N.D.W. Va. July 11, 2017) (quoting 3 Newberg on Class Actions § 7:37 (5th ed. 2013)). Rule 23(c)(1)(C) expressly provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Thus, "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *see also Piotrowski v. Wells Fargo Bank, NA*, Civ. No. DKC-11-3758, 2015 WL 4602591, at *5 (D. Md. July 29, 2015) ("The court possesses the power to modify the class definition."). When faced with a decertification motion, this Court has previously amended the class definition rather than outright decertifying a class that no longer meets Rule 23's requirements. *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 863 (D. Md. 2013) (redefining class because of typicality, commonality, and predominance concerns related to differences in contractual relationships). *Cf. In re Marriott Intl.*, 341 F.R.D. at 149 (concluding, at certification stage, that

---

[13] For the same reasons, this Court disagrees with class counsel's proposal at the motions hearing to create a subclass of members whose claims rely solely on title insurance overcharges. Such claims are simply not amenable to class certification, absent some common proof that can be used to easily and objectively assess whether a title insurance overcharge occurred.

certain classes did not satisfy Rule 23's typicality requirement, but nonetheless amending the class definitions rather than denying certification outright).

Rather than decertify the class, then, this Court will instead amend the class definition to ensure the predominance requirement of Rule 23(b)(3) remains satisfied. Specifically, while claims alleging title insurance overcharges are not amenable to class-wide resolution, the Court remains satisfied that the Wells Fargo Chart's 80th percentile figures provide objective and administrable baselines which a jury may ultimately consider in determining whether Eagle Class members have been overcharged for title examination, search, and abstract services.[14] Indeed, the Eagle Class was originally certified on this title services overcharge theory, and the vast majority of the class continues to assert it as a basis for relief. *See* ECF 164-29.[15] Therefore, this Court will amend the class order as follows (with changes noted in **bold**):

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) from, brokered or originated by, Eagle National Bank or Eagle Nationwide Mortgage Company for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2007, and January 31, 2011**, and whose HUD-1 reflects the payment of title abstract, search, and/or examination services exceeding the 80th percentile cost in their state according to the Wells Fargo Chart, ECF 70-4**. Exempted from this class is any person who, during the period of January 1, 2007 through January 31, 2011, was an employee, officer, member and/or agent of Defendants Eagle National Bank, Eagle Nationwide Mortgage Company, ESSA Bank & Trust, Genuine Title LLC, Brandon Glickstein, Inc., and/or Competitive Advantage Media Group LLC.

---

[14] For the reasons described above, this Court does not believe that the Wells Fargo Chart's mean and median figures are a reliable basis to show an injury. Plaintiffs have introduced no evidence that those numbers are sufficiently indicative of an overcharge, and in fact the testimony of Wells Fargo's corporate designee indicates that the opposite is true. ECF 160-4 at 69:14-70:7, 153:1-14

[15] At the motions hearing, class counsel represented that 83 percent of the Eagle Class members were charged more than the 80th percentile amount in their state for title examination, search, and abstract services.

*ii. Typical and Adequate Representative*

In light of this amended definition, Edmondson is no longer a member of the Eagle Class. This is because, as explained above, the amount Edmondson paid for title services in 2009 and 2010 falls below the 80th percentile total for Maryland listed on the Wells Fargo Chart, and there is no genuine dispute that she was overcharged for title examination, search, or abstract services (though there *is* a genuine dispute as to whether she was overcharged for title insurance). It is well-settled that, in order to satisfy Rule 23(a)(4), the "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Because she is no longer part of the class, then, Edmondson cannot serve as an adequate representative.

Once again, however, this Court concludes that the proper remedy is not decertification. Rather, this Court will permit Plaintiffs the opportunity to substitute a new named plaintiff. Fourth Circuit courts "routinely allow the substitution of a new class representative after the original representative has been disqualified." *McKandes v. CareFirst, Inc.*, Civ. No. AW-04-743, 2006 WL 8457129, at *6 (D. Md. June 12, 2006); *Chisolm*, 194 F.R.D. at 59 (named plaintiff's failure to meet class definition not fatal to case; substitution of appropriate plaintiff allowed); *cf. Natl. Fedn. of Blind v. Target Corp.*, 582 F. Supp. 2d 1185, 1200-03 (N.D. Cal. 2007) (conditionally certifying class and allowing opportunity to substitute a new named plaintiff from the class, where original plaintiff's claim was not typical and the class otherwise satisfied Rule 23). This Court finds substitution to be particularly warranted here, given that "substantial resources have already been expended in prosecuting this case, [and] that the putative class otherwise seems to satisfy the requirements of Rule 23," subject to the revised class definition discussed above. *McKandes*, 2006

WL 8457129, at *6. It is not lost on this Court that this case is now seven years old and that substitution will result in further delay. This Court disagrees with Defendants' representation at the motions hearing, however, that a full "do-over" will be required as to class certification. The class has already been certified. The sole question will be the adequacy and typicality of the named plaintiff, which should be reasonably easy to ascertain with some limited discovery to include written discovery and depositions of that new proposed representative.

Accordingly, Plaintiffs will be given 30 days from the entry of this Memorandum Opinion and Order to identify and propose a new representative for the Eagle Class. Moreover, it now appears that Edmondson's individual RESPA claim is otherwise ready for trial. The parties therefore shall confer and provide this Court with proposed schedules for (1) a trial for Edmondson and (2) discovery for the new proposed named plaintiff

### 3. Summary Judgment as to Specific Eagle Class Members

Defendants next seek summary judgment with respect to more than 300 Eagle Class members, contending Plaintiffs have adduced no evidence that they were subject to a RESPA violation. Initially, this Court notes that, in light of the amended class definition discussed above, some of the individuals who Defendants have identified in their summary judgment motion are no longer part of the Eagle Class. For example, Defendants argue they are entitled to summary judgment as to 192 purported Class members whose alleged injury cannot be supported by the Wells Fargo Chart. ECF 174 at 27-29. This includes (1) Class members whose property is in a state for which the Wells Fargo Chart provides no data; and (2) Class members whose HUD-1s do not separately identify a fee for a title search, abstract, or examination. However, because these individuals no longer fall within the amended class definition set forth above, they cannot be bound

by any adjudication of this case. *See Bezek*, 2023 WL 348967, at *11.[16] Accordingly, Defendants are not entitled to summary judgment on these 192 individual claims.

However, Defendants also seek summary judgment with respect to two other discernible groups within the Eagle Class: (1) those individuals whose loans were originated by ENMC branches that have not been directly linked to any kickbacks; and (2) those for whom Genuine Title merely coordinated the provision of title and settlement services through a third company.

### i. *Branches not linked to kickbacks*

Defendants contend that Plaintiffs have failed to offer any evidence that 90 Class member loans originating from certain ENMC branches have any direct connection to the alleged kickback scheme.[17] Through discovery, Plaintiffs have identified nine ENMC employees as taking part in a referral agreement  scheme with Genuine Title. Defendants assert, however, that these 90 loans were originated from ENMC branches where none of these individuals worked, and that Plaintiffs have failed to otherwise point to evidence linking these loans to kickbacks. As explained below, this Court concludes that Defendants are entitled to summary judgment on most of these loans, to the extent that their borrowers remain part of the Eagle Class.

First, Plaintiffs assert (and Defendants do not dispute) that that two loans from ENMC branches managed by Joseph Campagna and Gregory Novak were not closed by Genuine Title

---

[16] Likewise, the parties agree that 52 previously identified loans either did not close or were closed by a title company other than Genuine Title, and therefore are not part of the Eagle Class. ECF 165 at 25; ECF 174 at 27.

[17] Initially, Defendants also sought summary judgment with respect to 11 additional loans from ENMC's Towson, Maryland, and Wexford, Pennsylvania, branches. See ECF 157-1 at 18. However, in their Consolidated Reply, Defendants concede that Plaintiffs have identified sufficient evidence at this stage to support their allegations of involvement in the alleged scheme. ECF 174 at 31.

and were obtained by borrowers who are not part of the Eagle Class. Because they are not part of this action, then, Defendants are not entitled to summary judgment on these two loans.

Next, Defendants seek summary judgment on 46 loans referred to Genuine Title by ENMC's branch in Sarasota, Florida. In opposition, Plaintiffs point to the fact that Genuine Title issued 26 checks during the relevant time period to "American Consulting Services," *see* ECF 164-25, which they allege was set up by the wife of a Sarasota branch loan officer, Oday Marogi, ECF 165 at 26. However, Plaintiffs fail to point to evidence showing that Oday Marogi ever actually worked for ENMC's Sarasota Branch. Instead, Plaintiffs try to link Marogi to Eagle through the LinkedIn profile of another individual, Dustin Meshberger, who according to the profile is a Regional Manager at Bank of England. ECF 164-24 at 6-10. Plaintiffs specifically highlight a 2023 post from Meshberger stating that nine years earlier, he and Marogi "brought over our entire team to join forces with [Bank of England]." *Id*. at 6. Assuming Meshberger's LinkedIn profile, which is clearly hearsay, is even admissible, it fails to establish that Marogi and Meshberger ever worked together *at Eagle*. Rather, the LinkedIn page indicates that, immediately prior to joining Bank of England, Meshberger and Marogi worked for Emery Financial Services. *Id*. at 7. And while Meshberger did apparently work at Eagle from 2007 and 2009, there is no direct evidence that Marogi also worked there during that time. In short, Plaintiffs' speculative evidence, to the extent it is even admissible, fails to create a genuine dispute as to whether the Eagle Class loans originating from the Sarasota branch involved an illegal kickback.

Finally, the parties dispute whether Plaintiffs have adduced sufficient evidence of a kickback with respect to 40 loans from Eagle's Charleston, South Carolina branch, as well as single loans from the Orange Park, Florida, and Marriottsville, Maryland, branches. Initially, this Court will not grant summary judgment with respect to the Marriottsville loan. In their Memorandum in

support of summary judgment, Defendants seemingly misidentified that loan as being from Eagle's Plano, Texas branch managed by Richard Hinegardner. ECF 157-1 at 18; *see also* ECF 174 at 33 and ECF 159-14 at 8 (clarifying that the relevant loan was originated from the Marriottsville branch managed by George Chamberlian). Thus, it is this Court's view that Plaintiffs lacked adequate notice to address that loan in their opposition. As to the remaining 41 loans, however, this Court agrees with Defendants that Plaintiffs have failed to point to any evidence of a kickback. Plaintiffs acknowledge the lack of any direct evidence of kickbacks originating from the Charleston and Orange Park branches, but instead assert that evidence of Defendants' "repeated receipt of things of value in exchange for the practice of referring loans to Genuine Title . . . is a sufficient factual basis from which a jury could infer that the remaining forty-one loans . . . were affected by a kickback." ECF 165 at 27. But this Court rejected a similar guilt-by-association argument in *Bezek*, concluding that the mere fact that certain officers worked at the same branch as other employees implicated in the kickback scheme was insufficient to infer that those loan officers also participated in the scheme. *Bezek*, 2023 WL 348967, at *12, 14. Plaintiffs' argument here is even more attenuated—they point to no direct link between the Charleston and Orange Park branches and the Eagle employees directly implicated in the kickback scheme. Accordingly, Defendants are also entitled to summary judgment on the claims arising out of these loans, to the extent that they remain part of the amended Eagle Class.

*ii.  Coordination loans*

Additionally, Defendants move for summary judgment on 94 Class member loans for which Genuine Title merely coordinated the provision of title and settlement services through another company, Fidelity National Title Agency Solutions ("FNAS"). As explained by Zukerberg in his February, 24, 2023 affidavit, Genuine Title would coordinate title services through FNAS if

Genuine Title was not a licensed insurance provider in a particular state, or if the transaction was in a remote location. ECF 159-15 ¶ 8. In turn, Genuine Title would charge FNAS a coordination fee and sometimes a settlement fee. *Id*. In his affidavit, Zukerberg stated that Genuine Title "did not pay or provide any type of compensation to anyone for the referral of a loan in a state where Genuine Title did not have a license or a state where the services of FNAS were required." *Id*. ¶ 9. In light of this statement, Defendants contend there is no evidence of any kickbacks in connection with the Class member loans that Genuine Title passed on to FNAS.

In response, Plaintiffs point to another Zukerberg affidavit from March, 2016, in which he testified that he paid kickbacks on "each referral" from Mandelberg, Klopp and Pobletts's Eagle Branches and identified no exceptions for coordination fee loans. ECF 164-4 ¶¶ 4, 5, 6 (emphasis added); *see also id*. ¶ 9 (stating that a referral fee was paid to Mandelberg, Klobb, or Pobletts for "all Eagle National borrowers' loan referred by them that closed with Genuine Title between 2/1/2010 and 7/1/2011"). While Zukerberg's latter affidavit is both more recent and more explicit in addressing the coordination scenario, this Court remains mindful that it "may not make credibility determinations at the summary judgment stage[,]" and that "[t]his principle is especially true in cases in which witnesses tell contradictory versions of the same events." *Ferrell v. Harris Ventures, Inc.*, 812 F. Supp. 2d 741, 746 (E.D. Va. 2011) (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 333 (4th Cir. 2011)). Accordingly, this Court declines to grant summary judgment with respect to the coordination fee loans. Ultimately, it will be up to a jury to weigh the content and credibility of Zukerberg's testimony on this issue.

### 4.  Damages Amount

Defendants also seek summary judgment on the method of calculating damages for a RESPA violation pursuant to 12 U.S.C. § 2607(d)(2). This Court recently opined on this issue in

*Bezek*, concluding that the amount of damages available to a successful RESPA plaintiff under § 2607(d)(2) is three times the amount, if any, that the plaintiff was overcharged. *Bezek*, 2023 WL 348967, *14-16. This Court addressed the issue again in denying the Bezek plaintiffs' subsequent motion for reconsideration. *Bezek v. First Nat'l Bank of Pa.*, Civ. No. SAG-17-2902, 2023 WL 2571508, *2-4 (D. Md. Mar. 20, 2023). While this Court understands, as class counsel urges, that *Bezek* is not binding, this Court continues to believe that its analysis in that case is correct and will reiterate the substance of its reasoning here.

The amount of damages a successful RESPA plaintiff is entitled to is governed by 12 U.S.C. § 2607(d)(2), which states:

> Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

Defendants argue that Plaintiffs' RESPA damages are limited to three times the amount that each borrower was overcharged for title and settlement services as a result of the alleged kickbacks. Plaintiffs, on the other hand, argue that the plain language of the statute entitles them to treble the amount of *all* title-related charges involved in their transaction, regardless of whether a specific charge (such as a title examination or insurance premiums) was actually increased as a result of the kickback.

As it did in *Bezek*, this Court concludes that tying damages to the amount a plaintiff was actually overcharged best accords with both the plain language of § 2607(d)(2) and the purposes of the RESPA statute. *See Bezek*, 2023 WL 348967, *14-16. Turning first to the provision's text, § 2607(d)(2) provides for damages "in an amount equal to three times the amount of any charge paid for *such* settlement service." "Such" in this case refers back to "the settlement service *involved in the violation*." *Id.* (emphasis added). Plaintiffs, however, seek to treble the amount paid for all

of their settlement services, regardless of whether any of those charges were actually increased by an illegal kickback. Additionally, Congress passed RESPA to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices" through "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601; *see also Baehr*, 953 F.3d at 254. It is difficult to see how RESPA's goal of preventing increased settlement charges is served by allowing a plaintiff to collect damages for charges that are not in any way increased by an alleged kickback. Moreover, such an approach is in tension with *Baehr*, which specified that the injury-in-fact that gives a plaintiff standing to bring a RESPA claim is the increased costs—i.e., the overcharge—that result from an illegal kickback. *Baehr*, 953 F.3d at 254-56. Under Plaintiffs' proposed reading, the amount of damages available to a RESPA plaintiff would be determined completely by the amount paid for title settlement services (with larger loans subject to higher title insurance premiums and, by extension, greater damages), regardless of the amount of any actual overcharge. As in *Bezek*, this Court once again rejects such an approach, and instead agrees that "[t]ying (and trebling) the recoverable damages to that portion of the charge for the settlement service 'involved in the violation' advances the purposes of RESPA while respecting Article III's command that a private plaintiff must suffer an actual injury before invoking the jurisdiction of a United States District Court." *Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 825 (E.D. Texas 2002); *see also Durr v. Intercounty Title Ins. Co. of Ill.*, 14 F.3d 1183 (7th Cir.1994) (rejecting a demand for trebled damages on all settlement services under RESPA; *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1427 (S.D. Fla. 1997) ("[A] better reading of the statute is that the damage award consist of three times the amount which violates RESPA."); *Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474, 486 (M.D.N.C. 2004).

In opposing summary judgment in the present case, class counsel (who also represent the Plaintiffs in *Bezek*) largely repeat arguments made in support of the unsuccessful motion for reconsideration in *Bezek*. *See Bezek*, Civ. No. SAG-17-2902, ECF 118 at 4-8. Those arguments, summarized, contend that this Court's opinion in *Bezek* (1) improperly inserted an overcharge requirement into the text of § 2607(d)(2), and (2) is contrary to legislative history that, in Plaintiffs' view, supports their reading of the statute.[18] This Court continues to find these arguments unpersuasive. As noted above, the statute allows for damages for three times the value of the "settlement service *involved in the violation*." § 2607(d)(2) (emphasis added). It does not allow for treble damages on "all charges" paid by a borrower for all services, including insurance premiums, in a given transaction. Certainly, if Congress wanted to allow for such damages, it could have easily done so. *See* 12 U.S.C. § 2608(b) (authorizing a plaintiff to recover damages under a separate RESPA provision "in an amount equal to three times *all charges* made for such title insurance" (emphasis added)). That Congress has not chosen this path, instead tying recovery to those services which increased in cost as a result of a kickback, renders Plaintiffs' textual and legislative history arguments unavailing.

Accordingly, Defendants are entitled to summary judgment on the amount of damages available pursuant to § 2607(d)(2). Specifically, the damages Plaintiffs may seek are treble the amount (if any) that they were overcharged by Eagle as a result of the alleged illegal kickbacks.

---

[18] Specifically, Plaintiffs note that the damages provision originally allowed for damages equaling three times the "fee, kickback, or thing of value." In 1983, Congress amended the damages provision to its present iteration. *See* P. L. 98-181, Title I, Ch I, Title IV, Part C, § 461(b), (c) (Nov. 30, 1983).

### 5. Piercing the Corporate Veil

Finally, the summary judgment motion contends that all Defendants except ENMC are entitled to summary judgment on all claims because they cannot be held liable for the conduct of ENMC's employees. The allegations in this case are that employees of ENMC accepted kickbacks from Genuine Title in exchange for the referral of title services on loans brokered or originated by ENMC. Plaintiffs' theory as to the other defendants is that ENMC was an alter ego of ENB, permitting the corporate veil to be pierced for ENB, its holding company, Eagle National Bancorp ("EN Bancorp"), and their successor entities, ESSA Bank & Trust and ESSA Bancorp, Inc. (together, "ESSA").

Well-established Pennsylvania law[19] provides "a strong presumption . . . against piercing the corporate veil[,]" and "[a]ny Court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception."[20] *Mortimer v. McCool*, 255 A.2d 261, 268 (Pa. 2021) (internal quotation marks omitted). With that presumption in place, at summary judgment, a plaintiff must show "by clear and convincing evidence that such a remedy [piercing the corporate veil] is warranted." *Gateco, Inc. v. Safeco Ins. Co. of Am.*, Civ. No. 05-2869, 2006 WL 2077011, at *3 (E. D. Pa. July 24, 2006). In weighing the evidence, Pennsylvania courts assess four factors when deciding whether to disregard the corporate form: "[1] undercapitalization, [2] failure to adhere to corporate formalities, [3] substantial

---

[19] The Parties agree that Pennsylvania law applies to the issue of whether to pierce the corporate veil in this case, because ENMC and ENB were incorporated in Pennsylvania.

[20] Plaintiffs appear to misapprehend this strong presumption by suggesting that corporate formalities can be "disregarded 'whenever justice or public policy demand'" or that piercing the veil is a simple "matter of equity." ECF 165 at 32 (quoting *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978)). However, Pennsylvania law is clear that the corporate veil should not be pierced except under "specific, unusual circumstances." *Mortimer*, 255 A.3d at 268 (quoting *Wedner v. Unemployment Bd. of Review*, 296 A.2d 792, 794 (Pa. 1972)).

intermingling of corporate and personal affairs and [4] use of the corporate form to perpetrate a fraud." *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995) (internal quotation marks omitted). The last factor is critical, as "courts will disregard the general rule and allow the corporate veil to be pierced 'only when the corporation was an artifice and a sham to execute illegitimate purposes and . . . abuse of the corporate fiction and immunity that it carries.'" *Rice v. First Energy Corp.*, 339 F. Supp. 3d 523, 535 (W. D. Pa. 2018) (quoting *Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 469 (E. D. Pa. 2016)).

Plaintiffs rely on an "alter ego" theory, under which the corporate veil may be pierced when "the individual or corporate owner controls the corporation to be pierced and the controlling owner is to be held liable." *Miners, Inc. v. Alpine Equipment Corp.*, 722 A.2d 691, 695 (Pa. Super 1998). "To prevail under the alter-ego theory, a plaintiff must demonstrate that the degree of control exercised by the parent is greater than normally associated with common ownership and directorship." *Rice*, 339 F. Supp. 3d. at 534 (cleaned up). Additionally, a plaintiff seeking to invoke the alter ego theory must establish that "injustice will result if corporate fiction is maintained despite the unity of interests between the corporation and its principal." *Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co.,* 53 A.3d 53, 58 n. 7 (Pa. Super. 2012). In keeping with the presumption against piercing the corporate veil, however, the "injustice" inquiry is not broadly defined and it incorporates some element of intent. *See Rice*, 339 F. Supp. 3d at 535 (quoting *Lieberman*, 226 F. Supp. 3d at 467). As the Third Circuit has stated:

> Not every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil. That remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes.

*Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3d Cir. 1994) (internal citations omitted).

In light of those legal standards, a careful review of the available facts is required. ENB created ENMC, its wholly owned subsidiary, in April, 2007, largely by acquiring the assets of an existing entity, Sunset Mortgage Company. ECF 164-37 at 11:16-18; 41:8-17. ENMC was in the business of mortgage origination. *Id.* at 12:6-8. It served as the lender on 20 percent of its own loans, using other entities, including ENB, as the lender on other mortgages. *Id.* at 12:22-13:10 Although ENMC shared recruiting and compliance functions with ENB, it also did business with third parties, had its own employees, managed its own payroll, had its own website, and maintained its own IT department implementing its own Internet presence. *See, e.g.*, *id.*; ECF 164-34 at 27:4-6; 32:3-9; 53:8-19.

In 2009, the Office of the Comptroller of the Currency ("OCC") commenced an enforcement action against ENB, resulting in an agreement for ENB to increase monitors and controls over its mortgage banking operations. *See* ECF 164-28. The agreement does not refer to ENMC, and it does not disclose the reasons for the enforcement action. *Id.*

By late 2009, ENB decided to sell its mortgage operations. ECF 164-39 at 16:18-22. In August, 2010, ENB and ENMC executed an agreement (the "Asset Purchase Agreement" or "APA") to sell their respective mortgage businesses to ISCP Funding, LLC ("ISCP"). ECF 164-30. With respect to ENMC, the APA provides:

> ENMC is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has the full power and authority to own, lease and operate its properties and to carry on the Business as now conducted.  Each of ENB and ENMC is duly qualified or licensed to do business.

ECF 164-30 at 10, § 4.1. Representatives of ENMC and ENB signed the APA on separate signature lines. *Id.* at 42. The APA discusses ENMC and ENB separately but also refers to them collectively as "Sellers." *Id.* at 4. ENMC and ENB sold their assets (specifically the assets of 64 mortgage branches, retaining just 14, *see* ECF 168-6 at 14-15, 18) to ISCP but, as is customary in an asset sale, retained their liabilities. ECF 164-30 at 7, § 2.3(A) (stating that ENMC and ENB retain "all Liabilities" other than the "Assumed Liabilities" enumerated in the APA). Following the APA, ENMC was an inactive corporation without assets or capitalization. *See* ECF 164-32 at 18, § 3.01(f).

In July, 2015, EN Bancorp (the holding company of ENB and ENMC) merged with ESSA Acquisition Corp., with EN Bancorp as the surviving entity. ECF 164-32 at 13, § 2.01(a). EN Bancorp then merged with ESSA Bancorp, with ESSA Bancorp as the surviving entity. *Id.* § 2.01(b). All of the duties and obligations of EN Bancorp were transferred to and assumed by ESSA Bancorp. *Id.* The related banks merged as well, with ENB merging with and into ESSA Bank & Trust. ECF 164-33. The merger agreement required ESSA to dissolve ENMC, which it did on October 28, 2016. ECF 164-36 (articles of dissolution). Plaintiffs filed the instant lawsuit six weeks later. ECF 1.

In support of their efforts to hold all of the Defendants liable, Plaintiffs argue that ENMC constituted an "alter ego" of ENB, citing the companies' shared officers, directors, and management, ENMC's failure to maintain separate corporate formalities such as board meetings, and evidence of shared recordkeeping.[21] But in this Court's view, even under an "alter ego" theory,

---

[21] It is unclear that these facts alone indicate an "alter ego"-type relationship, as many of these factors also characterize a standard relationship between a company and its wholly owned subsidiary. For example, the Supreme Court has explained that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not

those facts do not alone support piercing the corporate veil. Despite Plaintiffs' burden to prove "by clear and convincing evidence" that veil piercing is warranted, *Gateco, Inc.*, 2006 WL 20077011, at *3, they proffer almost no evidence gleaned through targeted discovery in this case. Instead, Plaintiffs rely on brief snippets of depositions taken in entirely different contexts in 2008 and 2012 to try to cobble together persuasive evidence of ENB's exercise of corporate control. *See, e.g.*, ECF 164-34 (Feb. 11, 2008 deposition of S. Morelli); ECF 164-35 (Feb. 11, 2008 deposition of P. Gallen); ECF 164-37 (Feb. 11, 2008 deposition of W. Bromley); ECF 164-38 (Jan. 11, 2008 deposition of S. Morelli); ECF 164-39 (Jan. 17, 2012 deposition of S. Morelli). The evidence therefore lacks nuance and specificity relevant to such an inquiry, because the particular factors relevant to an alter ego theory were not explored outright.

But even if this Court were to assume, without deciding, that ENB exercised sufficient control over ENMC to have more than a standard parent/subsidiary relationship, there is no evidence of any intentional use of ENMC for sham or fraudulent purposes to justify piercing the corporate veil. There is no evidence that ENMC was undercapitalized at its inception (or during its period of operation between 2007 and 2010) or was designed simply to shield ENB from liability for misconduct.[22] And there is no evidence that the 2010 sale of ENB's mortgage operation and ENMC's assets was spurred by the OCC's enforcement action, other than the temporal proximity between the two events. Even if the sale was in fact prompted by the enforcement action, Plaintiffs offer no evidence indicating that the OCC action related to violations of RESPA. In other words, there is no evidence that ENB abused the corporate form and sold ENMC's assets in an

---

serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Best Foods,* 524 U.S. 51, 69 (1998).

[22] Of course, ENMC became "undercapitalized" when its assets were sold to ISCP in 2010, but that transaction occurred years before this RESPA case was filed.

attempt to avoid this RESPA liability (or any other liability, for that matter). Thus, Plaintiffs have failed to introduce any evidence of the "artifice and sham for illegitimate purposes" required to pierce the corporate veil. *Rice*, 339 F. Supp. 3d at 535. Absent clear and convincing evidence to that effect, this Court may not ignore corporate formalities under Pennsylvania law, even when those formalities may leave Plaintiffs with little remedy.

Without an ability to hold ENB liable for ENMC's conduct as an alter ego, Plaintiffs cannot reach ENB's holding company, EN Bancorp, and its successor, ESSA Bancorp. Plaintiffs likewise cannot reach ENB's successor, ESSA Bank & Trust. Summary judgment is therefore warranted as to all defendants other than ENMC.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude Expert Testimony, ECF 156, is GRANTED IN PART AND DENIED IN PART.  Defendants' Motion for Summary Judgment, ECF 157, is GRANTED IN PART AND DENIED IN PART as to ENMC and GRANTED as to the remaining Defendants. Finally, Defendants' Motion for Decertification, ECF 158, is DENIED, pursuant to the amended class definition set forth herein and pending Plaintiffs' substitution of a new named representative within 30 days. A separate order follows, which will direct the parties to meet and confer and advise the Court of proposed schedules for (1) trial of Edmondson's individual claim and (2) the discovery that will be required to determine the adequacy and typicality of the proposed new named plaintiff.


Dated: August 18, 2023                                    _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States District Judge